# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# AT LOUISVILLE

| | |
|---|---|
| **HBTPOWER LIMITED,** <br> Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG 1110, British Virgin Islands <br><br> Plaintiff, <br><br> vs. <br><br> **MOHAWK ENERGY, LLC,** <br> Serve: <br> Anna Whites <br> Anna Whites Law Office <br> 327 Logan Street <br> Frankfort, Kentucky 40601 <br><br> Defendant. | CASE NO.: 3:23-cv-628-RGJ <br><br> JUDGE: |

## VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND PERMANENT INJUNCTIVE RELIEF

Comes the Plaintiff, HBTPower Limited ("HBTPower"), by counsel, and for its Verified Complaint for Temporary Restraining Order and Permanent Injunctive Relief ("Verified Complaint") against Mohawk Energy LLC ("Mohawk") (HBTPower and Mohawk are referred to collectively herein as the "Parties"), states as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff HBTPower is a limited company incorporated under the laws of the British Virgin Islands with a principal place of business at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG1110, British Virgin Islands. HBTPower is owned by Sinohope Digital Services Limited, a limited company incorporated under the laws of Hong Kong, and

Mcore Limited, a limited company incorporated under the laws of the British Virgin Islands. Neither of HBTPower's owners are citizens of the United States.

2.  Defendant Mohawk is a Kentucky limited liability company with a principal place of business at P.O. Box 846, Hazard, Kentucky 41702. Mohawk's registered agent is Anna Whites at Anna Whites Law Office, 327 Logan Street, Frankfort, Kentucky 40601. Upon information and belief, Mohawk's sole member is Brandon D. Smith, who is a Kentucky resident.

3.  The Parties entered into the Operation Right License Agreement, dated May 31, 2022 (the "License Agreement"), pursuant to which HBTPower (as licensee) was to run and operate Bitcoin mining activities at 1004 Gateway Industrial Park, Jenkins, Kentucky 41537 (the "Premises"). The License Agreement is attached hereto as **Exhibit 1**.

4.  The License Agreement includes an arbitration provision at Section 20, which provides, in relevant part, that "[a]ny dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Lexington, Kentucky or Louisville, Kentucky before one arbitrator." Id. at § 20. The arbitration provision in the License Agreement explicitly authorizes the Parties to seek injunctive relief in the courts, as HBTPower does through this claim, without waiving arbitration. Id.

5.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.  In the alternative, this Court also has jurisdiction over this matter pursuant to 9 U.S.C. §§ 202-203 because this is "an action or proceeding arising under the [Convention on the

Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958]" and because it arises out of a contractual legal relationship between a domestic party (Mohawk) and a foreign party (HBTPower).

7. Venue is proper in this Court pursuant to 9 U.S.C. § 204 because it is the Court for the district which embraces Louisville, Kentucky, a place designated in the License Agreement as the place of arbitration.

8. All conditions precedent to bringing this action, if any, have occurred or have been excused or waived.

## FACTUAL ALLEGATIONS

9. HBTPower is an indirect non-wholly owned British Virgin Islands-based subsidiary of Sinohope Technology Holdings Limited (formerly known as New Huo Technology Holdings Limited or Huobi Technology Holdings Limited), a technology solution service provider, offering a variety of services in virtual asset ecosystem, such as asset management, trust and custodian businesses and cryptocurrency trading.

10. HBTPower is engaged, and has expertise, in mining of cryptocurrencies, including Bitcoin.

11. In or around March 2022, HBTPower was seeking opportunities to develop a Bitcoin mining facility in a place that could provide efficient power supply rates and a favorable return on investment policy. HBTPower also wanted to utilize the thousands of mining machines HBTPower had acquired.

12. Around this time, HBTPower was introduced to Brandon D. Smith, the President of Mohawk, who indicated Mohawk had the property and the ability to help HBTPower carry out its Bitcoin mining activities.

**The License Agreement**

13. On May 31, 2022, Mohawk as "Licensor" and HBTPower as "Licensee" entered into the License Agreement, pursuant to which HBTPower would operate Bitcoin mining activities at the Premises. See License Agreement, Ex. 1, Recitals.

14. In the License Agreement, Mohawk represented that it had "[a] valid fee simple absolute estate in the Premises free and clear of all liens, conditions, covenants, restrictions, rights of way, or regulations that would adversely affect or prohibit the use of the Premises for the Bitcoin Mining activities contemplated" therein. Id. at § 24(a)(v).

15. Mohawk was contractually required under the License Agreement to provide HBTPower with no less than 41,000 square feet of mining space on the Premises outfitted with a power capacity of no less than 30MW. Id. at Recitals.

16. Under the terms of the License Agreement, Mohawk granted HBTPower an exclusive, irrevocable license to run, operate, and manage Bitcoin mining activities on the Premises for the duration of the License Agreement, with the right to utilize the electricity facilities and racks of mining machines that Mohawk would install for HBTPower on the Premises. Id. at § 2.

17. The License Agreement required HBTPower to provide the Bitcoin mining machines it would use on the Premises. Id. at Recitals.

18. Mohawk was contractually required to purchase various equipment, including, but not limited to, transformers, substation transformers, racks and shelves, internet infrastructure, and construction materials, and to install them on the Premises on behalf of HBTPower. Id. at § 4(a). The overall cost of the equipment and construction material purchased by Mohawk on behalf of

HBTPower was not to exceed $8,000,000. Id. Mohawk was required to provide proforma invoices to HBTPower for the equipment that Mohawk purchased on HBTPower's behalf. Id. at § 4(c).

19. As a condition precedent and performance obligation, Mohawk represented in the License Agreement that it had already entered into a contract for power supply with Kentucky Power Company ("KPC"), with which Mohawk would continue to negotiate to bring the power consumption rates to an average of $0.047/kWh within 5 years. Id. at § 3(a)(iv).

20. The Parties agreed that, after June 1, 2022 (the "Effective Date"), HBTPower would pay a rent security deposit in the amount of $100,000 and an additional $50,000 for the first month of rent; energy security deposits in the amount of $2,850,000 and $293,000; and an $800,000 deposit for the construction and equipment. Id. at §§ (6)(e), 4(b).

21. Between June 7 and June 17, 2022, HBTPower paid, and Mohawk confirmed receipt of, $4,132,910 from HBTPower for the rent security deposit and first month of rent; energy security deposit; staffing fee; and deposit for construction and equipment. See Mohawk Receipt, attached hereto as **Exhibit 2**.

22. On June 8, 2022, Mohawk transferred to KPC the energy security deposit paid by HBTPower. On June 10, 2022, KPC confirmed receipt of $2,800,000 from Mohawk. See June 10, 2022 Email, attached hereto as **Exhibit 3**.

23. Per Section 5 of the License Agreement, the "Delivery Date" is the later of "the date on which [HBTPower] confirms [Mohawk's] [w]ork has been completed in a manner satisfactory to [HBTPower]" or "all of the conditions set forth in Section 3(b) have been satisfied or waived." See License Agreement, Ex. 1, § 5(c). The conditions set forth in Section 3(b) include, but are not limited to, Mohawk's obligation to "complete the upgrade of the Premises' electrical service and components, as well as the overall renovation of the Premises," obtain all necessary

governmental and regulatory authorizations, ensure "[t]he Premises is capable of sustained Bitcoin Mining activities consistent with [HBTPower's] intended use of the Premises," appropriately modify the Premises to host the Bitcoin mining rig equipment, and install the appropriate power supply infrastructure to host the mining machines purchased by HBTPower. Id. at §§ 3(a), (b).

24. Section 7 provides that the 8-year "Initial Term" under the License Agreement "shall commence on the Delivery Date." Id. at § 7(a). The "Delivery Date" is also the "Commencement Date" for the "Initial Term" of 8 years, when HBTPower's monthly obligation to pay rent, labor, and 10% of the revenue generated by its Bitcoin mining operation were scheduled to begin.

25. As a gesture of good faith, to ensure that Mohawk reached the Delivery Date, and to facilitate the commencement of mining activities at the Premises, HBTPower began paying rent and labor charges in June 2022 and continued to pay until July 2023, even though it was not obligated to do so.

26. To date, HBTPower has paid more than $12,000,000 in rent, labor, deposits for electricity charges and staffing fees, and advances for construction and equipment.

27. On June 20, 2022, HBTPower delivered 1,000 Bitcoin mining machine units to the Premises, all of which were M30 series and M31 series models.  On July 12, 2022, HBTPower delivered an additional 1,059 mining machine units to the Premises, which were also M30 series and M31 series models. The Bitcoin mining machines delivered to the Premises were among the best available on the market at that time. Very few entities in the world own mining machine inventory of this quality and size.

28. Since June 2022, HBTPower has consistently inquired about the status of construction at the Premises and requested proforma invoices for equipment, copies of executed power contracts, and updates on the electrification of the Premises for mining activities.

29. On December 19, 2022, Mohawk provided HBTPower with executed copies of Mohawk's power contracts with KPC for the first time. A copy of the KPC contracts with Mohawk, dated December 19, 2022, are collectively attached as **Exhibit 4**. Those contracts and their amendments were not fully executed until December 19, 2022, despite Mohawk's representation in the License Agreement that such a contract was already in place as of June 1, 2022. See License Agreement, Ex. 1, § 3(a)(iv).

30. On March 7, 2023, HBTPower delivered another shipment of 2,276 Bitcoin mining machines to the Premises, all of which were Bitmain Antminer S19j Pro and Bitmain Antminer S19 Pro models.

31. In total, HBTPower has delivered 4,335 Bitcoin mining machines ("Mining Machines") to the Premises.

32. In late August 2023, HBTPower learned that Mohawk does not actually own the Premises, despite Mohawk's representation in the License Agreement that it had a fee simple absolute estate in the Premises as of June 1, 2022. See id. at § 24(a)(v). HBTPower also learned that Mohawk is now in a dispute with the actual owner of the Premises.

33. The License Agreement obligated Mohawk to secure "[a]ll necessary governmental, and regulatory authorizations, together with all third party approvals and consents," which included an "Economic Development Rider" ("EDR") from KPC Id. at § 3(a)(ii). However, in mid-2023, both KPC and Mohawk informed HBTPower that KPC cannot provide an EDR to

Mohawk for HBTPower's mining activities. HBTPower must have an EDR to profitably conduct mining activities in Kentucky.

34. Starting in 2022 and continuing through 2023, Mohawk moved several transformers, substations, and other equipment necessary for carrying out mining activities to the Premises, but never installed the appropriate power supply infrastructure to host Bitcoin mining activities in violation of the License Agreement.

35. On October 11, 2023, Mohawk improperly removed HBTPower's staff from the Premises on the pretext of non-payment of rent and labor charges.

36. In a letter to HBTPower on October 12, 2023, Mohawk, through its counsel, incorrectly claimed that "many of the initial contract terms and provisions were modified or discarded" over Zoom meetings. See October 12, 2023 Letter, attached hereto as **Exhibit 5**. The October 12, 2023 Letter also stated that Mohawk would not provide proforma invoices for equipment acquired by Mohawk for HBTPower's use at the Premises since, according to Mohawk, HBTPower does not own the equipment. Id. Mohawk also "assured that [HBTPower's] mining machines are protected." Id.

### Mohawk's Attempts to Sell or Dispose of HBTPower's Mining Machines

37. On November 23, 2023, HBTPower received information from market sources that Mohawk is attempting to sell some or all of HBTPower's Mining Machines to third parties.

38. Upon information and belief, one of the third parties to whom Mohawk has attempted to sell Mining Machines is an entity in which Brandon D. Smith, Mohawk's President, has a founding interest and other financially-beneficial connections.

39. On November 24, 2023, HBTPower sent a cease and desist letter to Mohawk demanding that Mohawk, including its employees, agents, principals, immediately cease and desist

from any activities involving the unauthorized sale, disposition, or encumbrance of all or some of the Mining Machines. See November 24, 2023 Letter, attached hereto as **Exhibit 6**.

40. On November 27, 2023, Mohawk responded with another letter lodging additional erroneous allegations and offering HBTPower the opportunity to inspect the Premises. See November 27, 2023 Letter, attached as **Exhibit 7**. However, the November 27, 2023 letter did not include assurances by Mohawk that it would not sell the Mining Machines or that it had not already attempted to do so. Id.

41. While HBTPower has been diligent in its obligations under the License Agreement, Mohawk has carried out fundamental and material breaches of the License Agreement, including, but not limited to, making false representations about having the appropriate power supply for mining activities and holding a fee simple absolute interest in the Premises.

42. Moreover, without providing an account of money spent, Mohawk has attempted—and to an extent succeeded—to extract funds from HBTPower that have not been due.

43. As of the date of HBTPower's ouster from the Premises, the infrastructure necessary for HBTPower to perform its mining activities on the Premises was not made available by Mohawk under the terms outlined in the License Agreement.

44. Mohawk is now attempting to encumber or dispose of the Mining Machines for its own gain and at HBTPower's expense.

45. Mohawk has no legal interest whatsoever in the Mining Machines. Likewise, Mohawk has not sought—nor has it been granted—HBTPower's consent to use, sell, dispose, or encumber the Mining Machines.

46. As a result of Mohawk's wrongful actions and breaches, HBTPower has already suffered, and continues to suffer, irreparable harm.

47. More specifically, Mohawk's unauthorized distribution and sale of HBTPower's highly specialized and valuable Mining Machines not only constitutes a breach of contractual obligations, but also inflicts irreparable harm upon HBTPower. If Mohawk is allowed the opportunity to sell the Mining Machines to third parties, HBTPower cannot simply go out and replace them. Bitcoin mining hardware is designed for specific cryptocurrencies or algorithms. As a result, obtaining machines specialized for Bitcoin's algorithm, with the necessary hashing power, is more challenging than acquiring general-purpose hardware. The Mining Machines are virtually impossible to procure or replace on the same scale in the current market.

48. Moreover, the value of HBTPower's Mining Machines is not solely monetary; it extends to the strategic advantage the Machines provide in a highly competitive market. The Mining Machines give HBTPower a distinct competitive advantage in the cryptocurrency mining industry, which advantage is compromised by Mohawk's unlawful actions. The unauthorized sale of HBTPower's Mining Machines will not only result in direct financial losses for HBTPower but will also undermine its market position and reputation.

49. Furthermore, the unauthorized distribution of the Mining Machines will continue to disrupt HBTPower's operational efficiency, leading to tangible and intangible losses. The unauthorized use or distribution of the Mining Machines may result in a breach of warranty obligations, leaving HBTPower without the necessary support and maintenance required for optimal performance. This not only compromises the reliability of HBTPower's mining operations, but also poses a risk to the integrity of the Mining Machines.

50. In addition, Mohawk's breaches and improper removal of HBTPower from the Premises has so far resulted in the deprivation of more than 17 months of mining Bitcoin from which HBTPower should have enjoyed the benefits. The harm caused by Mohawk's decision to

oust HBTPower from the Premises is ongoing and the damages resulting therefrom will continue to mount with each day that passes.

51. The harm caused to HBTPower by Mohawk's actions would be irreparable. Mohawk was incorporated, or became an active business, entity in 2022. Mohawk reported its operating revenue in 2022 as $80,000 and identified just 3 employees of its own. Therefore, in addition to the irreparable harm associated with the possible loss of the Mining Machines, there is also a considerable risk that Mohawk will not have sufficient assets to pay a judgment entered against it.

52. HBTPower reserves its right to seek damages and other relief before an arbitral tribunal consistent with the arbitration provision in the Licensing Agreement.

## COUNT I
## INJUNCTIVE RELIEF AGAINST MOHAWK

53. HBTPower incorporates by reference the allegations in paragraphs 1 through 52 as though fully set forth herein.

54. HBTPower and Mohawk entered into the License Agreement on May 31, 2022.

55. Mohawk violated the terms of the License Agreement when it failed to provide the power connection for Bitcoin mining at the Premises, failed to provide adequate proforma invoices for its purchase of equipment on behalf of HBTPower, and failed to install the appropriate power supply infrastructure at the Premises.

56. HBTPower has performed all of its obligations under the License Agreement.

57. After improperly ousting HBTPower and its staff from the Premises, Mohawk is now attempting to wrongfully sell the Mining Machines to third parties, including, upon information and belief, one with strong financial ties to Mohawk's President.

58. HBTPower has demonstrated a strong likelihood of success on the merits of its claims by submitting evidence that Mohawk has breached the License Agreement by, among other things, failing to possess a fee simple interest in the Premises, failing to secure an adequate power supply per the License Agreement, and unlawfully attempting to sell the Mining Machines owned by HBTPower.

59. HBTPower will suffer immediate and irreparable injury unless Mohawk is preliminarily and permanently enjoined from any activities involving the unauthorized sale, disposition, or encumbrance of all or some of the Mining Machines.

60. HBTPower has no adequate remedy at law or otherwise to address its injuries, save in a court of equity.

**WHEREFORE**, Plaintiff, HBTPower Limited, by counsel, respectfully requests the following relief:

1. Enter an Order temporarily, preliminarily, and permanently enjoining and restraining Mohawk, including its employees, agents, principals, and those acting in concert or participation with it, from any activities involving the unauthorized sale, disposition, or encumbrance of all or some part of the Mining Machines; and

2. Award HBTPower costs, legal fees, and all other relief, at law or equity, that this Court deems appropriate.

Respectfully submitted,

STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, Kentucky 40507-1380
(859) 231-3000
(859) 253-1093 facsimile


By: /s/ Palmer G. Vance II
    Palmer G. Vance II
    Lindsey H. Meares

and

Harout J. Samra
**DLA PIPER LLP (US)**
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8500
Facsimile: (305) 437-8131
Florida Bar No. 70523
Harout.Samra@us.dlapiper.com

Motion for admission p*ro hac vice* to be filed.

COUNSEL FOR PLAINTIFF,
HBTPOWER LIMITED