**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT LOUISVILLE**

| | | |
|---|---|---|
| **HBTPOWER LIMITED,** | ) | CASE NO.: 3:23-cv-628-CHB |
| | ) | |
| Plaintiff, | ) | JUDGE: Claria Horn Boom |
| | ) | |
| vs. | ) | |
| | ) | |
| **MOHAWK ENERGY, LLC,** | ) | **MEMORANDUM OF PLAINTIFF,** |
| | ) | **HBTPOWER LIMITED, IN SUPPORT** |
| Defendant. | ) | **OF ITS MOTION FOR TEMPORARY** |
| | ) | **RESTRAINING ORDER** |

Comes the Plaintiff, HBTPower Limited ("HBTPower"), by counsel, and tenders this memorandum in support of its motion for a temporary restraining order ("Motion") to immediately stop Defendant Mohawk Energy, LLC ("Mohawk") from improperly selling, disposing of, or encumbering all or some of HBTPower's 4,335 units of Bitcoin mining machines ("Mining Machines") and all electricity equipment procured by Mohawk on behalf of HBTPower using HBTPower's funds, which equipment was installed and fixed to the Premises by Mohawk pursuant to the License Agreement between the Parties, dated June 1, 2022 (the "Equipment"), and to direct Mohawk to account for the sale or disposal of the Mining Machines that has already taken place and escrow any and all funds and consideration received by it from such sale or disposition.

## I.  INTRODUCTION

Having received more than $12,000,000 from HBTPower while fundamentally breaching several conditions of the enforceable license agreement between HBTPower and Mohawk (together, the "Parties"), Mohawk improperly ousted HBTPower's staff from the Bitcoin mining

- 1 -

facility at 1004 Gateway Industrial Park, Jenkins, Kentucky 41537 (the "Premises") – a facility HBTPower had an exclusive license to occupy. HBTPower learned that Mohawk was or is attempting to wrongfully sell HBTPower's Mining Machines, which are located on the Premises, to third parties, including one with strong ties to Mohawk's sole member.

On November 24, 2023, HBTPower issued a cease and desist letter to Mohawk with regard to the use and custody of the Mining Machines. Mohawk's response letter, dated November 27, 2023, included no assurances that it would not sell the Mining Machines or that it had not already attempted to do so. Even after HBTPower reminded Mohawk of its licensing agreement with Mohawk and filed its Verified Complaint for Temporary Restraining Order and Permanent Injunctive Relief (DN 1) ("Verified Complaint") against Mohawk, HBTPower received information indicating that Mohawk has continued its attempts to sell the Mining Machines owned by HBTPower. The Mining Machines are virtually impossible to procure or replace on the same scale in the current market. Mohawk indeed proceeded with the sale or disposition of some of the Mining Machines, despite the cease and desist letter.

In its Answer and Counterclaim to Verified Complaint for Temporary Restraining Order and Permanent Injunctive Relief (DN 14) ("Answer"), Mohawk has admitted to selling a significant portion of the Mining Machines on the pretext of recouping alleged dues. It has also created lien on at least 220 additional Mining Machines. HBTPower has reason to believe that, until restrained, Mohawk will continue to show extreme disregard for the law, HBTPower's ownership rights and the binding contract between the Parties.

Accordingly, to preserve the *status quo* until a full hearing on preliminary injunctive relief can be held, HBTPower now moves this Court for a temporary restraining order to prevent Mohawk from engaging in any activities involving the unauthorized sale, disposition, or

encumbrance of all or some of the Mining Machines and all electricity equipment procured by Mohawk on behalf of HBTPower using HBTPower's funds, which equipment was installed and fixed to the Premises by Mohawk pursuant to the License Agreement between the Parties, dated June 1, 2022, and to order Mohawk to account for any sale or disposal of the Mining Machines, and escrow any and all funds or consideration received by it from such sale or disposition.

## II.     FACTUAL BACKGROUND[1]

### A.     The Parties' Respective Obligations Under the License Agreement

HBTPower is engaged, and has expertise, in mining of cryptocurrencies, including Bitcoin. (See Declaration of Wang Yangping (the "Declaration"), ¶ 4, attached hereto as **Exhibit A**.)  In or around March 2022, HBTPower was seeking opportunities to develop a Bitcoin mining facility in a place where it could get efficient power supply rates and a favorable return on investments, and where it utilized the thousands of mining machines it had acquired. (Id. at ¶ 5.) Mohawk's sole member and President, Brandon D. Smith, indicated that Mohawk had the property and the ability to help HBTPower carry out its Bitcoin mining activities. (Id. at ¶ 6.)

On May 31, 2022, Mohawk, as "Licensor," and HBTPower, as "Licensee," entered into the Operation Right License Agreement (the "License Agreement"), pursuant to which HBTPower would operate Bitcoin mining activities at the Premises. (Id. at ¶ 7, Exhibit 1.[2]) Mohawk expressly represented in the License Agreement that it had "[a] valid fee simple absolute estate in the Premises." (Id. at ¶ 8, Ex. 1 at § 24(a)(v).) Mohawk granted HBTPower an exclusive, irrevocable license to run, operate, and manage Bitcoin mining activities on the Premises for the duration of the License Agreement, with the right to utilize the electricity facilities and racks of mining

---

[1] For the sake of brevity, HBTPower incorporates the allegations contained in the Verified Complaint (DN 1).
[2] A copy of the License Agreement is attached to the Declaration as Exhibit 1.

machines that Mohawk would install for HBTPower. (Id. at ¶ 10, Ex. 1 at § 2.) More specifically, Mohawk was contractually required to provide HBTPower with no less than 41,000 square feet of mining space on the Premises outfitted with a power capacity of no less than 30MW. (Id. at ¶ 9, Ex. 1 at Recitals.) The License Agreement required HBTPower to provide the Bitcoin mining machines it would use on the Premises and identified the kind of machines that would be used for mining. (Id. at ¶ 10, Ex. 1 at Recitals.)

Mohawk was also required under the License Agreement to purchase various equipment, including, but not limited to, transformers, substation transformers, racks and shelves, internet infrastructure, and construction materials, and to install them on the Premises on behalf of HBTPower. (Id. at ¶ 11, Ex. 1 at § 2.) The overall cost of the equipment and construction material purchased by Mohawk on behalf of HBTPower was not to exceed $8,000,000. (Id. at ¶ 11, Ex. 1 at § 4(a).) Mohawk was to provide pro forma invoices to HBTPower for the equipment that Mohawk purchased on HBTPower's behalf. (Id. at ¶ 11, Ex. 1 at § 4(c).)

As a condition precedent and performance obligation, Mohawk represented in the License Agreement that it had already entered into a contract for power supply with Kentucky Power Company ("KPC"), with which Mohawk would continue to negotiate to bring the power consumption rates to an average of $0.047/kWh within five (5) years. (Id. at ¶ 12, Ex. 1 at § 3(a)(iv).) The License Agreement obligated Mohawk to secure "[a]ll necessary governmental, and regulatory authorizations, together with all third party approvals and consents," which included an "Economic Development Rider" ("EDR") from KPC (Id. at ¶ 27, Ex. 1 at § 3(a)(iv).) HBTPower must have the EDR to conduct profitable mining activities. (Id.)

The Parties agreed that, after June 1, 2022 (the "Effective Date"), HBTPower would pay a rent security deposit in the amount of $100,000 and an additional $50,000 for the first month of

rent; energy security deposits in the amount of $2,850,000 and $293,000; and an $800,000 deposit for the construction and equipment. (Id. at ¶ 13, Ex. 1 at §§ (6)(e), 4(b).) In June 2022, Mohawk confirmed receipt of $4,132,910 from HBTPower for the rent security deposit and first month of rent; energy security deposit; staffing fee; and deposit for construction and equipment. (Id. at ¶ 15, Exhibit 2[3].) On June 10, 2022, KPC confirmed receipt of the $2,800,000 energy security deposit made by Mohawk. (Id. at ¶ 16, Exhibit 3[4].) HBTPower's obligations to make further payments towards rent, labor charges, and Bitcoin revenue sharing were not to commence until the "Commencement Date," which was also the "Delivery Date." (Id. at ¶ 17, Ex. 1 at § 5.) The "Delivery Date" is the later of "the date on which [HBTPower] confirms [Mohawk's] [w]ork has been completed in a manner satisfactory to [HBTPower]" or "all of the conditions set forth in Section 3(b) have been satisfied or waived." (Id. at ¶ 17, Ex. 1 at § 5(c).) The conditions set forth in Section 3(b) of the License Agreement include, but are not limited to, Mohawk's obligation to "complete the upgrade of the Premises' electrical service and components, as well as the overall renovation of the Premises," obtain all necessary governmental and regulatory authorizations, ensure "[t]he Premises is capable of sustained Bitcoin Mining activities consistent with [HBTPower's] intended use of the Premises," appropriately modify the Premises to host the Bitcoin mining rig equipment, and install the appropriate power supply infrastructure to host the mining machines purchased by HBTPower. (Id. at ¶ 17, Ex. 1 at §§ 3(a), (b).)

The Parties also agreed that "no provision of [the License Agreement] may be amended, modified, or waived, unless by an instrument in writing executed by a duly authorized officer of

---

[3] A copy of the Mohawk Receipt is attached to the Declaration (Exhibit A) as Exhibit 2.
[4] A copy of the June 10, 2022 email is attached to the Declaration (Exhibit A) as Exhibit 3.

the Party against whom enforcement of such amendment, modification, or waiver is sought." (Id. at ¶ 14, Ex. 1 at § 26.)

On June 20, 2022, HBTPower delivered 1,000 Bitcoin mining machine units to the Premises, all of which were M30 series and M31 series models. (Id. at ¶ 21.) On July 12, 2022, HBTPower delivered an additional 1,059 mining machine units to the Premises, which were also M30 series and M31 series models. (Id. at ¶ 21.) On March 7, 2023, HBTPower delivered another shipment of 2,276 Bitcoin mining machines to the Premises, all of which were Bitmain Antminer S19j Pro and Bitmain Antminer S19 Pro models. (Id. at ¶ 24.) These models were consistent with the machines identified in the License Agreement for Bitcoin mining activities. (Id. at ¶¶ 10, 25.) A significant number of the Mining Machines had already been unboxed and placed on racks awaiting the Delivery Date and commencement of mining activities. (Id. at ¶ 25.) In total, HBTPower has delivered 4,335 Mining Machines to the Premises. (Id. at ¶ 24.) The Bitcoin mining machines delivered to the Premises were among the best available on the market at that time. (Id. at ¶ 21.) Very few entities in the world own mining machine inventory of this quality and size. (Id.)

As a gesture of good faith, to ensure that Mohawk reached the Delivery Date, and to facilitate the commencement of mining activities at the Premises, HBTPower began paying rent and labor charges in June 2022 and continued to pay until July 2023, even though it was not obligated to do so. (Id. at ¶ 19.) To date, HBTPower has paid more than $12,000,000 in rent, labor, deposits for electricity charges and staffing fees, and advances for construction and equipment. (Id. at ¶ 20.)

### B. Mohawk's Misrepresentations and Fundamental Breaches of the License Agreement

Since June 2022, HBTPower has consistently inquired about the status of construction on the Premises and requested pro forma invoices for equipment purchased by Mohawk on behalf of HBTPower, copies of executed power contracts, and updates on the electrification of the Premises for mining activities. (Id. at ¶ 22.) Finally, on December 19, 2022, Mohawk provided HBTPower with executed copies of Mohawk's power contracts with KPC for the first time. (Id. at ¶ 23, Exhibit 3.[5]) However, those contracts and their amendments were not fully executed until December 19, 2022, despite Mohawk's representation in the License Agreement that such a contract was already in place as of June 1, 2022. (Id. at ¶ 23.) Worse, in mid-2023, both KPC and Mohawk informed HBTPower that KPC cannot provide an EDR to Mohawk for HBTPower's mining activities. (Id. at ¶ 27.)

In late August 2023, HBTPower learned that Mohawk does not actually own the Premises, despite Mohawk's representation in the License Agreement that it had a fee simple absolute estate in the Premises as of June 1, 2022. (Id. at ¶ 26.) HBTPower also learned that Mohawk is now in a dispute with the actual owner of the Premises. (Id. at ¶ 26.) Despite HBTPower's repeated requests, Mohawk has never provided any documents to show ownership of the Premises. (Id.)

Starting in 2022 and continuing through 2023, Mohawk moved several transformers, substations, and other equipment necessary for carrying out mining activities to the Premises, but never installed the appropriate power supply infrastructure to host Bitcoin mining activities in violation of the License Agreement. (Id. at ¶ 28.)

---

[5] A copy of the KPC contracts with Mohawk are collectively attached to the Declaration (Exhibit A) as Exhibit 4.

While HBTPower has been diligent in its obligations under the License Agreement, Mohawk has carried out fundamental and material breaches of the License Agreement, including, but not limited to, making false representations about having the appropriate power supply for mining activities and holding a fee simple absolute interest in the Premises. (Id. at ¶ 42.) Without providing an account of money spent, Mohawk has attempted—and to an extent succeeded—to extract funds from HBTPower that have not been due. (Id. at ¶ 43.)

C. **Mohawk Ousts HBTPower from the Premises and Attempts to Sell or Dispose Mining Machines**

On October 11, 2023, Mohawk improperly removed HBTPower's staff from the Premises on the pretext of non-payment of rent and labor charges. (Id. at ¶ 29.) As of the date of HBTPower's ouster from the Premises, the infrastructure necessary for HBTPower to perform its mining activities on the Premises was not made available by Mohawk under the terms outlined in the License Agreement. (Id. at ¶ 44.) In a letter to HBTPower the next day, Mohawk, through its counsel, stated that Mohawk would not provide pro forma invoices for equipment acquired by Mohawk for HBTPower's use at the Premises since, according to Mohawk, HBTPower does not own the equipment. (Id. at ¶ 30, Exhibit 4[6].) Mohawk also "assured that [HBTPower's] mining machines are protected." (Id.)

Importantly, Mohawk has no legal interest whatsoever in the Mining Machines. Likewise, Mohawk has not sought—nor has it been granted—HBTPower's consent to use, sell, dispose, or encumber the Mining Machines. (Id. at ¶ 46.) Nevertheless, on November 23, 2023, HBTPower received information from market sources that Mohawk is attempting to sell some or all of HBTPower's Mining Machines to third parties. (Id. at ¶ 32.) Upon information and belief, one of

---

[6] A copy of the October 12, 2023 letter is attached to the Declaration (Exhibit A) as Exhibit 5.

the third parties to whom Mohawk has attempted to sell Mining Machines is an entity in which Brandon D. Smith, Mohawk's President, has a founding interest and other financially-beneficial connections. (Id. at ¶ 33.)

On November 24, 2023, HBTPower sent a cease and desist letter to Mohawk demanding that Mohawk, including its employees, agents, principals, immediately cease and desist from any activities involving the unauthorized sale, disposition, or encumbrance of all or some of the Mining Machines. Id. at ¶ 34, Exhibit 5[7].) On November 27, 2023, Mohawk responded by offering HBTPower the opportunity to inspect the Premises, but refused to assure HBTPower that it would not sell the Mining Machines or that it had not already attempted to do so. (Id. at ¶ 35, Exhibit 6[8].)

On November 29, 2023, HBTPower filed the Verified Complaint and provided a courtesy copy to Mohawk's counsel. On the same morning, Mr. Wang witnessed via surveillance cameras unknown individuals enter the Premises, including driving inside the area to inspect the Mining Machines and Equipment owned by HBTPower and stored on the Premises. (Id. at ¶ 36.) Shortly after, Mr. Wang's access to the surveillance cameras was cut off. (Id. at ¶ 38.)

On November 30, 2023, HBTPower learned that Mohawk had reached a deal with unknown third-party purchasers on November 29, 2023 for the unauthorized sale or transfer of HBTPower's Mining Machines. (Id. at ¶ 39.) HBTPower has continued to have strong reasons to believe that, despite the filing of the Verified Complaint, Mohawk is proceeding with, has attempted to proceed, or has already succeeded in selling the Mining Machines to a third-party. (Id. at ¶ 39.)

---

[7] A copy of the November 24, 2023 letter is attached to the Declaration (Exhibit A) as Exhibit 6.
[8] A copy of the November 27, 2023 letter is attached to the Declaration (Exhibit A) as Exhibit 7.

Despite the cease and desist letter and the Verified Complaint, Mohawk has admittedly sold a significant portion of the Mining Machines allegedly in order to "recoup" unpaid dues. (See Answer (DN 14) at ¶ 42.) Mohawk has not provided an exact account of the Mining Machines that it has sold, but has categorized them as "the oldest and most outdated machines stored by [HBTPower], without permission, in the Mohawk warehouse." (Id.) Mohawk has also created lien on at least 220 of the Bitmain Antminer S19Pro Mining Machines delivered to the Premises. (See Declaration at ¶ 41)

As a result of Mohawk's wrongful actions, HBTPower has already suffered, and continues to suffer, irreparable harm. (Id. at ¶ 47.) Mohawk's unauthorized distribution and sale of HBTPower's highly specialized and valuable Mining Machines not only constitutes a breach of contractual obligations, but also inflicts irreparable harm upon HBTPower. (Id. at ¶ 48.) If Mohawk is allowed the opportunity to sell the Mining Machines to third parties, HBTPower cannot simply go out and replace them. (Id.) Bitcoin mining hardware is designed for specific cryptocurrencies or algorithms. (Id.) As a result, obtaining machines specialized for Bitcoin's algorithm, with the necessary hashing power, is more challenging than acquiring general-purpose hardware. (Id.) The Mining Machines are virtually impossible to procure or replace on the same scale in the current market. (Id.)

In order to protect its interests, HBTPower filed the Verified Complaint and this Motion seeking emergency injunctive relief, or, in the alternative, sequestration of funds if such sale has already occurred, to protect the *status quo* until a preliminary injunction hearing can be held.[9]

---

[9] The arbitration provision in the License Agreement explicitly authorizes the Parties to seek injunctive relief in the courts, without waiving arbitration. See Declaration at Ex. 1 at § 20.

### III.  ARGUMENT

HBTPower seeks a temporary restraining order: (1) restraining and enjoining Mohawk, including its employees, agents, principals, and those acting in concert or participation with it, from any activities involving the unauthorized sale, disposition, or encumbrance of all or some part of HBTPower's 4,335 units of Bitcoin Mining Machines and the HBTPower's Equipment; and, (2) directing Mohawk to account for the sale or disposal of the Mining Machines that has already taken place and escrow any and all funds or other consideration received by it from such sale or disposal. The clear, immediate and irreparable harm HBTPower will suffer if Mohawk is not enjoined from disposing of HBTPower's Mining Machines warrants a temporary restraining order. Mohawk has already sold a portion of the Mining Machines *after* having received the November 24, 2023 cease and desist letter from HBTPower. Moreover, if Mohawk has engaged in brazen attempts to dispose of the Mining Machines *even after* HBTPower filed its Verified Complaint in this action it would demonstrate disregard of the law. HBTPower is entitled to seek monetary relief and attorney fees based upon this willful, intentional interference with HBTPower's ownership rights, and a temporary restraining order is the only way to ensure that important evidence will not be destroyed and that an arbitrator will be able to provide HBTPower with an adequate final remedy.

#### A.     Legal Standard for Injunctive Relief

The Sixth Circuit Court of Appeals has held that preliminary injunctive relief should issue if: (a) the movant has a substantial likelihood of success on the merits; (b) the movant will suffer irreparable injury if the injunction is not issued; (c) the preliminary injunction will not unjustifiably harm third parties; and (d) the issuance of the preliminary injunction will be in the public's interest. See, e.g., In re Delorean Motor Co., 755 F.2d 1223, 1228 (6th Cir. 1985); Frisch's Restaurant, Inc.

v. Shoney's, Inc., 759 F.2d 1261, 1263 (6th Cir. 1985). The factors to be considered in the issuance of a temporary restraining order are the same, although in some cases courts require a "strong" likelihood of success on the merits. See, e.g., Summit County Democratic Cent. & Exec. Comm. v. Blackwell, 338 F.3d547, 550 (6th Cir. 2004). As the relief is equitable in nature, these criteria "do not establish a rigid and comprehensive test for determining the appropriateness of preliminary relief"; rather, they are "factors to be balanced, not prerequisites that must be met." Frisch's Rest., Inc., 759 F.2d at 1263. As set forth below, each of these four factors weighs heavily in favor of issuance of HBTPower's requested injunctive relief.

  **B.  HBTPower Has a Substantial and Strong Likelihood of Success on the Merits.**

  The Sixth Circuit has explained that, for satisfaction of this first element, "it is ordinarily sufficient if [the moving party] has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fairground for litigation and thus for more deliberate investigation." Six Clinics Holdings Corp. II v. Cafcomp Sys., 119 F.3d 393, 402 (6th Cir. 1997). As shown through the facts and evidence proffered in its Verified Complaint, Declaration and herein, HBTPower has demonstrated that it "has a fair question to raise" as to the existence of its right in need of protection. See Brandeis Machinery & Supply Corp. v. Barber Greene Co., 503 F.2d 503, 505 (6th Cir. 1974).

  To prevail on the merits of a breach of contract under Kentucky law, HBTPower must establish three things: 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract. See Barnett v. Mercy Health Partners-Lourdes, Inc., 233 S.W.3d 723, 727 (Ky. App. 2007). HBTPower has already provided irrefutable evidence that Mohawk has breached the License Agreement and has otherwise interfered, or intends to interfere, with

HBTPower's ownership rights in the Mining Machines. HBTPower easily carries its burden of establishing that it is substantially likely to successfully establish each of these elements.

First, it is beyond dispute that Mohawk is subject to the terms of the License Agreement, which it executed on May 31, 2023. (See Declaration at ¶ 7, Ex. 1.)

Next, HBTPower has already uncovered incontrovertible proof that Mohawk has breached—and continues to breach—the License Agreement. For example, contrary to Mohawk's representation in the License Agreement that it had a fee simple absolute estate in the Premises as of June 1, 2022, HBTPower now knows that Mohawk does not own the Premises and is presently engaged in a dispute with the actual owner of the Premises. (Id. at ¶ 26.) Mohawk was also required under the License Agreement to provide HBTPower with no less than 41,000 square feet of mining space on the Premises outfitted with a power capacity of no less than 30MW. (Id. at ¶ 9.) However, Mohawk has still never completely installed the appropriate power supply infrastructure to host Bitcoin mining activities on the Premises and has otherwise denied HBTPower access to the Premises. (Id. at ¶ 28.) These particular breaches undermine the very purpose of the License Agreement – to allow HBTPower to conduct Bitcoin mining activities at the Premises.

Similarly, Mohawk expressly represented in the License Agreement that it had already entered into a contract for power supply with KPC and that it would secure the necessary governmental and regulatory authorizations, which included the EDR. (Id. at ¶ 12, Ex. 1 at § 3(a)(iv).) In fact, the power contract and amendments with KPC were not fully executed until December 19, 2022 (Id. at ¶ 23), and KPC has refused to provide an EDR to Mohawk for HBTPower's Bitcoin mining activities (Id. at ¶ 27). Mohawk has also repeatedly refused to provide pro forma invoices for equipment acquired by it for HBTPower's use at the Premises, despite its obligation under the License Agreement to do so. (Id. at ¶¶ 22, 30.)

Finally, in accordance with its obligations under the License Agreement, HBTPower provided the 4,335 Bitcoin Mining Machines it would use on the Premises. (Id. at ¶ 25.) The make and kind of these Mining Machines was identified in the License Agreement. (Id. at ¶ 21, 24.) The Mining Machines are located at the Premises, to which Mohawk has blocked HBTPower's access. (Id. at ¶ 30.) HBTPower has admittedly sold a significant portion of the Mining Machines to unidentified third-party vendors. (Answer, at ¶ 42.) It is now beyond doubt that Mohawk is selling, or attempting to sell, HBTPower's Mining Machines, thereby directly interfering with HBTPower's ownership rights and interests in the Mining Machines and breaching the express terms of the License Agreement. (Id. at ¶¶ 32, 40, 41, 46.)

This is causing, and will continue to cause, HBTPower severe damage, including in the form of lost funds, customers, strategic advantages, and business opportunities. HBTPower has already paid Mohawk in excess of $12,000,000, but Mohawk has not performed virtually any of its obligations. (Id. at ¶ 52.) Accordingly, it is substantially likely – if not certain – that HBTPower will succeed on a breach of contract claim against Mohawk.[10]

### C. HBTPower Will Suffer Immediate, Irreparable Harm if an Injunction is Not Granted.

Mohawk has no ownership rights to the Mining Machines or the Equipment, and HBTPower has not consented to the use, sale, disposition or encumbrance of the Mining Machines or the Equipment. (Id. at ¶ 46.) Nevertheless, Mohawk has shown that it has, and will continue to, disregard HBTPower's ownership rights. In its November 27, 2023 letter in response to HBTPower's cease and desist letter, Mohawk refused to assure HBTPower that it would not sell

---

[10] HBTPower has contemporaneously filed a Demand for Arbitration with JAMS seeking damages and other relief before an arbitral tribunal consistent with the arbitration provision in the Licensing Agreement.

the Mining Machines, or that it had not already attempted to do so. (Id. at ¶ 35, Ex. 7.) Indeed, after that response, on November 29, 2023, several individuals visited the Premises and approached the Mining Machines. Mohawk has admittedly already sold a significant portion of the Mining Machines. It must not be permitted to continue to do so.

If Mohawk is permitted to sell, dispose of, or otherwise encumber the remainder of the Mining Machines, HBTPower will immediately suffer further irreparable injuries for which there are no adequate remedies at law. Typically, "[a]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." U.S. v. Miami Univ., 294 F.3d 797, 819 (6th Cir. 2002). The value of HBTPower's Mining Machines is not solely monetary; it extends to the strategic advantage the Machines provide in a highly competitive market. (See Ex. A (Declaration) at ¶ 49.) The Mining Machines give HBTPower a distinct competitive advantage in the cryptocurrency mining industry, which advantage is compromised by Mohawk's unlawful actions. (Id.) The unauthorized sale of HBTPower's Mining Machines will not only result in direct financial losses for HBTPower, but will also undermine its market position and reputation. (Id.)

Furthermore, the unauthorized distribution of the Mining Machines will continue to disrupt HBTPower's operational efficiency, leading to tangible and intangible losses. (Id. at ¶ 50.) The unauthorized use or distribution of the Mining Machines may result in a breach of warranty obligations, leaving HBTPower without the necessary support and maintenance required for optimal performance. (Id.) This not only compromises the reliability of HBTPower's mining operations, but also poses a risk to the integrity of the Mining Machines. (Id.)

Finally, the harm caused to HBTPower by Mohawk's actions would be irreparable. (Id. at ¶ 53.) Mohawk was incorporated, or became an active business, entity in 2022. (Id.) Mohawk

reported its operating revenue in 2022 as $80,000 and identified just three (3) employees of its own. (Id.) Therefore, in addition to the irreparable harm associated with the possible loss of the Mining Machines, there is also a considerable risk that Mohawk will not have sufficient assets to pay a judgment entered against it. (Id.)

    **D.**  **Injunctive Relief Will Not Cause Harm to Mohawk or Others.**

In stark contrast to the irreparable harm that HBTPower will suffer if injunctive relief is not granted, the injunctive relief HBTPower seeks from this Court will not cause any undue harm to Mohawk. Indeed, Mohawk does not own the Mining Machines and the Equipment and should not be permitted to financially benefit from the sale or disposition of them. Despite an assurance on October 12, 2023 that "[HBTPower's] mining machines are protected," Mohawk has already, and after being put on notice not do so, improperly sold a significant number of Mining Machines to "recoup" alleged unpaid dues. Mohawk has also created lien on some of the remaining Mining Machines. HBTPower is merely asking the Court to preserve the status quo by restraining Mohawk from selling the Mining Machines that HBTPower indisputably owns and the Equipment procured by Mohawk on behalf of HBTPower under the terms of the License Agreement. The balance of harm, therefore, weighs decidedly in favor of HBTPower.

    **E.**  **The Issuance of an Injunction in This Case is in the Public Interest**

The public interest also weighs in favor of injunctive relief. It is well established that "[e]nforcement of contractual duties is in the public interest." <u>Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.</u>, 511 F.3d 535, 551 (6th Cir. 2007). Thus, it is in the best interest of the public to enforce the provisions of the Agreements.

After considering HBTPower's strong likelihood of success on the merits, the irreparable harm that HBTPower will continue to suffer, the fact that Mohawk will not suffer any harm, and the public's interest, it becomes clear that the injunctive relief should be provided.

## IV. CONCLUSION

In light of the foregoing, Plaintiff HBTPower Limited requests that the Court issue a temporary restraining order to prevent irreparable harm and to require Defendant Mohawk Energy, LLC and all those acting in concert with it, to refrain from interfering with HBTPower's ownership and contractual rights in the Mining Machines and Equipment. In the alternative, if Mohawk has indeed proceeded with the sale of Mining Machines, HBTPower requests that the funds secured or to be secured from such sale be sequestered. A proposed Order is attached.

Respectfully submitted,

STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, Kentucky 40507-1380
(859) 231-3000
(859) 253-1093 facsimile


By: /s/ Lindsey H. Meares
    Palmer G. Vance II
    Lindsey H. Meares

and

Harout J. Samra
**DLA PIPER LLP (US)**
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8500
Facsimile: (305) 437-8131
Florida Bar No. 70523
Harout.Samra@us.dlapiper.com

*Pro hac vice* admission granted.

COUNSEL FOR PLAINTIFF,
HBTPOWER LIMITED

## CERTIFICATE OF SERVICE

      I certify that on December 5, 2023, I served the foregoing via CM/ECF, which will send all parties of record a notice of electronic filing, including the following:

Anna Stewart Whites
Anna Whites Law Office
327 Logan Street
P.O. Box 4023
Frankfort, KY 40601
E: [annawhites@aol.com](mailto:annawhites@aol.com)
COUNSEL FOR DEFENDANT,
MOHAWK ENERGY, LLC

                                        /s/ Lindsey H. Meares
                                        *Counsel for Plaintiff,*
                                        *HBTPower Limited*