# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# AT LOUISVILLE

| | | |
|---|---|---|
| **HBTPOWER LIMITED,** | ) | CASE NO.: 3:23-cv-628-CHB |
| | ) | |
| Plaintiff, | ) | JUDGE: Claria Horn Boom |
| | ) | |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **MOHAWK ENERGY, LLC,** | ) | |
| | ) | **MEMORANDUM OF PLAINTIFF HBTPOWER** |
| Defendant. | ) | **LIMITED IN SUPPORT OF MOTION TO** |
| | ) | **COMPEL ARBITRATION** |
| | ) | |

Plaintiff HBTPower Limited ("HBTPower"), by counsel, hereby tenders the following memorandum in support of its Motion to Compel Arbitration.

## FACTUAL BACKGROUND

### A.    The Underlying Dispute

Plaintiff, HBTPower, an indirect non-wholly owned British Virgin Islands-based limited company, Defendant Mohawk, a Kentucky limited liability company (together, the "Parties") entered into the Operation Right License Agreement, dated June 1, 2022 (the "License Agreement"), pursuant to which HBTPower (as licensee) was to run and operate Bitcoin mining activities at 1004 Gateway Industrial Park, Jenkins, Kentucky 41537 (the "Premises"). The License Agreement is attached hereto as **Exhibit 1**. See License Agreement, Exhibit 1, at Recitals. The License Agreement includes an arbitration provision at Section 20, which provides, in relevant part, that "[a]ny dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in

Lexington, Kentucky or Louisville, Kentucky before one arbitrator." Id. at § 20. The arbitration provision in the License Agreement explicitly authorizes the Parties to seek injunctive relief in the courts, as HBTPower has done through its Verified Complaint for Temporary Restraining Order and Permanent Injunctive Relief (the "Verified Complaint") [DN 1], without waiving arbitration. Id.

In the License Agreement, Mohawk represented that it had "[a] valid fee simple absolute estate in the Premises free and clear of all liens, conditions, covenants, restrictions, rights of way, or regulations that would adversely affect or prohibit the use of the Premises for the Bitcoin Mining activities contemplated" therein. Id. at § 24(a)(v). Under the terms of the License Agreement, Mohawk granted HBTPower an exclusive, irrevocable license to run, operate, and manage Bitcoin mining activities on the Premises for the duration of the License Agreement, with the right to utilize the electricity facilities and racks of mining machines that Mohawk would install for HBTPower on the Premises. Id. at § 2. Furthermore, Mohawk was contractually required to provide HBTPower with no less than 41,000 square feet of mining space on the Premises outfitted with a power capacity of no less than 30MW. Id. at Recitals.

Mohawk was also contractually required to purchase various equipment, including, but not limited to, transformers, substation transformers, racks and shelves, internet infrastructure, and construction materials, and to install them on the Premises on behalf of HBTPower. Id. at § 4(a). Starting in 2022 and continuing through 2023, Mohawk moved several transformers, substations, and other equipment necessary for carrying out mining activities to the Premises, but never installed the appropriate power supply infrastructure to host Bitcoin mining activities in violation of the License Agreement.

The License Agreement required HBTPower to provide the Bitcoin mining machines it would use on the Premises. (Id. at Recitals.) In total, HBTPower has delivered 4,335 Mining Machines to the Premises (the "Mining Machines"). The Bitcoin mining machines delivered to the Premises were among the best available on the market at that time. Mohawk has no legal interest whatsoever in the Mining Machines. Likewise, Mohawk has not sought—nor has it been granted— HBTPower's consent to use, sell, dispose, or encumber the Mining Machines. Nevertheless, on November 23, 2023, HBTPower received information from market sources that Mohawk is attempting to sell some or all of HBTPower's Mining Machines to third parties. (Id. at ¶ 32.) On November 24, 2023, HBTPower sent a cease and desist letter to Mohawk demanding that Mohawk, including its employees, agents, principals, immediately cease and desist from any activities involving the unauthorized sale, disposition, or encumbrance of all or some of the Mining Machines. See November 24, 2023 Letter, attached hereto as **Exhibit 2**.

In its Answer and Counterclaim to the Verified Complaint (the "Counterclaim") [DN 14], Mohawk has confirmed that it has already sold a significant portion of the Mining Machines. Mohawk has shown complete disregard of the law, and the cease and desist letter issued to it. Mohawk is now attempting to encumber or dispose of the Mining Machines for its own gain and at HBTPower's expense.

While HBTPower has been diligent in its obligations under the License Agreement, Mohawk has carried out fundamental and material breaches of the License Agreement, including, but not limited to, making false representations about having the appropriate power supply for mining activities and holding a fee simple absolute interest in the Premises. Moreover, without providing an account of money spent, Mohawk has attempted—and to an extent succeeded—to extract funds from HBTPower that have not been due.

As a result of Mohawk's wrongful actions and breaches, HBTPower has already suffered, and continues to suffer, irreparable harm. More specifically, Mohawk's unauthorized distribution and sale of HBTPower's highly specialized and valuable Mining Machines not only constitutes a breach of contractual obligations, but also inflicts irreparable harm upon HBTPower.

### B.   The Agreement to Arbitrate

The License Agreement includes an arbitration provision at Section 20, which provides, in relevant part, that "[a]ny dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Lexington, Kentucky or Louisville, Kentucky before one arbitrator." Exhibit 1 (License Agreement) at § 20.

As stated within the arbitration provision in the License Agreement, prior to seeking arbitration the parties are explicitly authorized to seek injunctive relief in the courts, as HBTPower has through its Verified Complaint [DE 1]. Such action shall not waive arbitration. Id.

In its "Answer" section in the Counterclaim, Mohawk admits HBTPower's assertion that "[t]he arbitration provision in the License Agreement explicitly authorizes the Parties to seek injunctive relief in the courts [...] without waiving arbitration." See Counterclaim [DE 14] at ¶ 4.

As of the date of this filing, HBTPower has already filed a Demand for Arbitration with JAMS ("Demand for Arbitration"). See Confirmation of Filing Demand for Arbitration with JAMS, attached hereto as **Exhibit 3**.

## ARGUMENT

**A.** **Federal Policy Strongly Favors Enforcing Arbitration Agreements**

The Federal Arbitration Act ("FAA") presents a national policy favoring arbitration within the United States. Hall Street Assocs., LLC v. Mattel, Inc., 552 U.S. 576, 581 (2008). The Supreme Court emphasized in Hall Street that "in cases falling within a court's jurisdiction, the [FAA] makes contracts to arbitrate `valid, irrevocable, and enforceable,' so long as their subject involves `commerce.'" Id. at 582. Similarly, in Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 22 (1983), the Court stated that "Congress's clear intent [in the FAA was] to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." Section 4 of the FAA clarifies Congress's intent:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement. ... The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

9 U.S.C. § 4 (emphasis added). This expedited procedure is consistent with "the statutory policy of rapid and unobstructed enforcement of arbitration agreements," and "manifest[s] a `liberal federal policy favoring arbitration agreements.'" Moses H. Cone Memorial Hosp., 460 U.S. at 22-23; and Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 25 (1991).

Thus, the Supreme Court of the United States has recognized that the FAA presents a federal public policy favoring arbitration, and that courts must vigorously enforce arbitration clauses. See Kruse v. AFLAC Intl, Inc., 458 F. Supp. 2d 375, 381 (E.D. Ky. 2006) (citing Shearson/American Express, Inc. v. McMahon, 482 U.S. 220 (1987)). This includes a presumption that ambiguity or doubt regarding arbitrability should be resolved in favor of

arbitration. Id. (citing Fazio v. Lehman Bros., Inc., 340 F.3d 386, 392 (6th Cir. 2003)). Likewise, ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985).

###### B.    Mohawk Energy, LLC Should Be Compelled to Arbitrate

Consistent with Sections 2 and 4 of the FAA, the Court here needs only conduct a narrow review of three simple threshold questions when deciding on a motion to compel arbitration: (1) did the subject parties agree to arbitrate?; (2) does the dispute between the subject parties fall within the scope of the arbitration provision?; and (3) does the contract involve transactions in interstate commerce? See 9 U.S.C. §§ 2, 4; see also Stout v. J.D. Byrider, 228 F.3d 709, 714 (6th Cir. 2000); North Fork Collieries, LLC v. Hall, 322 S.W.3d 98, 102 (Ky. 2010). If the answer to these three questions is yes, as in this present case, the Court must summarily order the parties to arbitration under the terms of their arbitration agreement. See 9 U.S.C. § 4; see also Hall, 322 S.W.3d at 102.

First, the Parties to this dispute clearly agreed to arbitrate. Section 20 of the License Agreement reflects the Parties' explicit agreement that "[a]ny dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Lexington, Kentucky or Louisville, Kentucky before one arbitrator." Exhibit 1 (License Agreement) at § 20. Thus, the agreement to arbitrate appears explicitly as a "mandatory" part of the contractual agreement.

Second, the Parties do not dispute the agreement to arbitrate.  Mohawk has admitted the agreement to arbitrate and HBTPower's assertion that "[t]he arbitration provision in the License

Agreement explicitly authorizes the Parties to seek injunctive relief in the courts [...] without waiving arbitration." <u>See</u> Counterclaim [DE 14] at ¶ 4.

Third, HBTPower has already commenced the arbitration and filed its Demand with JAMS. <u>See</u> Exhibit 3.

Fourth, the dispute between the Parties falls squarely within the scope of the parties' agreement to arbitrate. This mandatory arbitration section expressly applies when one party asserts a dispute regarding breach, enforcement, or interpretation of the contract, among other circumstances.  There has been no waiver of the arbitration agreement because HBTPower's Verified Complaint seeks only injunctive relief in the form of a temporary restraining order and permanent injunction against Mohawk. This is expressly authorized in the License Agreement, which states that the arbitration agreement does not "preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction." Exhibit 1 (License Agreement) at § 20. Similarly, the JAMS Streamlined Arbitration Rules and Procedures, which apply to the Parties' dispute, similarly provide that "[a]ny recourse by a Party to a court for interim or provisional relief shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate."[1] By contrast, the Counterclaim asserts numerous substantive claims, including "a judgment in Mohawk's favor finding [HBTPower] liable for all damages incurred by Mohawk," "an Order granting Mohawk the right to sell additional mining machines on Mohawk premises until and unless [HBT Power] pays the remainder of the sums due for fit-up, labor and rent," and "a final ruling holding that [HBTPower's] actions require a judgment and order requiring it to vacate the premises, remove any mining machines left after payment of its

---

[1] A copy of the JAMS Streamlined Arbitration Rules and Procedures is available at <u>https://www.jamsadr.com/rules-streamlined-arbitration/</u>.

debts, and allow Mohawk to use the business premises, fixtures and equipment as Mohawk sees fit with no further interference by [HBTPower]." Counterclaim [DE 14] at PageID # 125. These claims go far beyond the limited scope of "provisional" or "interim" relief expressly authorized by the License Agreement and the JAMS Streamlined Arbitration Rules and Procedures. Indeed, prior to the filing of this Motion, HBTPower initiated arbitration before JAMS with regard to the dispute between the Parties.

Finally, the FAA governs the agreement to arbitrate because the transaction concerns interstate or foreign commerce. 9 U.S.C. § 2. Here, the relationship of the Parties and the scope of the work falls under the umbrella of foreign commerce as HBTPower and Mohawk are incorporated under the laws to two separate sovereigns and engaged in a contract for international cryptocurrency mining. As further support, the Kentucky Supreme Court has previously held that a construction contract for work done in Kentucky relates to interstate commerce for the purpose of enforcing an arbitration clause under the FAA because construction contracts typically involve parties from different states, materials purchased from other states, and generally have a wide-ranging effect on commerce that affects others states. Fite and Warmath Constr. Co. v. Mys Corp., 559 S.W. 2d 729 (Ky. 1977). Moreover, the current dispute is "an action or proceeding arising under the [Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958]" because it involves a dispute between a U.S. party (Mohawk) and a foreign party (Huobi). Thus, the present matter is subject to the Federal Arbitration Act.

Accordingly, there is an agreement to arbitrate between the Parties and the dispute falls within the scope of the arbitration agreement and involves interstate or foreign commerce. Therefore, the test set forth in Sections 2 and 4 of the FAA is satisfied in this case. Upon a

showing such as this, the Court *"shall make an order* directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.

## CONCLUSION

For the foregoing reasons, HBTPower respectfully requests that the Court compel arbitration over the claims asserted in Mohawk's Counterclaim.

Respectfully submitted,

STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, Kentucky 40507-1380
(859) 231-3000
(859) 253-1093 facsimile

By: /s/ Lindsey H. Meares
     Palmer G. Vance II
     Lindsey H. Meares

and

Harout J. Samra
DLA PIPER LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8500
Facsimile: (305) 437-8131
Florida Bar No. 70523
Harout.Samra@us.dlapiper.com

*Pro hac vice* admission granted.

COUNSEL FOR PLAINTIFF,
HBTPOWER LIMITED