UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | | |
|---|---|---|
| **HBTPOWER LIMITED,** | ) | CASE NO.: 3:23-cv-628-CHB |
| | ) | |
| Plaintiff, | ) | JUDGE: Claria Horn Boom |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **MOHAWK ENERGY, LLC,** | ) | |
| | ) | **MEMORANDUM OF PLAINTIFF,** |
| Defendant. | ) | **HBTPOWER LIMITED, IN SUPPORT** |
| | ) | **OF ITS MOTION FOR PRELIMINARY** |
| | ) | **INJUNCTION** |
| | ) | |
| | ) | |
| | ) | |

Comes the Plaintiff, HBTPower Limited ("HBTPower"), by counsel and pursuant to Rule 65 of the Federal Rules of Civil Procedure, and respectfully submits this Memorandum of Law in Support of its Motion for Preliminary Injunction ("Motion") against Defendant Mohawk Energy, LLC ("Mohawk") to enjoin Mohawk from improperly selling, disposing of, encumbering, assigning or using all or some of HBTPower's 2,276 Bitmain Antminer S19j Pro and S19 Pro mining machines and to direct Mohawk to account for its sale of HBTPower's 2,059 m30 Series and m31 Series mining machines that has already taken place and escrow all funds and consideration received by it from such sale until a duly constituted arbitral tribunal decides the issues in dispute between HBTPower and Mohawk (together, the "Parties").

## I.      INTRODUCTION

Mohawk markets itself as a company specializing in delivering comprehensive infrastructure services tailored specifically for cryptocurrency mining operations. Mohawk's business model involves the use of a warehouse located at 1004 Gateway Industrial Park in Jenkins, Kentucky (the "Premises") as a storage facility outfitted with empty hardware racks to

house and protect its customers' cryptocurrency mining hardware and operations. At no point does Mohawk ever own the mining hardware it houses.

HBTPower, a cutting-edge technology company engaged in cryptocurrency mining, is one such customer. HBTPower employs state-of-the-art mining hardware, including specialized ASIC (Application-Specific Integrated Circuit) devices designed for optimal hash rates and energy efficiency, to ensure cost-effective and high-performance cryptocurrency mining. After entering into an enforceable license agreement with Mohawk, HBTPower delivered 2,059 m30 and m31 series Bitcoin mining computers (the "M Series Miners") to Mohawk's warehouse on the Premises. Despite a cease-and-desist letter instructing Mohawk not to interfere with HBTPower's ownership interests in the M Series Miners and HBTPower's filing of the Verified Complaint (Doc. No. 1), Mohawk admittedly sold HBTPower's M Series Miners "to recoup $360,000 of past due sums," despite that no sums were contractually due.[1] Mohawk has not provided an account of consideration received in the sale, despite signing an agreement and filing it with the Court requiring Mohawk to do so. (Doc. No. 21-1.) The predominant issue in this Motion, however, relates to the 2,276 Bitmain Antminer S19 Pro and S19j Pro series Bitcoin mining computers (the "S19 Series Miners") that HBTPower delivered to Mohawk's warehouse in March 2023. Unlike the M Series Miners, the S19 Series Miners are highly specialized and practically impossible to immediately procure or replace on the same scale in the current market.

Aside from Mohawk's unauthorized sale of the M Series Miners, Mohawk has also fundamentally breached several other conditions of the license agreement between the Parties and improperly ousted HBTPower's staff from the Premises. As such, in conjunction with the actions taken herein, HBTPower has initiated arbitration on its substantive claims against Mohawk for

---

[1] Answer and Counterclaim to Verified Complaint for Temporary Restraining Order and Permanent Injunctive Relief (Doc. No. 14) ("Answer") at ¶ 49.

breach of contract, conversion, fraudulent misrepresentation and breach of the implied duty of good faith and fair dealing.[2] As illustrated in the Verified Complaint (Doc. No. 1), the Declaration of Wang Yangping, dated December 5, 2023 (Doc. No. 16-2) (the "First Declaration")[3], the Declaration of Wang Yangping, dated December 18, 2023 ("Second Declaration"),[4] and the Declaration of Adam C. Bakula, Director in the Valuation Advisory Group of Stout Risius Ross, LLC, dated December 18, 2023 (the "Stout Declaration"),[5] HBTPower has a substantial likelihood of achieving success on the merits of its claims.

HBTPower now moves this Court for a preliminary injunction to prevent Mohawk from further infringing upon HBTPower's ownership rights, business interests and competitive advantage in the dynamic cryptocurrency market by unlawfully selling any of HBTPower's S19 Series Miners. Absent injunctive relief, HBTPower will suffer immediate, irreparable harm in the form of lost profits and the loss of its specialized S19 Miners, which hold serious and substantial value. Further, Mohawk's unfortunate financial circumstances render inadequate any eventual remedy of law awarded to HBTPower. Because HBTPower is substantially likely to succeed on the merits of its claims, the injunctive relief will not unjustifiably harm third parties, and the issuance of injunctive relief is in the public's interest, HBTPower is entitled to a preliminary injunction.

---

[2] As discussed below, the arbitration provision in the enforceable license agreement between the Parties explicitly authorizes the Parties to seek injunctive relief in the courts, without waiving arbitration.
[3] Despite having already been submitted in support of HBTPower's Motion for Temporary Restraining Order, a copy of the First Declaration is also attached hereto for ease of reference as **Exhibit A**.
[4] A copy of the Second Declaration is attached as **Exhibit B**.
[5] A copy of the Stout Declaration is attached as **Exhibit C**.

## II.    FACTUAL BACKGROUND[6]

### A.    The Parties' Respective Obligations Under the License Agreement

HBTPower is engaged, and has expertise, in mining of cryptocurrencies, including Bitcoin. (Ex. A (First Declaration) at ¶ 4.) In or around March 2022, HBTPower actively pursued opportunities to establish a Bitcoin mining operation at a location with cost-effective power rates and a favorable return on investment. (Id. at ¶ 5.) Mohawk's sole member and President, Brandon D. Smith, represented that Mohawk had the facility and the ability to help HBTPower carry out its Bitcoin mining activities. (Id. at ¶ 6.) Leveraging the extensive fleet of thousands of mining machines in its possession, HBTPower sought to optimize its Bitcoin mining operations and capitalize on the efficient power supply guaranteed it by Mohawk. (Id. at ¶ 5.)

On May 31, 2022, Mohawk, as "Licensor," and HBTPower, as "Licensee," entered into the Operation Right License Agreement (the "License Agreement"), pursuant to which HBTPower received an exclusive, irrevocable license to run, operate, and manage Bitcoin mining activities on the Premises for the duration of the License Agreement, with the right to utilize the electricity facilities and hardware racks Mohawk would install for HBTPower. (Id. at ¶¶ 7, 10, Ex. 1 at § 2.) To facilitate this, the License Agreement required Mohawk to purchase and install various equipment on behalf of HBTPower, including, but not limited to, transformers, substation transformers, racks and shelves, internet infrastructure, and construction materials. (Id. at ¶ 11, Ex. 1 at § 2.) Mohawk was to provide pro forma invoices to HBTPower for the equipment Mohawk purchased on HBTPower's behalf. (Id. at ¶ 11, Ex. 1 at § 4(c).)

Mohawk expressly represented in the License Agreement that it had "[a] valid fee simple absolute estate in the Premises." (Id. at ¶ 8, Ex. 1 at § 24(a)(v).) Importantly, Mohawk was

---

[6] For the sake of brevity, HBTPower incorporates the allegations contained in the Verified Complaint (DN 1).

contractually required to provide HBTPower with no less than 41,000 square feet of mining space on the Premises outfitted with a power capacity of no less than 30MW. (Id. at ¶ 9, Ex. 1 at Recitals.) As a condition precedent and performance obligation, Mohawk represented in the License Agreement that it had already entered into a contract for power supply with Kentucky Power Company ("KPC"), with which Mohawk would continue to negotiate to bring the power consumption rates to an average of $0.047/kWh within five (5) years. (Id. at ¶ 12, Ex. 1 at § 3(a)(iv).) Recognizing that HBTPower needed an "Economic Development Rider" ("EDR") from KPC to conduct profitable mining activities, the License Agreement obligated Mohawk to secure "[a]ll necessary governmental, and regulatory authorizations, together with all third party approvals and consents," which included the EDR. (Id. at ¶ 27, Ex. 1 at § 3(a)(iv).)

The Parties agreed that, after June 1, 2022 (the "Effective Date"), HBTPower would pay a rent security deposit in the amount of $100,000 and an additional $50,000 for the first month of rent; energy security deposits in the amount of $2,850,000 and $293,000; and an $800,000 deposit for the construction and equipment. (Id. at ¶ 13, Ex. 1 at §§ (6)(e), 4(b).) HBT satisfied its payment obligations on time. (Id. at ¶ 15, Ex. 2 (Mohawk Receipt)[7], Ex. 3 (June 10, 2022 Email)[8].)

HBTPower's obligations to make further payments towards rent, labor charges, and Bitcoin revenue sharing were not to commence until the "Commencement Date," which was also the "Delivery Date." (Id. at ¶ 17, Ex. 1 at § 5.) The "Delivery Date" is the later of "the date on which [HBTPower] confirms [Mohawk's] [w]ork has been completed in a manner satisfactory to [HBTPower]" or "all of the conditions set forth in Section 3(b) have been satisfied or waived." (Id.) The conditions set forth in Section 3(b) of the License Agreement include, but are not limited

---

[7] A copy of the Mohawk Receipt acknowledging HBTPower's payment in the amount of $4,132,910 is attached to the First Declaration (Exhibit A) as Exhibit 2.
[8] A copy of the June 10, 2022 email from KPC acknowledging receipt of the $2,800,000 energy security deposit is attached to the First Declaration (Exhibit A) as Exhibit 3.

to, Mohawk's obligation to "complete the upgrade of the Premises' electrical service and components, as well as the overall renovation of the Premises," obtain all necessary governmental and regulatory authorizations, ensure "[t]he Premises is capable of sustained Bitcoin Mining activities consistent with [HBTPower's] intended use of the Premises," appropriately modify the Premises to host the Bitcoin mining equipment, and install the appropriate power supply infrastructure to host the mining machines purchased by HBTPower.  (Id. at ¶ 17, Ex. 1 at §§ 3(a), (b).)

For HBTPower's part, the License Agreement required it to provide the Bitcoin mining machines it would use on the Premises and identified the types of machines that would be used for mining. (Id. at ¶ 10, Ex. 1 at Recitals.) On June 20, 2022 and July 12, 2022, HBTPower delivered 2,059 M Series Miners to the Premises. (Id. at ¶ 21.) On March 7, 2023, HBTPower delivered 2,276 S19 Series Miners to the Premises, which were consistent with those identified in the License Agreement. (Id. at ¶¶ 10, 24-25.)  The S19 Series Miners were among the best available on the market at that time. (Id. at ¶ 21.) Very few entities in the world own mining machine inventory of this quality and size. (Id.) A significant number of the S19 Series Miners were unboxed and placed on racks awaiting the Delivery Date and the commencement of mining activities. (Ex. B (Second Declaration) at ¶ 19, Ex. E (Photographs).)[9] In total, HBTPower delivered 4,335 M Series Miners and S19 Series Miners (together, the "Mining Machines") to the Premises. (Ex. A (First Declaration) at ¶ 24.) Mohawk specifically agreed to HBTPower's use of the M Series Miners and the S19 Series Miners in the License Agreement. (Ex. B (Second Declaration) at ¶¶ 12, 18; see also Ex. A (First Declaration) at ¶ 10, Ex. 1 at Recitals.)

---

[9] Photographs showing boxes and racks containing the S19 Series Miners stored on the Premises are collectively attached to the Second Declaration (Exhibit B) as Exhibit E.

**B.      Mohawk's Misrepresentations and Fundamental Breaches of the License Agreement**

Since June 2022, HBTPower has consistently inquired about copies of executed power contracts, the status of construction on the Premises, updates on the electrification of the Premises for mining activities and pro forma invoices for equipment purchased by Mohawk on behalf of HBTPower. (Ex. A (First Declaration) at ¶ 22.) On December 19, 2022, Mohawk provided HBTPower with executed copies of Mohawk's power contracts with KPC for the first time. (Id. at ¶ 23, Exhibit 3.[10]) However, those contracts and their amendments were not fully executed until December 19, 2022, despite Mohawk's representation in the License Agreement that such a contract was already in place as of June 1, 2022. (Id. at ¶ 23.) Both KPC and Mohawk have since informed HBTPower that KPC cannot provide an EDR to Mohawk for HBTPower's mining activities. (Id. at ¶ 27.) Moreover, while Mohawk moved several transformers, substations, and other equipment necessary for carrying out mining activities to the Premises (all of which was purchased *on behalf of*, and is therefore owned by, HBTPower), Mohawk never installed the appropriate power supply infrastructure to host Bitcoin mining activities. (Id. at ¶ 28.) This particular breach undermines the very essence of the License Agreement. Indeed, Mohawk's sole purpose is to provide a facility equipped with the appropriate power supply to support HBTPower's mining operations. Worse, HBTPower has also learned that Mohawk does not actually own the Premises, despite Mohawk's representation in the License Agreement that it had a fee simple absolute estate in the Premises as of June 1, 2022. (Id. at ¶ 26.)

HBTPower's obligations to make further payments towards rent, labor charges, and Bitcoin revenue sharing were not to commence until the "Delivery Date." (Id. at ¶ 17, Ex. 1 at § 5.)  The

---

[10] A copy of the KPC contracts with Mohawk are collectively attached to the First Declaration (Exhibit A) as Exhibit 4.

"Delivery Date" is the later of "the date on which [HBTPower] confirms [Mohawk's] [w]ork has been completed in a manner satisfactory to [HBTPower]" or "all of the conditions set forth in Section 3(b) have been satisfied or waived." (Id. at ¶ 17, Ex. 1 at § 5(c).)  The conditions set forth in Section 3(b) of the License Agreement include, but are not limited to, Mohawk's obligation to "complete the upgrade of the Premises' electrical service and components, as well as the overall renovation of the Premises," obtain all necessary governmental and regulatory authorizations, ensure "[t]he Premises is capable of sustained Bitcoin Mining activities consistent with [HBTPower's] intended use of the Premises," appropriately modify the Premises to host the Bitcoin mining equipment, and install the appropriate power supply infrastructure to host the mining machines purchased by HBTPower.  (Id. at ¶ 17, Ex. 1 at §§ 3(a), (b).) Because HBTPower never confirmed Mohawk's work was "completed in a manner satisfactory to HBTPower," and because virtually none of the "conditions set forth in Section (3)(b)" were satisfied or waived,[11] the "Delivery Date" has not occurred and, thus, HBTPower's obligations to make payments toward rent, labor, and revenue sharing were never triggered. (Ex. B (Second Declaration) at ¶ 35.)

Nevertheless, as a gesture of good faith, to ensure that Mohawk reached the Delivery Date, and to facilitate the commencement of mining activities on the Premises, HBTPower began paying rent and labor charges in June 2022 and continued to pay until July 2023, even though it was not obligated to do so until the "Delivery Date." (Ex. A (First Declaration) at ¶ 19.) HBTPower did not stop making payments until it realized that Mohawk was not serious about its obligations under the License Agreement. (Ex. B (Second Declaration) at ¶ 37.) To date, HBTPower has paid more

---

[11] The Parties agreed in the License Agreement that "no provision of [the License Agreement] may be amended, modified, or waived, unless by an instrument in writing executed by a duly authorized officer of the Party against whom enforcement of such amendment, modification, or waiver is sought." (Id. at ¶ 14, Ex. 1 at § 26.) No written instrument amending, modifying, or waiving any provision of the License Agreement exists.

than $12,000,000 in rent, labor, deposits for electricity charges and staffing fees, and advances for construction and equipment. (Id. at ¶ 8.)

While HBTPower has been diligent in its obligations under the License Agreement, Mohawk has committed fundamental and material breaches of the License Agreement, including, but not limited to, making false representations about having the appropriate power supply for mining activities and holding a fee simple absolute interest in the Premises. (Ex. A (First Declaration) at ¶ 42.) Without providing an account of money spent, Mohawk has attempted—and to an extent succeeded—to extract funds from HBTPower that have not been due. (Id. at ¶ 43.)

Without investing its own funds, Mohawk used HBTPower's resources to equip the Premises with most of the infrastructure required to carry out Bitcoin mining activities, caused HBTPower to deliver 4,335 Bitcoin mining machines to the Premises, earned $1,260,000 in rent and labor charges that were not due, accepted $12,000,000 in total payments from HBTPower, failed to perform any of its material obligations under the License Agreement, and then converted the M Series Miners for its own gain. (Ex. B (Second Declaration) at ¶¶ 8, 38.)

### C.   Mohawk Ousts HBTPower from the Premises and Sells the M Series Miners

On October 11, 2023, Mohawk improperly removed HBTPower's staff from the Premises on the pretext of non-payment of rent and labor charges. (Ex. A (First Declaration) at ¶ 29.) As of the date of HBTPower's ouster from the Premises, the infrastructure necessary for HBTPower to perform its mining activities on the Premises was not made available by Mohawk under the terms outlined in the License Agreement. In a letter to HBTPower the next day, Mohawk, through its counsel, stated that Mohawk would not provide pro forma invoices for equipment acquired by

Mohawk for HBTPower's use at the Premises and "assured that [HBTPower's] mining machines are protected." (Id. at ¶ 30, Exhibit 4[12].)

Importantly, Mohawk has no legal interest whatsoever in the Mining Machines. Likewise, Mohawk has not sought—nor has it been granted—HBTPower's consent to use, sell, dispose, or encumber the Mining Machines. (Id. at ¶ 46.) Nevertheless, on November 23, 2023, HBTPower received information from market sources that Mohawk was attempting to sell some or all of HBTPower's Mining Machines to third parties. (Id. at ¶ 32.) Upon information and belief, one of the third parties to whom Mohawk has attempted to sell Mining Machines is an entity in which Brandon D. Smith, Mohawk's President, has a founding interest and other financially beneficial connections. (Id. at ¶ 33.) Thus, the very next day, HBTPower sent a cease-and-desist letter to Mohawk demanding that Mohawk immediately refrain from any activities involving the unauthorized sale, disposition, or encumbrance of the Mining Machines. (Id. at ¶ 34, Exhibit 5[13].) On November 27, 2023, Mohawk responded by offering HBTPower the opportunity to inspect the Premises, but refused to assure HBTPower that it would not sell the Mining Machines or that it had not already attempted to do so. (Id. at ¶ 35, Exhibit 6[14.]) On November 29, 2023, HBTPower filed the Verified Complaint (Doc. No. 1) and provided a courtesy copy to Mohawk's counsel. That very same day, Mohawk sold all 2,059 of HBTPower's M Series Miners to third-party purchasers. (See Answer (Doc. No. 14) at ¶ 49; see also (Proposed) Stipulated Order (Doc. No. 21-1) at ¶ 6.) Mohawk has also improperly created a lien on at least 220 of the S19 Series Miners. (See Ex. A (First Declaration) at ¶ 41.)

---

[12] A copy of the October 12, 2023 letter is attached to the First Declaration (Exhibit A) as Exhibit 5.

[13] A copy of the November 24, 2023 letter is attached to the First Declaration (Exhibit A) as Exhibit 6.

[14] A copy of the November 27, 2023 letter is attached to the First Declaration (Exhibit A) as Exhibit 7.

**D.      Procedural History of this Case**

After filing its Verified Complaint (Doc. No. 1), and to preserve the *status quo* until a full hearing on preliminary injunctive relief could be held, HBTPower filed the Motion for Temporary Restraining Order (Doc. No. 16) (the "TRO Motion") to prevent Mohawk from engaging in any activities involving the unauthorized sale, disposition, or encumbrance of all or some of the Mining Machines and to order Mohawk to account for any sale or disposal of the Mining Machines, and escrow any and all funds or consideration received by it from such sale or disposition.[15] However, following the telephonic status conference before this Court on December 5, 2023, the Parties reached an agreement that rendered the TRO Motion moot. (See Joint Status Report (Doc. No. 21).) The Parties memorialized their agreement in the (Proposed) Stipulated Order (Doc. No. 21-1), in which the Parties stipulated, in relevant part, that:

–      Until the Court issues an order regarding HBTPower's request for preliminary injunction, Mohawk will not sell, dispose, encumber, assign, use or in any manner compromise the mining machines that were delivered at the Premises by HBTPower and are stored thereon. Mohawk agrees not to execute on any liens filed to date with respect to any of the mining machines in connection with its claims against HBTPower.

–      Until the Court issues an order regarding HBTPower's request for preliminary injunction, Mohawk will not sell, dispose, encumber, assign, or in any manner compromise the electrical equipment, including transformers and substations, located at the Premises.

–      Mohawk will allow HBTPower access to the security cameras at the Premises which allow a view of the interior of the Premises showing the mining machines and electricity equipment that remain on the Premises.

–      Until the Court issues an order regarding HBTPower's request for preliminary injunction, Mohawk agrees to maintain a minimum balance of $360,000 in its bank account, reflecting the amount that it received from the sale of 2059 m30+ and m31+ Bitcoin mining machines.

---

[15] The arbitration provision in the License Agreement explicitly authorizes the Parties to seek injunctive relief in the courts, without waiving arbitration. See Ex. A (First Declaration) at Ex. 1, § 20.

- Mohawk will provide HBTPower a list with serial numbers of all the mining machines it has sold, and details of consideration received for the mining machines reflecting such sale, including confirmation on whether the consideration was received in cash, cryptocurrency or other kind.

Despite the agreement, Mohawk has not provided access to security cameras, has not shared details of consideration received for the M Series Miners, and has not provided an inventory of the Mining Machines that are currently on site.

Now, to preserve the status quo until the Parties' disputes are resolved by a duly constituted arbitral tribunal, HBTPower moves this Court for a preliminary injunction to prevent Mohawk from engaging in any activities involving the unauthorized sale, disposition, or encumbrance of the S19 Miners and to direct Mohawk to account for the sale of the M Series Miners that has already taken place and escrow all funds and consideration received by it from such sale.

### III.    ARGUMENT

#### A.    Standard for Injunctive Relief

The Sixth Circuit Court of Appeals has held that a preliminary injunction should issue if: (a) the movant has a substantial likelihood of success on the merits; (b) the movant will suffer irreparable injury if the injunction is not issued; (c) the preliminary injunction will not unjustifiably harm third parties; and (d) the issuance of the preliminary injunction will be in the public's interest. See, e.g., In re Delorean Motor Co., 755 F.2d 1223, 1228 (6th Cir. 1985); Frisch's Rest., Inc. v. Shoney's, Inc., 759 F.2d 1261, 1263 (6th Cir. 1985). Because injunctive relief is equitable in nature, these criteria "do not establish a rigid and comprehensive test for determining the appropriateness of preliminary relief"; rather, they are "factors to be balanced, not prerequisites that must be met." Frisch's Rest., Inc., 759 F.2d at 1263. As set forth below, each of these four factors weighs in favor of HBTPower's requested injunctive relief.

**B.      HBTPower Has a Substantial and Strong Likelihood of Success on the Merits**

The Sixth Circuit has explained that, to satisfy the first element, "it is ordinarily sufficient if [the moving party] has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fairground for litigation and thus for more deliberate investigation." Six Clinics Holdings Corp. II v. Cafcomp Sys., 119 F.3d 393, 402 (6th Cir. 1997). This Motion is based on HBTPower's claims against Mohawk for breach of contract, conversion and fraudulent misrepresentation.[16] As shown through the facts and evidence proffered in its Verified Complaint, First Declaration, Second Declaration and herein, HBTPower has demonstrated that it "has a fair question to raise" as to the existence of its right in need of protection. See Brandeis Mach. & Supply Corp. v. Barber Greene Co., 503 F.2d 503, 505 (6th Cir. 1974).

**1.      HBTPower will prevail on its breach of contract claim against Mohawk.**

To succeed on a claim for breach of contract under Kentucky law, HBTPower must establish three things: (1) existence of a contract; (2) breach of that contract; and (3) damages flowing from the breach of contract. See Barnett v. Mercy Health Partners-Lourdes, Inc., 233 S.W.3d 723, 727 (Ky. App. 2007). There is no question that HBTPower is likely to succeed on the merits of its breach of contract claim against Mohawk.

First, it is beyond dispute that Mohawk is subject to the terms of the License Agreement, which it executed on May 31, 2023. (See Ex. A (First Declaration) at ¶ 7, Ex. 1.) The License Agreement has not been amended. (Id. at ¶ 31.) Next, HBTPower has already uncovered

---

[16] HBTPower's substantive claims on the merits are detailed in the Complaint and Demand for Arbitration filed by HBTPower against Mohawk on December 5, 2023. The issue involved here – whether the Plaintiff is entitled to injunctive relief – is not referable to arbitration under the Parties' agreement. 9 U.S.C. § 3. The arbitral tribunal is yet to be constituted. In a dispute subject to mandatory arbitration under the Federal Arbitration Act, a district court has subject matter jurisdiction under § 3 of the Act to grant preliminary injunctive relief provided that the party seeking the relief satisfies the four criteria which are prerequisites to the grant of such relief." *Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1380 (6th Cir. 1995).

incontrovertible proof that Mohawk has breached—and continues to breach—the License Agreement. For example, contrary to Mohawk's representation in the License Agreement that it had a fee simple absolute estate in the Premises as of June 1, 2022, HBTPower now knows that Mohawk does not own the Premises. (Id. at ¶ 26.) Indeed, in its Answer (Doc. No. 14), Mohawk "admits the allegations of paragraph 14 of the Complaint that the license agreement calls for title free and clear for the premises, but denies that it stated that it had free and clear title to the facility to Huobi. The term in the agreement written by [HBTPower] is incorrect." (Answer (Doc. No. 14) at ¶ 13.) As this Court is aware, it is of no consequence that the "term in the agreement" is allegedly incorrect, that HBTPower was the drafting party, or that Mohawk purportedly never verbally told HBTPower that it owned the Premises. Indeed, "[i]t is abundantly clear that a party is bound by his agreement with the terms of a contract he has signed and had an opportunity to review, and ignorance of the terms thereof is not a defense to the rights and obligations set forth therein." Villas at Woodson Bend Condo. Ass'n v. S. Fork Dev. Inc., 387 S.W.3d 352, 358-59 (Ky. App. 2012) (citing Pewitt v. Estate Building & Loan Ass'n, 156 S.W.2d 173, 174 (Ky. 1941)).

Moreover, Mohawk expressly represented in the License Agreement that it had already entered into a contract for power supply with KPC and that it would secure the necessary governmental and regulatory authorizations, which included the EDR. (Id. at ¶ 12, Ex. 1 at § 3(a)(iv).) In fact, the power contract and amendments with KPC were not fully executed until December 19, 2022 (Id. at ¶ 23), and KPC has refused to provide an EDR to Mohawk for HBTPower's Bitcoin mining activities (Id. at ¶ 27). Mohawk has also repeatedly refused to provide pro forma invoices for equipment acquired by it for HBTPower's use at the Premises, despite its obligation under the License Agreement to do so. (Id. at ¶¶ 22, 30.)

These particular breaches undermine the very purpose of the License Agreement – to allow HBTPower to conduct Bitcoin mining activities at the Premises. This is causing, and will continue to cause, HBTPower severe damage, including in the form of lost funds, customers, strategic advantages, and business opportunities. HBTPower has already paid Mohawk in excess of $12,000,000, but Mohawk has failed to performed virtually any of its obligations. (Id. at ¶ 52.) Accordingly, it is substantially likely – if not certain – that HBTPower will succeed on a breach of contract claim against Mohawk.[17]

### 2.     HBTPower will prevail on its fraudulent misrepresentation claim against Mohawk.

To succeed on a fraudulent misrepresentation claim, HBTPower must satisfy six elements:

> (1) That the declarant made a material representation to the plaintiff; (2) that this representation was false; (3) that the declarant knew the representation was false or made it recklessly; (4) that the declarant induced the plaintiff to act upon the misrepresentation; (5) that the plaintiff relied upon the misrepresentation; and (6) that the misrepresentation caused injury to the plaintiff.

Flegles, Inc. v. TruServ Corp., 289 S.W.3d 544, 549 (Ky. 2009). HBTPower has a number of examples of fraudulent misrepresentations Mohawk made to induce HBTPower to enter into the License Agreement and can easily satisfy the necessary elements for such a claim.

By way of one example, Mohawk was required under the License Agreement to provide HBTPower with mining space on the Premises outfitted with a power capacity of no less than 30MW, for which it had already entered into a contract with KPC. (Id. at ¶ 9.) However, Mohawk had not in fact entered into any such contract with KPC and cannot outfit the Premises with a power capacity of 30MW, which representations Mohawk knew were false. Had HBTPower known that Mohawk had not entered into such a contract and could not obtain the proper power

---

[17] HBTPower has contemporaneously filed a Demand for Arbitration with JAMS seeking damages and other relief before an arbitral tribunal consistent with the arbitration provision in the Licensing Agreement.

capacity, HBTPower would never have executed the License Agreement. Indeed, Mohawk has still never completely installed the appropriate power supply infrastructure to host Bitcoin mining activities on the Premises and has otherwise denied HBTPower access to the Premises. (Id. at ¶ 28.) Thus, clearly HBTPower has sustained damages because of Mohawk's misrepresentations.

### 3.   HBTPower will prevail on its conversion claim against Mohawk.

Finally, by intentionally and unlawfully retaining HBTPower's S19 Series Miners over its repeated demands to return them, and selling some portion of the older M Series Miners without permission, Mohawk is liable to HBTPower for conversion under Kentucky law. (See Answer (Doc. No. 14) at ¶ 42; see also (Proposed) Stipulated Order (Doc. No. 21-1) ¶ 6.) To prove a conversion claim in Kentucky, HBTPower must satisfy seven elements:

> (1) the plaintiff had legal title to the converted property; (2) the plaintiff had possession of the property or the right to possess it at the time of conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's right to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) the defendant intended to interfere with the plaintiff's possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act was the legal cause of the plaintiff's loss of property; and (7) the plaintiff suffered damage by the loss of the property.

Holley Performance Prods., Inc. v. Smith-CNC China Network Co., 2006 U.S. Dist. LEXIS 82317, at *6 (W.D. Ky. Nov. 9, 2006) (citing Ky. Ass'n of Counties All Lines Fund Trust v. McClendon, 157 S.W.3d 626, 632 (Ky. 2005)).

Mohawk does not dispute that HBTPower was the sole owner of the M Series Miners. (Answer (Doc. No. 14) at ¶ 29.) Mohawk was in possession of the M Series Miners and, under the terms of the License Agreement, was required to maintain and protect them for the duration. (Ex. A (First Declaration) at ¶¶ 10, 46.) Mohawk failed to return the M Series Miners upon receipt of HBTPower's cease-and-desist letter and instead sold them to third parties allegedly in exchange for $360,000, despite having no ownership interest whatsoever in the M Series Miners. (Answer

(Doc. No. 14) at ¶ 49.) Mohawk did not have HBTPower's permission to remove the Miners from the Premises, much less to sell them. HBTPower's entitlement to damages for a conversion claim is clear.

### C.   HBTPower Will Suffer Immediate and Irreparable Harm if Mohawk is Not Enjoined

It is now beyond doubt that, until restrained, Mohawk will sell, or attempt to sell, HBTPower's S19 Series Miners, thereby directly interfering with HBTPower's ownership rights and interests in the Miners, rendering it nearly impossible for HBTPower to obtain replacement Miners, causing substantial lost profits to HBTPower and breaching the express terms of the License Agreement. (Id. at ¶¶ 32, 40, 41, 46.)  Indeed, despite an agreement to this effect made before the Court, Mohawk is failing to provide inventory of the S19 Series Miners that are currently on site.

HBTPower recognizes that courts are typically precluded from granting injunctive relief when the movant could be fully compensated by money damages after an adjudication of the merits. However, the Sixth Circuit recognizes a number of limited exceptions to that rule, including where damages will be "seriously deficient as a remedy for the harm suffered" and where "the nature of the plaintiff's loss would make damages difficult to calculate." Transamerica Ins. Fin. Corp. v. North Am. Trucking Ass'n, 937 F.Supp. 630, 634 n.5 (W.D. Ky. 1996); see also U.S. v. Miami Univ., 294 F.3d 797, 819 (6th Cir. 2002). HBTPower will suffer irreparable harm (1) because of the unique nature of the S19 Series Miners, (2) because Mohawk is financially unstable, presenting a unique risk that final monetary relief is uncollectible, and (3) because of the difficulty associated with calculating lost profits, especially in the cryptocurrency industry. HBTPower is therefore entitled to injunctive relief to prevent immediate harm for which there is no adequate remedy at law.

**1.      Damages will be seriously deficient as a remedy for the harm suffered by HBTPower because of Mohawk's financial instability.**

First, HBTPower will suffer irreparable harm in the interim because Mohawk is financially unstable, presenting a unique risk that any final judgment issued in its favor is uncollectible. "The requirement that there be 'no adequate remedy at law' does not mean that the plaintiff must show that an award of damages at trial would be wholly ineffectual; it is sufficient if damages will for some reason be seriously deficient as a remedy for the harm suffered." Transamerica Ins. Fin. Corp., 937 F.Supp. at 634 n.5 (citing Roland Mach. Co. v. Dresser Indus., 749 F.2d 380, 386 (7th Cir. 1984)). As noted, although courts are generally precluded from granting injunctive relief when the movant could be compensated by money damages after an adjudication of the merits, "[t]he power of the district court to preserve a fund or property which may be the subject of a final decree is well established." USACO Coal Co. v. Carbomin Energy, Inc., 689 F.2d 94, 97 (6th Cir. 1982) (citing DeBeers Consol. Mines v. U.S., 325 U.S. 212, 220 (1945), and Deckert v. Indep. Shares Corp., 311 U.S. 282 (1940)); see also Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 206 (3rd Cir. 1990) (concluding the possibility of an unsatisfied money judgment can constitute irreparable harm for purposes of granting preliminary injunctive relief); In re Feit & Drexler, Inc., 760 F.2d 406, 416 (2d Cir. 1985) ("Even where the ultimate relief sought is money damages, federal courts have found preliminary injunctions appropriate where it has been shown that the defendant 'intended to frustrate any judgment on the merits' by 'transferring its assets out of the jurisdiction.'") (internal citations omitted).

The preliminary injunction HBTPower requests seeks relief of the same character as that which might be granted finally on the merits, but which will likely be uncollectable. Mohawk was incorporated, or became an active business entity, in 2022. (Ex. A (First Declaration) at ¶ 53.) Mohawk reported its operating revenue in 2022 as $80,000 and identified just three (3) employees

of its own. (<u>Id</u>.) Therefore, in addition to the irreparable harm associated with the possible loss of the S19 Series Miners and lost profits, there is also a considerable risk that Mohawk will not have sufficient assets to pay a judgment entered against it. (<u>Id</u>.) When HBTPower seeks to collect on its eventual judgment against Mohawk, it will far exceed the mere $80,000 in operating revenue Mohawk gathers each year. If the Court does not grant HBTPower's request for preliminary injunctive relief, it risks jeopardizing the arbitral panel's ability to grant meaningful relief. Restricting Mohawk from selling HBTPower's S19 Miners and requiring it to sequester funds obtained from the unlawful sale of the M Series Miners is a measured and appropriate exercise of the Court's discretionary power.

> **2.    The S19 Series Miners hold serious and substantial value and have peculiar characteristics, making it difficult to calculate the nature of HBTPower's loss.**

Next, where the S19 Series Miners are either unavailable on the market, or impossibly difficult to source, the nature of HBTPower's loss will make it difficult to calculate damages and any money damages awarded to HBTPower will be seriously deficient as a remedy for the harm suffered if Mohawk is permitted to deprive HBTPower of its S19 Series Miners. Indeed, "[a]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." <u>Basicomputer Corp. v. Scott</u>, 973 F.2d 507, 511 (6th Cir. 1992) (citing <u>Roland Mach. Co.</u>, 749 F.2d at 386).

In <u>Goldopp Energy LLC v. Stewart</u>, 2023 U.S. Dist. LEXIS 118504 (E.D. Pa. July 11, 2023), the Court denied the plaintiff's motion for temporary injunction restraining the defendant from selling Bitcoin miners to third parties for failure to meet the irreparable harm requirement. Importantly, however, the <u>Goldopp</u> court noted that "[P]laintiff has not shown these computers hold any 'serious or substantial value,' nor do they have any 'peculiar' characteristics that might deem temporary injunctive relief appropriate." <u>Id</u>. at *8. Conversely, the S19 Series Miners at issue

in this case do, in fact, hold serious and substantial value and have peculiar characteristics. Goldopp is factually distinct from the present case.

The Bitmain Antimer S19Pro Series miners are specialized hardware designed for efficient cryptocurrency mining and specifically tailored for high performance operations. (See Ex. C (Stout Declaration) at ¶ 8.) The peculiar characteristics of the S19 Series Miners, including their hash rate, energy efficiency, and compatibility with current mining algorithms, make them irreplaceable for HBTPower's mining setup. Indeed, the Parties agreed to an 8-year term for Bitcoin mining activities at the Premises using M Series and S19 Series Miners. Every investment HBTPower made in, and expended on, Mohawk depended on HBTPower's use of the S19 Series Miners delivered to the Premises. If Mohawk is not enjoined from selling HBTPower's S19 Series Miners, HBTPower cannot simply go out and purchase replacement miners of the same quality at a similar price point. Finding comparable replacements with similar specifications could prove challenging, if not impossible. (Id. at ¶¶ 6, 9, 11, 12, 14, 17, 18, 25.)

The cryptocurrency mining industry is highly dynamic, and the availability and pricing of mining hardware are subject to rapid changes. (Id. at ¶ 14.) More specifically, the overall conditions of the cryptocurrency market, especially the price of Bitcoin, significantly impacts the demand for mining hardware. (Id.) The cryptocurrency market reached $2,255.2 billion in 2023 and is expected to exhibit a growth rate of 10.2% between 2024-2032.[18] When Bitcoin prices are high, there is increased interest in mining, leading to higher demand for miners. (Ex. C (Stout Declaration) at ¶ 14.) HBTPower's mining infrastructure is intricately dependent on the S19 Series Miners, and any disruption in the availability of these miners would not only impact its mining

---

[18] *Cryptocurrency Market Report by Type (Bitcoin, Ethereum, Bitcoin Cash, Ripple, Litecoin, Dashvoin, and Others), Component (Hardware, Software), Process (Mining, Transaction), Application (Trading, Remittance, Payment, and Others), and Region 2024-2032*, IMARC GROUP, available at https://imarcgroup.com/cryptocurrency-market (last accessed Dec. 13, 2023).

- 20 -

operations, but also undermine the stability and reliability of the entire cryptocurrency mining setup.

Moreover, the value of HBTPower's S19 Miners is not solely monetary; it extends to the strategic advantage the machines provide in a highly competitive market. (See Ex. A (First Declaration) at ¶ 49.) The S19 Miners give HBTPower a distinct competitive advantage in the cryptocurrency mining industry, which advantage is compromised by Mohawk's unlawful actions. (Id.) The unauthorized sale of HBTPower's S19 Series Miners will not only result in direct financial losses for HBTPower, but will also undermine its market position and reputation. (Id.)

In addition, it will be difficult, if not impossible, to calculate HBTPower's future lost profits resulting from Mohawk's breaches of the License Agreement and could be of such a magnitude as to threaten the viability of HBTPower's business. Courts in the Sixth Circuit frequently recognize the difficulty associated with quantifying future lost profits when issuing preliminary injunctions. See, e.g., Warren v. City of Athens, 411 F.3d 697, 712 (6th Cir. 2005) (finding there was no adequate remedy at law where "future lost profits are much harder to quantify," especially where "these lost profits were of such a magnitude that the viability of their business were threatened . . . [.]"). Lost profits are particularly difficult to calculate in this context, where Bitcoin mining companies like HBTPower are subject to risks associated with the need for significant electric power and the limited availability of power resources, which could have material adverse effects on their businesses, financial conditions and results of operations. (Ex. C (Stout Declaration) at ¶¶ 18, 20.)

Furthermore, the unauthorized distribution of the S19 Series Miners will continue to disrupt HBTPower's operational efficiency well beyond the time at which it receives a final decision on the merits in its favor, leading to tangible and intangible losses. (Ex. A (First Declaration) at ¶ 50.)

For example, Mohawk's unauthorized use of, and continued refusal to grant access to, the S19 Series Miners may result in a breach of warranty obligations, leaving HBTPower without the necessary support and maintenance required for optimal performance. (<u>Id</u>.) This not only compromises the reliability of HBTPower's mining operations, but also poses a risk to the integrity of the S19 Series Miners. (<u>Id</u>.)

### D.   The Balance of Harm Weighs Decidedly in Favor of HBTPower

In balancing the equities, a court "must balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 24 (2008) (internal quotations omitted). HBTPower is the victim of the intentional tort of conversion, fraudulent misrepresentation and breach of contract. In stark contrast to the irreparable harm that HBTPower will suffer if injunctive relief is not granted, the injunctive relief HBTPower seeks from this Court will not cause any undue harm to Mohawk. Indeed, Mohawk does not own the S19 Miners and should not be permitted to financially benefit from the sale of them. Despite an assurance that "[HBTPower's] mining machines are protected," Mohawk has already, and after being put on notice to not do so, improperly sold the M Series Miners. Mohawk has also created an unenforceable lien on a portion of the S19 Miners. Any harm that Mohawk suffers by not being able to further infringe upon HBTPower's ownership interests for ill-gotten gains is far outweighed by the ongoing harm to HBTPower if Mohawk is permitted to dispose of the S19 Series Miners, which Miners are incredibly important to HBTPower's business. The balance of harm, therefore, favors HBTPower.

### E.   A Preliminary Injunction is in the Public's Interest

Here, an injunction would serve the public interest, not harm it. It behooves the legal industry and the public at large to know that contracts are enforceable, that parties are held to their promises, and that such conduct on the part of a defendant will not be tolerated. Issuancce of the

preliminary injunction would hold Mohawk to the terms of the bargain it entered into through the License Agreement, including by preventing Mohawk from disregarding HBTPower's contractual right to the S19 Series Miner. Indeed, the Sixth Circuit Court of Appeals has observed that the "[e]nforcement of contractual duties is in the public interest." Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 551 (6th Cir. 2007); see also F.S. Sperry Co. v. Schopmann, 304 F.Supp.3d 694, 711 (E.D. Tenn. 2018) ("enforcing contractual obligations are public interests that towuld be furthered by injunctive relief").

Considering and balancing HBTPower's strong likelihood of success on the merits, the immediate irreparable harm that HBTPower will unquestionably suffer in the absence of injunctive relief, the reality that Mohawk will not suffer any harm, and the public's interest, the Court should find that HBTPower has carried its burden of proving that the circumstances in this case demand an injunction.

## IV.    CONCLUSION

In light of the foregoing, Plaintiff HBTPower Limited requests that, until a duly constituted arbitral tribunal decides the issues in dispute between the Parties, the Court issue a preliminary injunction to prevent irreparable harm and to require Defendant Mohawk Energy, LLC and all those acting in concert with it to refrain from interfering with HBTPower's ownership and contractual rights in the S19 Miners. Additionally, HBTPower requests that the funds secured or to be secured from the sale of the M Series Miners be sequestered. A proposed Order is attached.

Respectfully submitted,

STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, Kentucky 40507-1380
(859) 231-3000
(859) 253-1093 facsimile


By:  /s/ Lindsey H. Meares
      Palmer G. Vance II
      Lindsey H. Meares

and

Harout J. Samra
**DLA PIPER LLP (US)**
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8500
Facsimile: (305) 437-8131
Florida Bar No. 70523
Harout.Samra@us.dlapiper.com

*Pro hac vice* admission granted.

COUNSEL FOR PLAINTIFF,
HBTPOWER LIMITED

## CERTIFICATE OF SERVICE

I certify that on December 18, 2023, I served the foregoing via CM/ECF, which will send

all parties of record a notice of electronic filing, including the following:

Anna Stewart Whites
Anna Whites Law Office
327 Logan Street
P.O. Box 4023
Frankfort, KY 40601
E: annawhites@aol.com
COUNSEL FOR DEFENDANT,
MOHAWK ENERGY, LLC

/s/ Lindsey H. Meares
*Counsel for Plaintiff,*
*HBTPower Limited*

*4858-0868-1367.3*