# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT LOUISVILLE**

| | | |
|---|---|---|
| **HBTPOWER LIMITED,** | ) | CASE NO.: 3:23-cv-00628-CHB |
| | ) | |
| Plaintiff, | ) | JUDGE: Claria Horn Boom |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **MOHAWK ENERGY, LLC,** | ) | **DECLARATION OF WANG** |
| | ) | **YANGPING** |
| Defendant. | ) | |
| | ) | |

Comes now the Declarant, Wang Yangping, and declare under penalty of perjury under the laws of the United States that the following statements are true and correct:

1.      My name is Wang Yangping. I am over the age of eighteen, and in my capacity as stated, I have personal knowledge of the facts contained herein.

2.      I served as the General Manager of HBTPower Limited ("HBTPower") from June 2022 through November 2023.  I am currently employed as a Technology Consultant for HBTPower, and am its authorized representative.

3.      HBTPower is an indirect non-wholly owned British Virgin Islands-based subsidiary of Sinohope Technology Holdings Limited (formerly known as New Huo Technology Holdings Limited or Huobi Technology Holdings Limited), a technology solution service provider, offering a variety of services in virtual asset ecosystem, such as asset management, trust and custodian businesses and cryptocurrency trading.

4.      HBTPower is engaged, and has expertise, in mining of cryptocurrencies, including Bitcoin.

5.      In or around March 2022, HBTPower was seeking opportunities to develop a Bitcoin mining facility in a place that could provide efficient power supply rates and a favorable

1

return on investment policy. HBTPower also wanted to utilize the thousands of mining machines HBTPower had acquired.

6.      Around this time, HBTPower was introduced to Brandon D. Smith, the President of Mohawk, who indicated Mohawk had the property and the ability to help HBTPower carry out its Bitcoin mining activities.

### The License Agreement

7.      Mohawk as "Licensor" and HBTPower as "Licensee" entered into the Operation Right License Agreement, dated May 31, 2022 (the "License Agreement") pursuant to which HBTPower would operate Bitcoin mining activities at the Bitcoin mining facility at 1004 Gateway Industrial Park, Jenkins, Kentucky 41537 (the "Premises"). A copy of the License Agreement is attached hereto as **Exhibit 1**.

8.      In the License Agreement, Mohawk represented that it had "[a] valid fee simple absolute estate in the Premises free and clear of all liens, conditions, covenants, restrictions, rights of way, or regulations that would adversely affect or prohibit the use of the Premises for the Bitcoin Mining activities contemplated" therein. Id. at § 24(a)(v).

9.      Mohawk was contractually required under the License Agreement to provide HBTPower with no less than 41,000 square feet of mining space on the Premises outfitted with a power capacity of no less than 30MW. Id. at Recitals.

10.     Under the terms of the License Agreement, Mohawk granted HBTPower an exclusive, irrevocable license to run, operate, and manage Bitcoin mining activities on the Premises for the duration of the License Agreement, with the right to utilize the electricity facilities and racks of mining machines that Mohawk would install for HBTPower on the Premises. Id. at § 2. The License Agreement required HBTPower to provide the Bitcoin mining machines it would

use on the Premises. Id. at Recitals.  These machines were identified as "s19, m30, m31 and crypto mining machines with the same or higher computing power." Id.

11.     Mohawk was contractually required to purchase various equipment, including, but not limited to, transformers, substation transformers, racks and shelves, internet infrastructure, and construction materials, and to install them on the Premises on behalf of HBTPower. Id. at § 4(a). The overall cost of the equipment and construction material purchased by Mohawk on behalf of HBTPower was not to exceed $8,000,000.  Id.  Mohawk was required to provide proforma invoices to HBTPower for the equipment that Mohawk purchased on HBTPower's behalf. Id. at § 4(c).

12.     As a condition precedent and performance obligation, Mohawk represented in the License Agreement that it had already entered into a contract for power supply with Kentucky Power Company ("KPC"), with which Mohawk would continue to negotiate to bring the power consumption rates to an average of $0.047/kWh within 5 years. Id. at § 3(a)(iv).

13.     The Parties agreed that, after June 1, 2022 (the "Effective Date"), HBTPower would pay a rent security deposit in the amount of $100,000 and an additional $50,000 for the first month of rent; energy security deposits in the amount of $2,850,000 and $293,000; and an $800,000 deposit for the construction and equipment. Id. at §§ (6)(e), 4(b).

14.     The Parties also agreed the "no provision of [the License Agreement] may be amended, modified, or waived, unless by an instrument in writing executed by a duly authorized officer of the Party against whom enforcement of such amendment, modification, or waiver is sought." Id. at § 26.

15.     Between June 7 and June 17, 2022, HBTPower paid, and Mohawk confirmed receipt of, $4,132,910 from HBTPower for the rent security deposit and first month of rent; energy

security deposit; staffing fee; and deposit for construction and equipment. See Mohawk Receipt, attached hereto as **Exhibit 2**.

16.     On June 8, 2022, Mohawk transferred to KPC the energy security deposit paid by HBTPower. On June 10, 2022, KPC confirmed receipt of $2,800,000 from Mohawk. See June 10, 2022 Email, attached hereto as **Exhibit 3**.

17.     Per Section 5 of the License Agreement, the "Delivery Date" is the later of "the date on which [HBTPower] confirms [Mohawk's] [w]ork has been completed in a manner satisfactory to [HBTPower]" or "all of the conditions set forth in Section 3(b) have been satisfied or waived." See License Agreement, Ex. 1, § 5(c).  The conditions set forth in Section 3(b) include, but are not limited to, Mohawk's obligation to "complete the upgrade of the Premises' electrical service and components, as well as the overall renovation of the Premises," obtain all necessary governmental and regulatory authorizations, ensure "[t]he Premises is capable of sustained Bitcoin Mining activities consistent with [HBTPower's] intended use of the Premises," appropriately modify the Premises to host the Bitcoin mining rig equipment, and install the appropriate power supply infrastructure to host the mining machines purchased by HBTPower. Id. at §§ 3(a), (b).

18.     Section 7 provides that the 8-year "Initial Term" under the License Agreement "shall commence on the Delivery Date." Id. at § 7(a). The "Delivery Date" is also the "Commencement Date" for the "Initial Term" of 8 years, when HBTPower's monthly obligation to pay rent, labor, and 10% of the revenue generated by its Bitcoin mining operation were scheduled to begin.

19.     As a gesture of good faith, to ensure that Mohawk reached the Delivery Date, and to facilitate the commencement of mining activities at the Premises, HBTPower began paying rent

and labor charges in June 2022 and continued to pay until July 2023, even though it was not obligated to do so.

20.     To date, HBTPower has paid more than $12,000,000 in rent, labor, deposits for electricity charges and staffing fees, and advances for construction and equipment.

21.     On June 20, 2022, HBTPower delivered 1,000 Bitcoin mining machine units to the Premises, all of which were M30 series and M31 series models.  On July 12, 2022, HBTPower delivered an additional 1,059 mining machine units to the Premises, which were also M30 series and M31 series models. These models were consistent with the kind of machines that were identified in the License Agreement for Bitcoin mining activities. The Bitcoin mining machines delivered to the Premises were among the best available on the market at that time. Very few entities in the world own mining machine inventory of this quality and size.

22.     Since June 2022, HBTPower has consistently inquired about the status of construction at the Premises and requested proforma invoices for equipment, copies of executed power contracts, and updates on the electrification of the Premises for mining activities.

23.     On December 19, 2022, Mohawk provided HBTPower with executed copies of Mohawk's power contracts with KPC for the first time. A copy of the KPC contracts with Mohawk, dated December 19, 2022, are collectively attached as **Exhibit 4**. Those contracts and their amendments were not fully executed until December 19, 2022, despite Mohawk's representation in the License Agreement that such a contract was already in place as of June 1, 2022. See License Agreement, Ex. 1, § 3(a)(iv).

24.     On March 7, 2023, HBTPower delivered another shipment of 2,276 Bitcoin mining machines to the Premises, all of which were Bitmain Antminer S19j Pro and Bitmain Antminer

S19 Pro models.  These models were also consistent with the kind of machines that were identified in the License Agreement for Bitcoin mining activities.

25.    In total, HBTPower has delivered 4,335 Bitcoin mining machines ("Mining Machines") to the Premises.  While some of the Mining Machines were still kept in their packaging, a significant number of machines had already been unboxed and placed on racks awaiting the Delivery Date and commencement of mining activities.

26.    In late August 2023, HBTPower learned that Mohawk does not actually own the Premises, despite Mohawk's representation in the License Agreement that it had a fee simple absolute estate in the Premises as of June 1, 2022. See id. at § 24(a)(v). HBTPower also learned that Mohawk is now in a dispute with the actual owner of the Premises. Despite HBTPower's repeated requests, Mohawk never provided any documents to show ownership of the Premises.

27.    The License Agreement obligated Mohawk to secure "[a]ll necessary governmental, and regulatory authorizations, together with all third party approvals and consents," which included an "Economic Development Rider" ("EDR") from KPC. Id. at § 3(a)(ii). However, in mid-2023, both KPC and Mohawk informed HBTPower that KPC cannot provide an EDR to Mohawk for HBTPower's mining activities. HBTPower must have an EDR to profitably conduct mining activities in Kentucky.

28.    Starting in 2022 and continuing through 2023, Mohawk moved several transformers, substations, and other equipment necessary for carrying out mining activities to the Premises, but never completely installed the appropriate power supply infrastructure to host Bitcoin mining activities in violation of the License Agreement.

29.    On October 11, 2023, Mohawk improperly removed HBTPower's staff from the Premises on the pretext of non-payment of rent and labor charges.

30.     In a letter to HBTPower on October 12, 2023, Mohawk, through its counsel, incorrectly claimed that "many of the initial contract terms and provisions were modified or discarded" over Zoom meetings.  See October 12, 2023 Letter, attached hereto as **Exhibit 5**. The October 12, 2023 Letter also stated that Mohawk would not provide proforma invoices for equipment acquired by Mohawk for HBTPower's use at the Premises since, according to Mohawk, HBTPower does not own the equipment. Id. Mohawk also "assured that [HBTPower's] mining machines are protected." Id.

31.     To my knowledge and understanding, the Parties did not execute any instrument to amend the License Agreement, or waived any obligations that Mohawk is required to perform under the License Agreement.

### Mohawk's Attempts to Sell or Dispose of HBTPower's Mining Machines

32.     On November 23, 2023, I received information from market sources that Mohawk was attempting to sell some or all of HBTPower's Mining Machines to third parties.

33.     Upon information and belief, one of the third parties to whom Mohawk has attempted to sell Mining Machines is an entity in which Brandon D. Smith, Mohawk's President, has a founding interest and other financially-beneficial connections.

34.     On November 24, 2023, HBTPower sent a cease and desist letter to Mohawk demanding that Mohawk, including its employees, agents, principals, immediately cease and desist from any activities involving the unauthorized sale, disposition, or encumbrance of all or some of the Mining Machines. See November 24, 2023 Letter, attached hereto as **Exhibit 6**.

35.     On November 27, 2023, Mohawk responded with another letter lodging additional erroneous allegations and offering HBTPower the opportunity to inspect the Premises. See November 27, 2023 Letter, attached as **Exhibit 7**. However, the November 27, 2023 letter did not

7

include assurances by Mohawk that it would not sell the Mining Machines or that it had not already attempted to do so. Id.

36.     On November 29, 2023, I checked the remote surveillance footage from cameras that had been set up on the Premises for the security of the Mining Machines. I witnessed unknown individuals enter the Premises, including driving inside the Premises, upon information and belief, to inspect the Mining Machines and/or equipment owned by HBTPower and stored on the Premises.

37.     On November 29, 2023, HBTPower filed its Verified Complaint in the above action.

38.     On November 30, 2023, my access to surveillance cameras was cut off.

39.     Also on November 30, 2023, I received information from market sources that Mohawk reached a deal with unknown third-party purchasers for the unauthorized sale or transfer of HBTPower's Mining Machines by Mohawk.

40.     On December 4, 2023, my fear was confirmed that despite the cease and desist letter in place, and after filing the Verified Complaint, Mohawk had already sold a major portion of HBTPower's Mining Machines.   Mohawk confirmed this position in its Answer and Counterclaim to Verified Complaint for Temporary Restraining Order and Permanent Injunctive Relief ("Answer").

41.     On the same day, I also learned that Mohawk has created lien on at least 220 of the Mining Machines.   The lien documents were prepared by Mohawk's counsel, and served on HBTPower in a clandestine manner instead of directly communicating to counsel; knowing fully well and having asserted herself that "As both parties are represented by counsel, please include

me and your lawyer on communications." The serial numbers in the lien documents match the inventory of the Bitmain Antminer machines that were delivered at the Premises.

42.     While HBTPower has been diligent in its obligations under the License Agreement, Mohawk has carried out fundamental and material breaches of the License Agreement, including, but not limited to, making false representations about having the appropriate power supply for mining activities and holding a fee simple absolute interest in the Premises.

43.     Moreover, without providing an account of money spent, Mohawk has attempted—and to an extent succeeded—to extract funds from HBTPower that have not been due.

44.     As of the date of HBTPower's ouster from the Premises, the infrastructure necessary for HBTPower to perform its mining activities on the Premises was not made available by Mohawk under the terms outlined in the License Agreement.

45.     Mohawk is now encumbering or disposing of the Mining Machines for its own gain and at HBTPower's expense. It has admittedly sold a significant portion of the Mining Machines.

46.     Mohawk has no legal interest whatsoever in the Mining Machines. Likewise, Mohawk has not sought—nor has it been granted—HBTPower's consent to use, sell, dispose, or encumber the Mining Machines.

47.     As a result of Mohawk's wrongful actions and breaches, HBTPower has already suffered, and continues to suffer, irreparable harm.

48.     More specifically, Mohawk's unauthorized distribution and sale of HBTPower's highly specialized and valuable Mining Machines not only constitutes a breach of contractual obligations, but also inflicts irreparable harm upon HBTPower. If Mohawk is allowed the opportunity to sell the Mining Machines to third parties, HBTPower cannot simply go out and replace them. Bitcoin mining hardware is designed for specific cryptocurrencies or algorithms. As

a result, obtaining machines specialized for Bitcoin's algorithm, with the necessary hashing power, is more challenging than acquiring general-purpose hardware. The Mining Machines are virtually impossible to procure or replace on the same scale in the current market.

49.     Moreover, the value of HBTPower's Mining Machines is not solely monetary; it extends to the strategic advantage the Machines provide in a highly competitive market. The Mining Machines give HBTPower a distinct competitive advantage in the cryptocurrency mining industry, which advantage is compromised by Mohawk's unlawful actions. The unauthorized sale of HBTPower's Mining Machines will not only result in direct financial losses for HBTPower but will also undermine its market position and reputation.

50.     Furthermore, the unauthorized distribution of the Mining Machines will continue to disrupt HBTPower's operational efficiency, leading to tangible and intangible losses. The unauthorized use or distribution of the Mining Machines may result in a breach of warranty obligations, leaving HBTPower without the necessary support and maintenance required for optimal performance. This not only compromises the reliability of HBTPower's mining operations, but also poses a risk to the integrity of the Mining Machines.

51.     In addition, Mohawk's breaches and improper removal of HBTPower from the Premises has so far resulted in the deprivation of more than 17 months of mining Bitcoin from which HBTPower should have enjoyed the benefits. The harm caused by Mohawk's decision to oust HBTPower from the Premises is ongoing and the damages resulting therefrom will continue to mount with each day that passes.

52.     This is causing, and will continue to cause, HBTPower severe damage, including in the form of lost funds, customers, strategic advantages, and business opportunities. HBTPower

has already paid Mohawk in excess of $12,000,000, but Mohawk has not performed virtually any of its obligations.

53.     HBTPower continues to investigate and evaluate the extent of harm already caused by Mohawk's unauthorized sale of part of the Mining Machines. The harm caused to HBTPower by Mohawk's actions would be irreparable. Mohawk was incorporated, or became an active business, entity in 2022.  Mohawk reported its operating revenue in 2022 as $80,000 and identified just 3 employees of its own. Therefore, in addition to the irreparable harm associated with the possible loss of the Mining Machines, there is also a considerable risk that Mohawk will not have sufficient assets to pay a judgment entered against it.

**[SIGNATURE AND ACKNOWLEDGEMENT ON FOLLOWING PAGE]**

I, Wang Yangping, Authorized Representative at HBTPower Limited, pursuant to 28 U.S.C. § 1746(2), declare under penalty of perjury under the laws of the United States of America that the information contained in this Declaration is true and correct.

Yangping Wang

Wang Yangping
Authorized Representative
HBTPower Limited

Beijing, China

EXECUTED IN

December 5, 2023

DATE

*4881-0526-4021.2*

# EXHIBIT 1

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

## OPERATION RIGHT LICENSE AGREEMENT
运营权许可协议

**THIS OPERATION RIGHT LICENSE AGREEMENT** ("<u>Agreement</u>"), dated as of June 1st, 2022 ("<u>Effective Date</u>"), is by and between Mohawk Energy, LLC, a Kentucky limited liability company, with a principal business address at 1004 Gateway Industrials Park, Jenkins, KY 41537 ("<u>Licensor</u>"), and HBTPower Limited, a Huobi Technology Holdings Limited controlled BVI business company with its registered address being Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG1110, British Virgin Islands ("<u>Licensee or Huobi</u>"). Licensor and Licensee may be referred to herein individually as a "Party" and collectively as the "Parties."

本经营权许可协议("本协议")于 2022 年 六月 1 日("生效日期")由 Mohawk Energy, LLC ， 一家位于肯塔基州的有限责任公司，其主要营业地址为肯塔基州 Jenkins 41537 市 Gateway 工业园区 1004 号（"许可方"），与 HBTPower limited，是 Huobi Technology Holdings Limited 控股的 BVI 商业公司，注册地址为英属维尔京群岛托尔托拉岛 VG1110 路镇 Wickhams Cay II Vistra Corporate Services Centre （"被许可方或 Huobi"）。许可方和被许可方在本协议中分别称为一方，合称双方。

**WHEREAS,** the Parties wish to enter into a relationship so that Licensee may run and operate Bitcoin Mining (as defined below) activities at 1004 Gateway Industrial Park, Jenkins, KY 41537 (the "<u>Premises</u>").

鉴于：双方希望建立一种合作关系，以便被许可方可以在 KY 41537 Jenkins 市 Gateway 工业园区 1004 号("矿场")运行和经营比特币挖矿(定义见下文)活动。

**WHEREAS,** Licensor has agreed to complete certain physical improvements to the Premises and assist the Licensee on the purchase and installation of certain equipment (as further described in the Bill of Sale, as defined below) on behalf of Licensee so that Licensee can operate its Bitcoin Mining activities within the Premises.

鉴于：许可方已同意完成矿场的某些改进，并代表被许可方协助其购买和安装某些设备(见《销售清单》中进一步描述，定义见下文)，以便被许可方能够在矿场内经营其比特币挖矿活动。

**WHEREAS,** Licensor is responsible for providing no less than 41,000 square feet of mining plant and no less than 30MW power capacity for the Bitcoin Mining Activities. Licensee is responsible for providing crypto mining equipment with a total power no less than 27MW. The mining equipment models are S19, m30, m31 and crypto mining machines with the same or higher computing power.



1

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

鉴于：许可方有责任为比特币挖矿活动提供不少于 41,000 平方英尺的挖矿厂房和不少于 30MW 的电力供应。被许可方负责提供总功率不低于27MW的虚拟币挖矿设备。挖矿设备型号为S19、m30、m31 以及同等或更高算力的虚拟币矿机。

**WHEREAS**, it is agreed that the Licensor shall use its best endeavors to apply, for and on behalf of the Licensee, any applicable business incentive programs, tax deductions and/or other benefits in the State of Kentucky, including but not limited to the Kentucky Business Investment (KBI) program, the Kentucky Enterprise Initiative Act (KEIA), the Incentives for Energy-related Business Act (IEBA) and any other relevant incentive schemes as the Licensee deems necessary in connection with the investment and operation of the Licensee under this Agreement.

鉴于：双方同意许可方应尽最大努力为被许可方并代表被许可方申请肯塔基州任何适用的激励计划、减税及/或其他优惠，包括但不限于 Kentucky Business Investment (KBI) program、Kentucky Enterprise Initiative Act (KEIA)、Incentives for Energy-related Business Act (IEBA)以及被许可方认为与本协议下的投资和运营有关的任何其他相关激励计划。

**NOW THEREFORE**, in consideration of the mutual benefits and other good and valuable consideration described herein, the Parties agree as follows:

考虑到双方的利益和本协议中所述的其他有益和有价值的对价，双方同意如下：

**1. Definitions. 定义**

For purposes of this Agreement, unless the context requires otherwise, the following definitions shall apply:

就本协议而言，除非上下文另有要求，应适用以下定义：

(a)       "Affiliate" means any Person that (at any point during the Term) is controlled by, is under common control with or controls a Party, as applicable, where "control" means (i) the ownership of, or the power to vote, more than fifty percent (50%) of the voting stock, shares or interests of a Person, or (ii) the power to direct or cause the direction of the management and policies of a Person through the ownership of voting securities, by contract or otherwise.

（a）"关联方"意思是附属意味着任何人(在任何时候期间)控制，共同控制或控制方,如适用,在控制手段(i)的所有权,或有权投票,超过百分之五十(50%)的投票股票,股票或利益的一个人,或(ii)通过有表决权证券的所有权,通过合同或其他方式,指导或导致指导某人的管理和政策的权力。

2

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

(b)     "<u>Agreement</u>" shall have the meaning set forth in the preamble.

（b）"合同"具有序言所述的含义。

(c)     "<u>Bitcoin Mining</u>" means all activities associated with creating new Bitcoin by solving mathematical puzzles with special mining machines equipped with specialized chips. The mining process also confirms transactions on the cryptocurrency's network.

（c）"比特币挖矿"是指用装有专门芯片的特殊矿机解决数字谜题，与创造新的比特币有关的所有活动。挖矿过程还会确认加密货币网络上的交易。

(d)     "<u>Bill of Sale</u>" means the bill of sale or procurement contracts to be dated as of the Commencement Date or earlier between the Licensee and various suppliers.

（d）"销售清单"系指被许可方与各供应商之间，在本合同开始日期之前或与本合同开始日期同时签订的销售清单或采购合同，其副本载于本协议附件 E。

(e)     "<u>Confidential Information</u>" shall have the meaning set forth in <u>Section 13</u>.

（e）"保密信息"具有第 13 条规定的含义。

(f)     "<u>Effective Date</u>" shall have the meaning set forth in the preamble.

（f）"生效日期"具有序言所述含义。

(g)     "<u>Indemnified Party</u>" shall have the meaning set forth in <u>Section 11(b)</u>.

（g）"受偿方"应具有第 11(b)条所述含义。

(h)     "<u>Initial Term</u>" shall have the meaning set forth in <u>Section7(a)</u>.

(h)"初始期限"具有第 7(a)条规定的含义。

(i)     "<u>Licensee</u>" shall have the meaning set forth in the preamble.

(i)"被许可方"具有序言中所述的含义。

(j)     "<u>Licensee Property</u>" means the property/equipment to be used to conduct Bitcoin Mining activities, including without limitation, the property/equipment set forth in <u>Schedule B</u> attached hereto, which shall be further supplemented when such details are finalized.



3

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

(j)"被许可方财产"系指用于开展比特币挖矿活动的财产/设备，包括但不限于本协议附件 A 中规定的财产/设备（该等细节确定后将进一步补充）。

(k)      "Licensor" shall have the meaning set forth in the preamble.

(k)"许可方"具有序言中所述的含义。

(l)      "Licensor Property" means the property/equipment, if any, at the Premises owned by the Licensor, as set forth in Schedule B attached hereto, which shall be further supplemented when such details are finalized.

(l)"许可方财产"系指本协议附件 B 中所列许可方在矿场内拥有的财产/设备(如有，该等细节确定后将进一步补充)。

(m)      "Losses" shall have the meaning set forth in Section 11(a).

(m)"损失"具有第 11(a)条规定的含义。

(n)      "Output" means Bitcoin and any similar commercially measurable reward, and other output generated through the running of diverse cryptographic hash functions using the Licensee Property at the Premises, over the applicable period (e.g., a calendar month).

(n)"产出"指在适用期间(例如一个日历月)，比特币和任何类似的商业上可衡量的回报，以及通过使用被许可方财产在矿场运行各种加密哈希函数而产生的其他产出。

(o)      "Party" shall have the meaning set forth in the preamble.

(o)"当事人"具有序言中所述的含义。

(p)      "Person" means any individual, corporation, partnership, firm, association, trust, unincorporated organization or other entity, as well as any syndicate or group of any of the foregoing.

(p)"人"指任何个人、公司、合伙企业、商号、协会、信托、非法人组织或其他实体，以及上述任何集团或团体。

(q)      "Renewal Term" shall have the meaning set forth in Section 7(a).

(q)"续展期限"具有第 7(a)条所述含义。



4

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

(r)      "Term" shall have the meaning set forth in Section 7(a).

(r)"期限"具有第 7(a)条规定的含义。

(s)      "Third-Party Claims" shall have the meaning set forth in Section 11.

(s)"第三方索赔"应有第 11 条规定的意义。

**2. License Grant. 许可内容**

Licensor hereby grants to Licensee an exclusive, irrevocable license for the duration of the Term only to run, operate, manage Bitcoin Mining activities in the Premises for the 30MW mining site only and to generate revenue in connection therewith, including the right:

许可方在此向被许可方仅就上述地址的 30MW 电力的矿场在期限内授予独家的，不可撤销的许可，在矿场中运营、经营、管理比特币挖矿活动，并由此产生收入，包括以下权利：

(a) to run, operate and manage the mining field located at the Premises and to conduct Bitcoin Mining or other cryptocurrency mining activities therein;

（a）运营、经营和管理位于本处所的矿场，并在其中开展比特币或其他加密币挖矿活动

(b)      to utilize the Premises with electricity facilities and racks of mining machines;

（b）使用矿场的电力设施和矿机机架

(c)      to administer, arrange and dispatch employees who are assigned to Licensees by Licensor to work at the Premises; Licensee will provide the job description to Licensor, the Licensor will select the employees candidates which are going to assign to Licensee based on the job description which is provided by the Licensee, and will hire the assigned employees to the Licensee upon the approval of the Licensee; and

(c) 管理、安排、派遣授权方安排给被授权方使用的在此矿场工作人员；被授权方将提供给授权方所需岗位的岗位责任，授权方将根据被授权方提供的岗位责任选择及招聘合格的员工，并正式聘用及安排由授权方同意及确认合格的员工交由被授权方安排管理使用以及

(d)      to take all other actions necessary or advisable in connection with the foregoing.

(d) 从事与上述有关的所有其他必要或可取的活动。

5

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

For the avoidance of doubt, such license shall only be exclusive in relation to the operation of the 30MW Bitcoin Mining operation carried out by the Licensee on the Premises.

为免生疑问，该许可仅与被许可方在矿场上进行的 30MW 比特币挖矿操作有关。

### 3. Conditions Precedent and Performance Obligations 先决条件和义务履行

(a)      Conditions 条件

The foregoing shall constitute conditions to Licensee's obligations hereunder:

下述规定构成被许可方在本协议项下义务履行的条件：

i.     The Warranties (as set forth in <u>Section 24</u> below) are true and correct;

i. 下文第 24 条所述保证内容真实无误

ii.    all necessary governmental, and regulatory authorizations, together with all third party approvals and consents, having been obtained for the purposes stated in <u>Section 2</u> above;

ii. 已为上述第 2 条所述目的获得所有必要的政府和监管授权，以及所有第三方的批准和同意

iii.   the Premises is capable of sustained Bitcoin Mining activities consistent with Licensee's intended use of the Premises and the Design and Specifications which shall be attached hereto as <u>Schedule C when the parties have agreed upon the specifications</u>, including, without limitation, the Premises conditions and electrical service and facilities satisfying the aforementioned requirements related to Bitcoin Mining activities;

iii. 该矿场能够按照被许可方对该矿场的预期用途以及双方一致同意的本协议附件 C 所附的设计和规格进行持续的比特币挖矿活动，包括但不限于：与比特币挖矿活动相关的矿场条件和满足上述要求的电力服务和设施

iv. Licensor has entered into a contract for power supply ("**Power Supply Agreement**") with a power supply company for the firm power supply to the Premises, Licensor shall negotiate  the best power rate at the time in behalf of the licensee at its best effort to match the Licensee target  average rate of $0.047/kWh within five years. Licensee understand that Licensor only passing through the power supply company's utility bill to Licensee,  and the power rate  subjects to certain adjustments at the time when the utility bill is billed to the Licensee. The Licensee will pay the power company's utility bill based on the utility bill will receive at the time directly. The contract of which shall be annexed as Schedule D of this Agreement when the Power Supply Agreement has been entered into by the Licensor and approved by the Licensee ;



6

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

iv.许可方已与电力供应公司签订了一份关于矿场的电力供应合同(《电力供应协议》)，授权方应尽最大努力为被授权方争取到当期最好的电费，并尽最大努力和电力公司协商争取实现授权方在五年内平均费率 0.047 美元/千瓦时的目标价格，被授权方明白授权方将直接把电力公司的账单转送给被授权方，当期的电费账单会有某些调整，被授权方将按当期收到的账单直接支付电费给电力公司。该合同经被许可方同意，并经许可方与电力公司签署后，附于本协议附件 D

v. The Premises shall contain a 41,000sq feet plant which shall be appropriately modified (as approved by the Licensee) as part of the Licensor's Work (as defined below) to host the Licensee's Bitcoin Mining rig equipment; and

v. 矿场应包括一个 41,000 平方英尺的厂房，该厂房应经做适当修整（经被许可方同意）作为许可方工作(定义见下文)的一部分，以容纳被许可方的比特币挖矿设备;和

vi. The Premises shall be installed with the appropriate power supply infrastructure (as approved by the Licensee) as part of the Licensor's Work (as defined below) to host the Licensee's Bitcoin Mining rig equipment.

vi.矿场应安装合适的供电基础设施(需为经被许可方批准的)，作为许可方工作(定义见下文)的一部分，以供被许可方的比特币挖矿设备运转。

(b)      Obligations in Relation to Conditions   与条件有关的义务

Licensor must: 许可人必须：

i.      use all reasonable efforts to ensure that each condition set forth in <u>Section 3(a)</u> above is satisfied as soon as practicable;

i.尽一切合理努力，确保在切实可行的情况下尽快满足上述第 3(a)条所述的各项条件

ii.      keep the other Party informed of any fact, matter or circumstance of which it becomes aware of that may result in a condition not being satisfied in accordance with its terms; and

ii. 将其所知的任何可能导致该方无法满足条件的事实、事项或情况告知另一方;和

iii. complete the upgrade of the Premises' electrical service and components, as well as the overall renovation of the Premises (as set forth in the Design and Specifications attached hereto as <u>Schedule C</u> or as otherwise explicitly agreed by Licensee in writing) (the "<u>Licensor's Work</u>") by no later than three (3)

7

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

months after the Effective Date. There is an exception if Licensor delayed the site upgrade completing day because Licensee failed to pay the equipment profoma invoice Licensor provided to Licensee in time. Licensee has obligations to pay the Licensor the amount on the profoma invoice for equipment in time as the payment deadline on the proforma invoice,

iii.不晚于本合同生效日后 3 个月内完成矿场电力服务和组件的升级,以及矿场的整体改造, 如果由于被授权方迟付购买设备金额所导致的延期应该除外。被授权方有责任按授权方提供的商业发票的付款时间内按时支付设备金额。(如附件 C 设计和规范规定的或被许可方以书面形式明确同意的)("许可方的工作")。

Upon the failure of any of the foregoing conditions, Licensee shall have the right to terminate this Agreement upon written notice thereof to Licensor and, in such event, this Agreement will terminate, the Security Deposit and any other amounts paid hereunder will be returned to Licensee, and neither Party shall have any further rights or obligations under this Agreement except as expressly set forth herein.

若上述任何一项条件未能履行,被许可方有权书面通知许可方终止本协议,在此情况下,本协议将终止,保证金和本协议项下支付的任何其他款项将退还给被许可方,除本协议明确规定外,任一方在本协议项下均不需承担任何其他权利或义务。

（c） Performance obligations of the Licensee  被许可方义务的履行

Licensee must: 被许可方必须：

i. use all reasonable efforts to ensure that each condition is satisfied as soon as practicable;

i. 尽一切合理努力，确保每项条件在切实可行的情况下尽快得到满足

ii. keep the other Party informed of any fact, matter or circumstance of which it becomes aware that may result in a Condition not being satisfied in accordance with its terms; and

ii.将其所知的任何可能导致该方无法满足条件的事实、事项或情况告知另一方;和

iii. appoint a representative to inspect and take delivery of every shipment of mining machine that is shipped to a port in the United States of America.

iii.委派一名代表检查并接收运往美国港口的每批矿机

iv. procure and enter into insurance coverage for the shipment and transportation of mining machines to the Premises.

8

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

iv.为运输和运送矿机到该矿场购买保险并签订保险合同。

v. Licensee shall, on best endeavor basis, operate the mining machines to reach ninety percent (90%) of the mining hash rate (for the purpose if this clause, the mining hash rate of each mining machine shall be the figure as stated by the manufacturer for the relevant model) of the total capacity of the mining machines installed on the Premises ("**Minimum Operating Level**") for each consecutive quarterly (3 months) blocks starting following the Initial Operation Period. In the event the actual operation level falls below the Minimum Operation Level, Licensor is entitled to receive a payment in the form of Bitcoin in proportion to the Monthly Revenue share for the amount of shortfall from the Minimum Operating Level ("**Operating Level Credit**"). The Operating Level Credit shall be paid in two (2) equal instalments by the Licensee to the Licensor within two (2) months immediately following the relevant quarter that does not meet the Minimum Operating Level. Notwithstanding the foregoing, the Parties agree that the Licensee shall not be liable for any liability, loss or cost suffered by the Parties caused by or resulting from any Force Majeure Events or other events beyond the Licensee's reasonable control. The Parties further agree that the first three (3) months starting from the Commencement Date or the period before all the mining racks have been fully installed and are operational (whichever the earlier) shall be initial operation period ("**Initial Operation Period**"), during which the Parties may agree to amend or supplement this Clause 3(c) as appropriate. For the purpose of this Clause 3(c), "Force Majeure Events" shall include, without limitation, the following events:

v.被许可方应尽最大努力提供平均 90%的开机运转率("最低开机运转率",就本条款而言,每台矿机的挖矿哈希率应为制造商对相关型号所述的数字),以初始运营期之后的每连续 6 个月挖矿为基础计算。如果实际开机运转率低于最低开机运转率,则许可方有权从月收入分成中按比例收取实际开机运转率和最低开机运转率之间差额("运转率补偿")。被许可方应每两(2)个月等额向许可方支付运转率补偿。在本协议期限的最后两(2)个月内,任何未偿付的运转率补偿均须以法币支付。尽管有上述规定,双方同意,被许可方对任何不可抗力事件或被许可方合理控制范围之外的事件造成或导致双方遭受的任何责任、损失或费用不承担责任。双方进一步同意,开始日期前三(3)个月为初始运营期,在此期间,双方同意根据需要对本第 3(c)条进行修改或补充。就本第 3(c)条而言,不可抗力事件包括但不限于以下事件:

(a)      Power outage or blackout of power supply to the Bitcoin Mining operation carried out on the Premises;

(a)矿场中进行的比特币挖矿操作过程中的停电或电力供应中断;



9

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

(b)     Power outage due to failure of the power supply infrastructure on the Premises. In such circumstances, Licensor shall assist Licensee in making claims against the supplier of such power supply infrastructure.

（b）由于矿场供电基础设施故障而停电。在该等情况下，授权方应协助被授权方 对该等供电基础设施的供应商进行索赔。

(c)     Damage to mining machines or downtime caused by or resulting from the power outage or blackout. The damage caused by power outage is calculated by the difference in hash rate of mining machines before and after the power outage. For the purpose of calculating the Minimum Operating Level, the actual power outage time is calculated according to the length of power outage plus four hours, taking into account the time required for network reconnection and for the mining machine to return to normal computing power when power supply is recovered;

（c）停电造成的采矿机器损坏或停机。停电造成的损失是通过停电前后矿机哈希率的差异来计算的。为计算最低运营水平的目的，计算实际停电时间时应按照停电时长+ 4 个小时的长度计算,同时考虑网络重新连接所需的时间和采矿机恢复正常计算能力的时间；

(d)     Damage to mining machines caused by or resulting from natural disasters (such as lightnings, earthquakes, floods, typhoons, tsunami, rainstorms, tornadoes.) ;

（d）由自然灾害(如闪电、地震、洪水、台风、海啸、暴雨、龙卷风等)引起或导致的矿机损坏

(e)     The occurrence of a pandemic resulting in the suspension of the Bitcoin Mining operation on the Premises;

（e）发生疾病大流行，导致矿场内的比特币挖矿作业暂停

(f)     The loss of hash rate or computing power of mining machines due to strike and shutdown of workers.

（f）由于工人罢工和停工而使矿机丢失哈希率或计算能力。

(g)     The Parties shall discuss and negotiate on a good faith basis how to appropriate losses resulting from stoppage of operations or damages to mining machines resulting from a malicious or intentional sabotage to the Bitcoin Mining operation.

10

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

(g) 双方应在诚信的基础上讨论和协商如何适当处理因恶意或故意破坏而导致的比特币挖矿作业中断或挖矿机器损坏所造成的损失。

4.Purchasing of Equipment as Part of the Licensor's responsibilities.  购买设备作为许可方责任的一部分

(a)The Parties agree that the overall cost of the equipment which will be purchased by Licensor on behalf of Licensee, including, without limitation, the purchase of the various equipment and construction materials to be incorporated into the Premises, shall not exceed Eight Million US Dollars (US$8,000,000.00) (the "Maximum Work Cost").

（a）双方同意，许可方工作代为被许可方采购的设备，包括但不限于用于该矿场的各种设备和建筑材料的采购，不得超过 800 万美元($8,000,000.00)(最高工作成本)。

(b) The Licensee shall pay 10% of the Maximum Work Cost, being Eight Hundred Thousand US Dollars (US$800,000) (the "Work Deposit") as a deposit to the Licensor upon signing of this Agreement. The Work Deposit shall be applied to deduct payments the total amount of all of the proforma invoice to suppliers as contained in the Bill of Sale and any remaining balance of the Work Deposit shall be returned to the Licensee after all the balance of the total amount of all of the proforma invoice to be paid in full.

（b）在签署本协议时，被许可方应向许可方支付最高工作成本的 10%，即捌拾万美元($800,000)(工作保证金)作为保证金。保证金应用于抵扣销售清单中规定的支付给供应商的商业发票总款项，如在付清所有商业发票的总金额后保证金尚有余额，该余额应在付清所有商业发票的总金额后退还给被许可方。

(c)     The licensor will submit all the proforma invoice for the equipment which include but is not limited to transformers, substation transformers, 69kV Substation and 15kV Distribution; and internal mining site of the 41,000 square feet mining plant and mining rig cases, which include but is not limited to Pdu plus splitter cables, Racks and Shelves, Silver board or replacement material, Cat5 Cable premade, Ventilation Louvers for intake, and internet infrastructure, which include but is not limited to network switches and components to Licensee for approve before purchase, the licensee will pay for  the balance of the total amount due on the proforma invoice to the vendors or the licensor within three working days after approval of the proforma invoice. The licensee will pay for all financial fee or transaction charges for each transaction. For the avoidance of doubt, the Licensee shall be the party to such procurement contracts and shall be the legal and beneficial owner to all such equipment and infrastructure.

（c）许可方在购买前应向被许可方提供（包括但不限于变压器、配电变压器、69kV 变电站和15kV 配电设备在内的所有设备;以及 41,000 平方英尺矿场的内部采矿现场和采矿钻机机箱，包括但

11

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

不限于 Pdu 加分割线电缆、机架和货架、银板或替代材料、Cat5 电缆预制、进气通风百叶窗和互联网基础设施，包括但不限于网络交换机和组件）的订货单供被许可方审批。被许可方应在订货单批准后三个工作日内向供应商或许可方支付订货单上应付总金额的余款。被许可方须支付每笔交易中产生的所有财务费用或交易费用。为免生疑义，被许可方应是该等采购合同的一方，并应是所有该等设备和基础设施的合法和实益所有人。

### 5.Delivery.  交付

(a)    Licensor shall notify Licensee at least (30 ) days in advance of the completion of the Licensor's Work.
（a）许可方应在其工作完成前至少 (30)天通知被许可方。

(b)    Licensee shall inspect the Licensor's Work within (_7) days after receiving Licensor's notice of such completion in order to determine if Licensor's Work is completed in a manner satisfactory to Licensee.
（b）被许可方应在收到许可方的完工通知后(_7_)天内检查许可方的工作，以确定许可方的工作是否以令其满意的方式完成。

(c)    Licensor shall deliver the Premises to Licensee in the condition required promptly after the later of (i) the date on which Licensee confirms Licensor's Work has been completed in a manner satisfactory to Licensee and (ii) the date on which all of the conditions set forth in Section 3(b) have been satisfied or waived (such date being the "Delivery Date").
（c）许可方应向被许可方交付符合条件的矿场的时间，是下述发生时间在后者：(i)被许可方确认许可方的工作已经按照被许可方满意的方式完成的日期和(ii)所有 3 (b)款规定的条件被满足或放弃(交付日期)的日期。

(d)    Licensor shall provide on or prior to the Commencement Date all materials and documents (including the Bill of Sale) to verify the legitimate possession and, to the extent applicable, of the Premises, Licensee Property, and Licensor Property as reasonably requested by Licensee.
（d）在被许可方提出合理要求的情况下，许可方应在合同开始日期当天或之前提供所有材料和文件(包括销售清单)，以核实其对矿场、许可方财产和被许可方财产的合法占有情况，（如适用）。

12

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

(e)   Licensor shall provide electricity facilities with well-adapted installed capacity, ensure the power connection, and certify that all such facilities, connections, and available capacity are in accordance with the requirements set forth in the Design and Specifications.

（e）许可方应提供适应良好的装机容量的电力设施，确保电源连接，并证明所有该等设施、连接和可用容量符合设计与规格中规定的要求。

(f)   Licensor shall employ the number of workers necessary to effectively conduct the Bitcoin Mining activities.

（f）许可方应雇用能够有效进行比特币挖矿活动所需的一定数量的工人。

**6.Fees.  费用**

(a)   As full and complete compensation for the license granted herein, Licensee, commencing on the Commencement Date, agrees to pay Licensor a license fee (the "Fee"), consisting of:

（a）自本合同生效日期起，被许可方同意向许可方支付许可费，作为对在本协议中授予的许可的全部和完全补偿，费用包括：

i   Rent: Rent for the Premises: US$50,000.00 per month.

i.租金:矿场租金:每月 5 万美元。

ii   Staffing: Licensee and Licensor shall agree on the number of employee and job duties of such employees to work on the Bitcoin Mining operation on the Premises. The licensor will provide six maintenance technicians, one electrical engineer, three security guarders and one cleaning person (the "Seconded Employees"). The cost of hiring and employing such pre-determined workers to conduct Bitcoin Mining at the Premise shall be US$40,000.00 per month. If Licensee is to later request additional employees rather than the above agreed employees to work on the Premises, licensee shall be responsible for paying the additional cost of the extra employees. The Licensor shall be responsible for employing the Seconded Employees and any such additional employees that the Licensee requests. ii.人员成本:被授权方和授权方应就该矿场从事比特币挖矿操作的员工数量和工作职责达成一致。授权方将会提供六个矿场维修维护工人，一个电力工程师，三个保安，一个保洁人员（"借调员工"）。根据许可方实际记录的雇佣该等预先确定的工人进行比特币挖矿的实际支出成本，在该矿场雇用该等预先确定工人进行比特币挖矿的成本为每月不超过 40,000.00 美元。如果被授权方 随后要求增加员工在该矿场工

13

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

作，被授权方应负责承担支付该等额外雇佣的费用并由授权方负责聘用。许可方应负责雇用借调员工以及被许可方要求的任何此类额外员工。

iii  Energy Charges: The target average estimated rate of power supply within five years is US$0.047/kWh, save for certain electricity adjustment charges in accordance with the terms as set forth in the Power Supply Agreement.  The estimated rate of power payable to the Licensee shall be in accordance with the Power Supply Agreement and the power company's utility bill at the time.  The Licensee takes the full responsibility for paying the monthly utility charges based upon the month utility bill from the power company that is issued in relation to the operation of the Licensee

iii 能源费:除根据供电协议规定的某些电力调整费用外，目标争取达到的预估供电价格五年内的平均值是 US$0.047/kWh。该许可人应付的电费将按照供电协议的规定和当期收到的电力公司的电费账单执行。被授权方对每月电力公司就其使用的电费送达的电费账单负全责。

iv. Revenue Sharing: Ten percent (10%) of Licensee's output generated during the Term commencing immediately after the Initial Operation Period  (the "Revenue Share").

iv 收入分成:被许可方在协议期限内紧接上一个日历月内挖矿产出的百分之十(10%)。

The Fee shall be payable on a monthly basis, in arrears, on or before the tenth (10th) day of each month commencing with the first month following the commencement of the Term.  Licensee shall provide Licensor with a reasonably detailed accounting and access to verify the output of the monthly Bitcoin mined for the calculation of the Revenue Share on a monthly basis, no later than the date on which the Fee is due. In the event that Licensor disputes any aspect thereof in good faith, Licensor shall provide notice thereof to Licensee not later than 15 days following receipt of such accounting.  Thereafter, Licensee's calculation shall be deemed final and binding . In the event if at any month-end settlement calculation, the total value of the crypto currency mined during that month is less than the total electricity cost for that month, the licensee will show the calculation details to the licensor and get the licensor's permission, then the Licensee will pay the power bill for that month and the related fee it might have at the time, and shut down the mining machines in the following month, until the threshold is reached when the total value of crypto currency mined is higher enough to cover the power costs . For the avoidance of doubt, during the shutdown period where the total value of the crypto currency mined is less than the total electricity cost, the Licensee shall not be required to share revenue to the Licensor as stipulated under this section.

14

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

上述费用应在合同开始后的第一个月开始的每月第十(10)天或之前按月支付。被许可方应在不迟于应支付费用的日期向许可方提供合理详细的账目和用于核实计算收入分成的每月比特币挖矿量的权限。如果许可方善意地对其中的任何方面提出异议，则许可方应在收到该等会计报告后 15 天内向被许可方发出有关通知。此后，被许可方的计算将被视为最终的并具有约束力。如果在某一个月结束计算结账时，当月挖出的总币值不足支付当月电费，被授权方向授权方出具证明并征得授权方同意，被授权方将支付当月的电费及可能发生的相关费用，并在下一个月里关闭所有矿机的运行，直到币值回升到总币值足够支付当月电费的平衡点时再重新开机运营。為免存疑，在关闭期间，即开采的加密货币的总价值低于总电费，被许可人不需要按照本节规定向许可人分成收入。

(b)   All payments of the Fee hereunder (except for the Revenue Sharing portion of the Fee, which is to be paid out per the terms of subsection (c) below) shall be made in USD.

（b）本协议项下的所有费用付款(费用的收入分成部分除外，该部分应按照下文第(c)款的条款支付)均应以美元支付。

(c) The Revenue Share potion of the Fee shall be paid to Licensor in specie in the form of Bitcoin mined as part of the Output.  In order to calculate the appropriate Revenue Share amounts to be paid to Licensor in specie, Licensee shall grant Licensor read access rights to the Bitcoin wallet address where the proceeds of the Bitcoin Mining activities are to be deposited. The Licensor and Licensee shall share equally the costs for paying all relevant Bitcoin network fees ("Bitcoin Transaction Fees") associated with the transaction, separate and apart from the Bitcoin due to Licensor hereunder.

（c）收入分成应作为比特币挖矿产出的一部分，以币的形式支付给许可方。为了计算精确的以币的形式支付给许可方的收入分成数额，被许可方应授予许可方对比特币挖矿活动收益存放的比特币钱包地址的读取访问权。许可方和被许可方应平等分担与交易相关的所有相关比特币网络费用(比特币交易费用)的支付费用，该费用不包括本协议项下应支付给许可方的比特币。。

(d) Licensor acknowledges and agrees that the price of cryptocurrencies can be extremely volatile and subject to upward and downward movements.  Licensor alone is responsible for providing Licensee with the correct Bitcoin and/or wallet address information. Once Licensee initiates a payment of the Fee to licensor in Bitcoin, the transaction cannot be reversed. Licensor acknowledges and agrees that this is inherent in the nature of cryptocurrency networks, and accepts all associated risks. LICENSOR IS SOLELY RESPONSIBLE FOR VERIFYING THAT IT HAS PROVIDED THE CORRECT ADDRESSES FOR

15

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

PAYMENTS IN CRYPTOCURRENCY.  ANY PAYMENT MADE BY LICENSEE IN RELIANCE ON ADDRESS INFORMATION PROVIDED BY LICENSOR SHALL BE CONSIDERED FINAL PAYMENT AND SATISFACTION OF AMOUNTS DUE TO LICENSOR HEREUNDER.

（d）许可方承认并同意，加密货币的价格可能异常波动，并受上行和下行波动的影响。许可方独自负责向被许可方提供正确的比特币和/或钱包地址信息。一旦被许可方开始以比特币支付费用，交易就不能逆转。许可方承认并同意，这是加密货币网络的固有性质，并接受所有相关风险。许可方单独负责验证其加密货币支付提供了正确的地址。被许可方根据许可方提供的地址信息支付的任何款项均应被视为支付了本协议项下应付给许可方的款项。

(e) After the Effective Date, Licensee shall pay to Licensor a first month and Security Deposit (as defined below) amounts as follows:

（e）本协议生效后，被许可方应向许可方支付以下第一个月金额和保证金(定义见下文)

(i)   For Energy Usage: Licensee shall pay to Licensor US$293,000.00 an "Energy Security Deposit" in an amount of US$2,850,000.00 which is equal to two (2) months of estimated energy usage at the rate established above upon signing this agreement; Licensee will pay US$ 293,000.00 and the Energy Security Deposit to the power company according to its payment instruction directly. Licensee shall pay to Licensor the first month payment for the estimated energy usage which is US$1,425,000.00 no later than thirty (30) days before commencing its Bitcoin Mining activities. 。

（i）在能源使用方面:被许可方应在签署本协议时按照电力公司的支付细则向电力公司支付293,000 美元及能源保证金金额 2,850,000 美元;被许可方应在开始比特币挖矿活动不少于 30 天前向许可方支付，第一个月预估的能源使用费 1,425,000 美元。

(ii) For Rent: Licensee shall pay to Licensor, within seven (7) business days of the Effective Date, a "Rent Security Deposit" (together with the Energy Security Deposit, the "Security Deposit") in the amount of US$100,000.00, as well as the first month rent payment of US$50,000.00.

（ii）关于租金:被许可方应在协议生效之日起七(7)个工作日内向许可方支付金额为$100,000.00 的保证金(连同能源保证金，统称为保证金)，以及第一个月的租金$50,000.00。

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

**7.Term and Termination. 合同期限及终止**

(a)The term of this Agreement shall commence on the Delivery Date (the "Commencement Date") and shall continue until the last day of the eighth (8th) License Year (as defined below) (the "Initial Term"). At the end of the Initial Term, unless the Licensee has provided Licensor with written notice (at least thirty (30) days in advance of the end of the Initial Term) of its intention not to extend the Term beyond the end of the Initial Term, the term of the Agreement shall automatically renew for a three (3) year period (the "Renewal Term") upon the same terms and conditions as are herein provided, except that the Premises shall be delivered in their existing condition (on an "as is" basis) at the time the Renewal Term commences.

（a）本协议的期限应从交付(生效日)开始，并持续至第 8 个许可年(定义见下文)的最后一天(初始期限)。在初始期限结束时，除非被许可方已(在初始期限结束前至少三十(30)天)书面通知许可方其不打算在初始期限结束后延长期限的意图，协议的期限将自动延期 3 年（续展期）。续展期合同条款与本协议的规定相同，除了矿场在续展期时应以其届时实际条件交付。

The Initial Term together with the Renewal Term may be referred to hereinafter as the "Term."
初始期和续展期在本合同项下统称为合同期限。

The first "**License Year**" shall be the period from the Commencement Date to the last day of the twelfth (12th) full calendar month following the calendar month in which the Commencement Date occurs. Thereafter, each consecutive twelve (12) calendar month period shall constitute one (1) License Year. Notwithstanding anything contained herein to the contrary, if the Commencement Date occurs on the first (1st) day of a calendar month, the first License Year shall be twelve (12) full calendar months.
第一个许可年应从开始日期起至开始日期所在的日历月后的第十二(12)个完整日历月的最后一天。此后，每个连续十二(12)个公历月期间将构成一(1)许可年。尽管本协议中有相反规定，但如果生效日期发生在日历月的第(1)天，则第一个许可年应为整整十二(12)个日历月。

The Parties agree to review the terms and conditions of this Agreement every two License Year starting from the Commencement Date and that upon the mutual agreement by both Parties, the terms and conditions of this Agreement shall be revised accordingly through entering into a supplemental agreement. Either Party may unilaterally cancel the requirement to review the terms and conditions of this Agreement as stipulated under this clause.

17

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

双方同意，自生效日期起，每两个许可年审查一次本协议的条款和条件，并在双方同意的情况下，通过签订补充协议，对本协议的条款和条件进行相应修改。任一方均可按本条规定单方面取消对本协议条款和条件的审查要求。

**8.Survival.** Notwithstanding expiration or termination of this Agreement for any reason, <u>Sections 1, 9 through 11, and 13 through 23</u> shall survive and continue to bind the Parties after expiration or termination of this Agreement.

8.继续有效。即使本协议因任何原因期满或终止，第1条、第9条至第11条和第13条至第23条仍将继续有效，并在本协议期满或终止后继续对双方具有约束力。

**9.Proprietary Rights. 所有权**

(a) Licensor acknowledges and agrees on behalf of itself and its Affiliates that all Licensee Property shall be owned and controlled solely by Licensee and its Affiliates, and Licensee and its Affiliates may use, dispose and otherwise exploit such Licensee Property for any purpose, commercial or otherwise, without any obligation, fee or other consideration due to Licensor or any of its Affiliates; and

（a）许可方代表其自身及其关联方承认并同意:所有被许可方财产应由被许可方及其关联方单独拥有和控制，被许可方及其关联方可为任何商业目的或其他目的的使用、处置或以其他方式利用该等被许可方财产，无需向许可方或其任何关联方承担任何义务、费用或其他对价;和

(b) Licensee acknowledges and agrees on behalf of itself and its Affiliates that, except for the rights granted to Licensee in this Agreement and the exclusive use of Premises and the related electricity facilities, all Licensor Property shall be owned and controlled solely by Licensor and its Affiliates, and that no fee or other consideration shall be due to Licensee hereunder or otherwise in connection with Licensor's or its Affiliates' use, disposition or other exploitation of Licensor Property.

（b）被许可方代表其自身及其关联方承认并同意，除在本协议中授予其的权利以及对矿场和相关电力设施的独家使用外，所有许可方场地财产均应由许可方及其关联方单独拥有和控制，且在本协议项下，或在许可方或其关联方对许可方财产的使用、处置或其他使用方面，无需向被许可方支付任何费用或其他对价。

(c) Licensor shall, and shall cause its Affiliates to, take such actions and execute such instruments as are reasonably necessary and appropriate (or Licensee may otherwise reasonably request) to protect Licensee Property and secure Licensee's and its Affiliates' rights in Licensee Property at Licensee's expense.



18

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

（c）许可方应并应促使其关联方采取合理必要的行动和执行适当的措施（或在被许可方另外提出合理要求时）以保护被许可方财产，并保障被许可方及其关联方在被许可方财产中的权利，费用由被许可方承担。

**10.Disclaimer.** NO PARTY MAKES ANY WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE SUBJECT MATTER OF THIS AGREEMENT EXCEPT AS EXPRESSLY STATED IN <u>SECTION 24 BELOW</u>.

10.免责。除下文第 24 条明确规定外，任何一方均不得对本协议标的物作出任何明示或暗示的保证。

**11.Indemnification. 赔偿**

(a) Licensor will defend, indemnify, and hold harmless Licensee, Licensee's Affiliates, and its and their respective officers, directors, employees, agents and service providers (each an "<u>Indemnified Party</u>") against any and all third party claims, demands, actions, suits, or proceedings ("<u>Third-Party Claims</u>"), and resulting judgements, settlements, liabilities, losses and expenses, including reasonable legal fees and costs ("<u>Losses</u>") to the extent caused by or related to: (i) a breach or alleged breach of any warranty made by Licensor in <u>Section 24</u> of this Agreement, (ii) allegations that Licensor Property or any property purchased by the Licensor on behalf of the Licensee pursuant to the Bill of Sale infringes the proprietary right of any third party or violates applicable legal requirements,(iii) allegations that Licensor Property or any property purchased by Licensor on behalf of the Licensee is not in compliance with any applicable law, rule, regulation, contract, order of any governmental (including any regulatory or quasi-regulatory) agency or stock exchange, including any financial disclosure or encryption law, (iv) hazardous materials in any way affecting the Premises and not solely caused by the Licensee, and (v) allegations by any of Licensor's employees .

（a）许可方将针对任何和所有第三方的索赔、要求、诉讼、诉讼程序(第三方索赔)以及由此产生的判决、和解，为被许可方、被许可方的关联方及其各自的管理人员、董事、员工、代理和服务提供商(均为受赔偿方)进行辩护，使其免受损害、责任、损失和费用，包括合理的法律费用和成本(损失)，其范围是由以下原因引起的或与之相关的:(i)许可方违反或涉嫌违反本协议第 24 条中规定的任何保证，(ii)指控许可方财产或任何许可方按照销售清单代表被许可方购买的财产侵犯了任何第三方的所有权或违反适用的法律要求,(iii)指控许可方财产或任何许可方代表被许可方购买的财产不遵守任何政府(包括任何监管或准监管)机构或证券交易所(包括任何财务披露或加密法律)的

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

任何适用法律、规则、法规、合同、命令，(iv)有危险物质以任何方式影响矿场且该危险并非由被许可方单独造成，以及(v)许可方任何员工的指控。

(b) Promptly after receipt by the Licensor of notice of the commencement of any Third-Party Claim in respect of which an Indemnified Party believes that it is entitled to be indemnified pursuant to this Section 11, such Indemnified Party will, if it intends to pursue indemnification in respect thereof, notify the Licensor in writing of the commencement thereof; but the failure to notify the Licensor will not relieve the Licensor from any liability which it may have to the Indemnified Party under Section 11(a). The Parties' obligations under Section 11(a) shall apply only where (i) the Indemnified Party cooperates fully with the Licensor in the defense thereof (such cooperation does not require and is without waiver by either Party of attorney/client, work product, or other privilege); and (ii) the Licensor has sole control of the defense. After notice from the Licensor to the Indemnified Party of the Licensor's election to assume the defense of any Third-Party Claim, the Licensor will not be liable to the Indemnified Party for any legal or other expenses subsequently incurred by the Indemnified Party in connection with the defense thereof other than reasonable costs of investigation, but the Indemnified Party may, at its own expense, participate in such defense by counsel chosen by it, without, however, impairing the Licensor's control of the defense. The Licensor may negotiate a compromise or settlement of any such action provided that such compromise or settlement (i) does not require a contribution by the Indemnified Party, (ii) is limited solely to monetary damages, (iii) includes an unconditional release of the Indemnified Party from all liability arising out of the action and (iv) does not include any statement as to, or admission of fault, culpability, or failure to act by or on behalf of, the Indemnified Party.

（b）在许可方收到受偿方认为有权根据本 11 条获得赔偿的任何第三方索赔的通知后，该受偿方如果意图就该索赔寻求赔偿，则应立即书面通知许可方;但未通知许可方并不免除许可方根据第 11(a)条可能对受偿方承担的任何责任。仅在以下情况下，双方在第 11(a)条项下的义务才适用:(i)受偿方在其辩护中与许可方充分合作(该等合作不要求，任何一方也不需放弃其律师/客户、工作成果或其他特权);且(ii)许可方对抗辩拥有唯一控制权。在许可方通知受偿方许可方选择为任何第三方索赔进行辩护后，除合理的调查费用外，许可方对受偿方随后就其辩护而产生的任何法律或其他费用不承担责任,但受偿方可以自费由其选择的律师参加该等辩护，但不影响许可方对该等辩护的控制。许可方可以就任何该等行为协商达成妥协或和解，但该等妥协或和解(i)不要求受偿方作出贡献，(ii)仅限于金钱赔偿，(iii)包括无条件免除受偿方因该行为而产生的所有责任，且(iv)不包括任何关于受偿方或其代表的过错、过失或未采取行动的声明或承认。



20

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

**12. Force Majeure.**  Notwithstanding any other term or condition of this Agreement, a Party shall be excused from failure to timely perform obligations under this Agreement for such time as it is prevented or hindered by circumstances beyond its reasonable control and without fault or negligence, including acts of God, perils of the sea and air, fire, flood, drought, war, explosion, sabotage, terrorism, embargo, civil commotion, acts of any governmental body, supplier delays, communication or power systems failure, equipment or software malfunction, or labor disputes.  If a Party is affected by any such event, it will give prompt notice thereof to the other Party and will use all reasonable efforts to eliminate or alleviate the effect of such event and to continue with the performance of its obligations under this Agreement.

12.不可抗力。尽管有本协议的任何其他条款或条件规定,一方应当免除在超出其合理控制的情况和无过错或过失情形下未能及时履行本协议的义务,包括天灾，海难，火灾,洪水,干旱,战争、爆炸、破坏、恐怖主义、禁运、内乱、任何政府机构的行为、供应商延误、通讯或电力系统故障、设备或软件故障、或劳资纠纷。如果一方受到任何该等事件的影响，则其应立即通知另一方，并应尽一切合理努力消除或减轻该等事件的影响，并继续履行其在本协议项下的义务。

**13. Confidentiality.**  Other than as set forth in this Agreement, each Party shall treat as confidential and shall neither use nor disclose to any third party other than on a need-to-know basis to employees or authorized representatives of such Party or its Affiliates who have been advised that such information is confidential and are bound by confidentiality obligations pursuant to a written agreement or company policies or procedures, attorney-client privilege or similar obligation, any non-public information of the other Party received in connection with discussing or conducting the activities which are the subject of this Agreement (collectively, "Confidential Information").  In fulfilling such obligations, each Party shall use a reasonable standard of care to protect the Confidential Information of the other Party, which is not less than the standard of care it uses to protect its own similar confidential information.  The specific terms of this Agreement and the relationship of the Parties shall be treated as Confidential Information.  Confidential Information shall not include Licensor Property or any information that is or becomes available to the public or to the receiving Party hereunder from sources other than the providing Party (provided that such source is not subject to a confidentiality agreement with regard to such information), or that is independently developed by the receiving Party without use of or reference to information from the providing Party. Notwithstanding the foregoing, a Party may disclose Confidential Information: (a) to the extent approved in writing signed by an authorized representative of the providing Party, (b) to the extent required by law or by a court of competent jurisdiction, or (c) that is required to be disclosed or requested by a regulatory agency having jurisdiction over the Party (provided, if permitted by law, that the Party disclosing such



21

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

Confidential Information shall advise the providing Party in advance, and shall alert the recipient that the information is confidential and that further distribution should be limited accordingly).  The provisions of this Section 13 shall survive for a period of two (2) years following the end of the Term.

13.保密条款。除本协议另有规定外，每一方均不得使用或向任何第三方披露任何非公开信息(统称为保密信息)，除了是基于"需要知悉"且仅为与另一方讨论或开展本协议事项需要的的情形下向员工或授权代表或其附属公司披露。而他们已被告知这样的信息是保密的和依照书面协议或公司政策或程序、律师-客户保密特权或类似义务保护的。在履行该等义务时，每一方均应使用合理的谨慎标准来保护另一方的机密信息，该谨慎标准不低于其保护自己的类似机密信息的谨慎标准。本协议的具体条款和双方的关系应被视为保密信息。保密信息不包括许可方的财产，或公众或本协议项下接收方从提供方以外的来源(前提是该等来源不受有关该等信息的保密协议的约束)获得的或已获得的任何信息。或由接收方在未使用或参考提供方信息的情况下独立开发的信息。尽管有上述规定，一方可以在下列情况下披露保密信息:(a)的书面批准的授权代表签署的提供方,(b)的法律规定或法院的管辖权,或(c)对一方具有管辖权的监管机关要求披露(如果法律允许的情况下,披露该等保密信息的一方应事先通知提供方，并应提醒接收方该等信息为保密信息，应据此限制其进一步传播)。本第 13 条的规定在合同结束后的两(2)年内有效。

**14.Taxes.** Both Licensor and Licensee shall take the responsibilities for paying their portion of any and all applicable federal, state, and local taxes in connection with this Agreement for their respective business practice section under federal, state and local taxes laws.

14.税费。许可方和被授权方应各自承担在本协议约定的经营活动中按法律规定所需支付的联邦，州和地方税。

**15.Assignment/Transfer of This Agreement.**   合同转让

(a) Licensee may, with Licensor's consent and agreement, sublet the Premises or assign this Agreement or any interest therein to any Affiliate. Subject to the foregoing sentence, Licensee may not, without Licensor's prior written consent, sublet the Premises or assign this Agreement or any interest therein to any Person whatsoever.  No sublease or assignment permitted pursuant to this Section 15 shall release Licensee from any of its obligations under this Agreement unless such sublease or assignment is to an Affiliate of Licensee or to a non-Affiliated entity that has a tangible net worth equal to or greater than the tangible net worth of Licensee on or about the date of assignment.  If applicable, Licensee shall deliver certified financials of both Licensee and assignee demonstrating the tangible net worth of each.



DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

（a）被许可方可在经许可方同意的情况下，将该物业矿场转租或将本协议或其中的任何权益转让给任何关联方。即使有上述规定，未经许可方事先书面同意，被许可方不得将该矿场转租或将本协议或其中的任何权益转让给其他任何公司、企业或个人。根据本 15 条规定，转租或转让并不免除被许可方在本协议项下的义务,除非此等转租或转让是对被许可方的关联方或是有形资产净值等于或大于被许可方在转让日时有形资产净值的非关联实体。如适用，被许可方应提供被许可方和受让方的经认证的财务报告，证明双方的有形资产净值。

(b) Should Licensee desire to enter into an assignment or sublease (a "<u>Transfer</u>"), Licensee shall, by no later than ten (45) days prior to such Transfer, provide Licensor with written notice of its intent to do so via any manner permitted pursuant to the "Notices" provision of this Agreement.

（b）如果被许可方希望转让或转租，则被许可方应在该等转让前不迟于十(45)天，通过本协议"通知"条款规定的任何方式，向许可方书面通知其转让或转租的意向。

(c) Each and all of the covenants, provisions, and conditions of this Agreement to be performed by or on the part of Licensor, whether affirmative or negative in nature, are intended to and shall bind Licensor, its successors, and assigns at any time and from time to time and shall inure to the benefit of Licensee, its successors, tenants, and assigns, and such covenants, provisions, and conditions are intended to be for the benefit of Licensee and the Premises.

（c）需要许可方履行的本协议的每一项和所有承诺、规定和条件，无论其性质是肯定的还是否定的，在任何时候均旨在并约束许可方，其继承人，受让人，并应符合被许可方、其继承人、租户和受让人的利益，且该等承诺、规定和条件旨在符合被许可方和矿场的利益。

(d) Each and all of the covenants, provisions, and conditions of this Agreement to be performed by or on the part of Licensee, whether to be performed on or in the Premises and whether affirmative or negative in nature, are intended to and shall bind Licensee, its successors, sublessees, and assigns, and such covenants, provisions, and conditions are intended to be for the benefit of Licensor.

（d）需要被许可方履行的本协议的每一项和所有承诺、规定和条件，不论是否应在矿场内履行该义务，还是其性质是肯定的还是否定的，均旨在并约束被许可方、其继承人、转租方和受让人，且该等承诺、规定和条件旨在为许可方的利益而作出。

(e) If, at any time during the Term of this Agreement, either Party whom receives a bona fide offer to purchase all or part of its interest under this Agreement from a third party, and desire to sell or otherwise

23

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

dispose of such interest, it shall notify (the "Notifying Party") the other Party (the "Receiving Party) in writing of the third party to whom it desires to sell such interest and the price at which and the terms upon which it desires to sell the same, and the Receiving Party shall, within 30 days of receipt of the notice, notify the Notifying Party in writing whether it wishes to purchase such interest at the price and on the terms set forth in the notice. If Receiving Party elects to purchase such interest, the Notifying Party shall be bound to convey, assign, or otherwise transfer such interest to the Receiving Party promptly thereafter at such price and on such terms. If Receiving Party elects not to purchase such interest or fails to give notice of its intention within the 30-day period, the Notifying Party shall be free to convey, assign, or otherwise transfer such interest to the third party at a price not less than stated in the notice or on not more favorable terms than those stated in the notice. If the Notifying Party shall not have so disposed of such interest to said third party within 90 days after receipt of notice that Receiving Party elects not to exercise its right of first refusal or after expiration of that Party's 30 day period within which to give notice, the provisions of this clause shall again apply to the disposition by the Notifying Party of any such interest.

（e）如在本协议有效期内的任何时候，任何一方从第三方收到了购买其在本协议项下全部或部分权益的善意要约，并希望出售或以其他方式处置该等权益，应当书面通知（"通知方"）另一方（"接收方"）并告知其其欲出售的利益和并在通知告知它的价格及条款。如果接收方选择购买此类利益，通知方应在此价格和这样的条件下，将这种利益向接收方传递、分配或转让。如果接收方选择不购买或未能在 30 天内通知其意图，通知方则免于转达,分配或转让第三方感兴趣这样的价格不低于规定在通知或不通知比规定更有利的条款。如果在收到接收方选择不行使优先购买权的通知后 90 天内，或在接收方发出通知的 30 天期限届满后，通知方未向该第三方处置该等权益，本条款的规定应再次适用于通知方对任何该等权益的处置。

**16.Default.**  违约

(a)        Licensor shall be in default under this Agreement if Licensor fails to:  (i) pay any obligation of Licensor under this Agreement or any mortgage, trust deed, judgment, assessment, tax or other encumbrance affecting the Premises (including, without limitation, those in connection with the Licensor's Work) within thirty (30) days after receipt of notice from Licensee stating the obligation Licensor has failed to pay; or (ii) perform any other act or acts required of Licensor by this Agreement and if such failure continues for thirty (30) days after receipt of notice from Licensee (provided that if the obligation is such that it is not capable of being cured with said 30-day period Licensor shall not be in default hereunder if it commences to cure such breach within thirty (30) days after receipt of notice from Licensee stating the obligation Licensor has failed to perform, and thereafter Licensor diligently pursues the required

24

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

performance to completion). In the event of a default by Licensor, Licensee may pay or perform any obligation of Licensor, in addition to the right to exercise all other legal and equitable remedies available, including the right to specific performance and the right to terminate. If Licensee elects to pay or perform any Licensor obligation, Licensor shall, within ten (10) days of demand, reimburse Licensee the full amount paid or costs or expenses so incurred by Licensee. If Licensor fails to timely pay or reimburse Licensee for any amount owed to Licensee under this Agreement by Licensor (including any indemnification obligation under <u>Section 11</u> hereof), Licensee may offset the amount so owed or to be reimbursed against the Fee along with interest at the rate of fifteen percent (9%) per annum until paid in full. Any such deduction or offset shall not constitute a default in the payment of the Fee.

（a）在本协议项下，如果许可方未能:(i)在收到被许可方声明其未履行义务的通知后 10 天内，仍未履行本协议项下的任何义务，或支付任何贷款,信托契约,判决,评估、税收或其他负债影响到矿场(包括,但不限于,那些与许可方工作相关的)的;或(ii)履行本合同项下要求许可方履行的其他行为，如果这种不履行的行为自接到被许可方通知之日起持续时间达 30 天（但是许可方在接到被许可方通知后已经开始进行补救，但是如果上述义务是无法在 30 天内予以补救的，并且此后许可方尽力按照要求完成义务履行，在此种情形下不视为许可方违约）。在许可方违约的情况下，除行使所有其他可用的法律上和衡平法上救济的权利(包括具体履行权和终止权)外，被许可方还可以自己支付或履行许可方的任何义务。如果被许可方决定自己支付或履行任何许可方的义务，则许可方应在被许可方提出要求后的十(10)天内，偿还被许可方已支付的全部金额或因此而发生的费用。如果许可方未能及时支付或赔偿被许可方，根据本协议(包括本 11 条项下的任何赔偿义务)所欠被许可方的费用，被许可方可以按照年息 9%的利率抵偿相应的数额或用该部分赔偿金抵偿许可方应支付的费用，直到全部付清。任何此类扣减或抵消均不构成被许可方支付费用的违约。

(b)       Licensee shall be in default under this Agreement if Licensee fails to: (i) pay any amount  on or before the same becomes due hereunder (for avoidance of doubt, which shall include the Fee), and such failure continues for thirty  (30) days after written notice from Licensor thereof; or (ii) Licensee  shall fail to perform or observe any other term or covenant contained in this Agreement  for thirty (30) days after written notice from Licensor thereof unless such default is of such a nature that it cannot be cured within such thirty (30) day period, in which event no default shall occur so long as Licensee shall commence the curing of the default within such thirty (30) day period and shall thereafter promptly and diligently prosecute the curing of the same. In the event of a default by Licensee, Licensor shall have the right to exercise all legal and equitable remedies available including the right to terminate this Agreement.  . If Licensor elects to pay or perform any Licensee obligation, Licensor shall, within ten (10) days of demand, reimburse

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

Licensor the full amount paid or costs or expenses so incurred by Licensee.  If Licensee fails to timely pay or reimburse Licensor for any amount owed to Licensor under this Agreement by Licensee (including any indemnification obligation under Section 11 hereof) after receiving Licensor's notification Licensor may offset the amount so owed by deducting the Licensee owned money along with interest at the rate of nine percent (9%) per annum plus the fee which will be occurred because of the delayed payment  from their security deposit until paid in full, Licensor may shut down the power on the site after the 10 days notification if the licensee still could not take their obligation to pay the amount so owed.  Licensee have the obligation to pay the Fee for the period of time the machines are shut down due to licensee non-performance or owed Licensor's money. ,

（b）在本协议项下，如果被许可方未能:(i)在本协议约定日期当日或之前支付任何款项，且在许可方发出书面通知后十(10)天内仍未支付该等款项，则许可方为违约;或(ii)被许可方在收到许可方书面通知后三十(30)天内未履行或遵守本协议中包含的任何其他条款或契约，除非违约的性质无法在该三十(30)天内补救，在此情况下，只要被许可方在该三十(30)天的期限内开始对违约进行补救，并在此后迅速、勤勉地对违约进行补救，则不发生违约。在被许可方违约的情况下，许可方有权行使包括终止本协议在内的所有可用的法律和衡平法上的救济。在被许可方违约的情况下，除行使所有其他可用的法律上和衡平法上救济的权利(包括具体履行权和终止权)外，被许可方还可以自己支付或履行许可方的任何义务。如果许可方决定自己支付或履行任何被许可方的义务，则被许可方应在许可方提出要求后的十(10)天内，偿还许可方已支付的全部金额或因此而发生的费用。如果被许可方未能及时支付或赔偿被许可方，根据本协议(包括本 11 条项下的任何赔偿义务)所欠许可方的费用，许可方可以按照年息 9%的利率抵偿向被许可方索偿应支付的费用，直到全部付清。

**17.Relationship of the Parties.**  Except with respect to rights of third parties to be defended, indemnified and held harmless as provided in Section 11 of this Agreement, nothing in this Agreement, express or implied, shall confer any rights or remedies under or by reason of this Agreement on any third party.

17.双方关系。除本协议第 11 条规定的抗辩第三方主张、受赔偿和免受损害的权利外，不得明示或暗示地将本协议中的任何权利或救济授予任何第三方。

**18.Entire Agreement.**  This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes all prior negotiations, communications, writings, and understandings with respect thereto.  The Parties acknowledge and agree that this Agreement has been

26

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

negotiated and drafted jointly by the Parties, and that provisions should be construed to accomplish the manifest intent of the Parties and not to the benefit or detriment of either Party.

18.整个协议。本协议构成双方就本协议标的达成的完整协议，并取代双方此前就本协议标的达成的所有协商、通信、书面文件和谅解备忘录。双方承认并同意，本协议是由双方共同协商和起草的，且应将条款解释为实现双方的明确意图，而不是对任何一方有利或不利。

**19.Construction.** For purposes of this Agreement, unless clearly specified otherwise herein: (a) the words "hereof," "herein," "hereunder" and words of similar import will refer to this Agreement as a whole and not to any particular Section or paragraph of this Agreement, and reference to a particular Section of this Agreement will include all paragraphs thereof; (b) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation"; (c) definitions will be equally applicable to both the singular and plural forms of the terms defined; (d) references to the masculine, feminine or neuter gender will include each other gender; (e) all references in this Agreement to any Section, paragraph or Schedule will be deemed to be a reference to a Section, paragraph or Schedule of or to this Agreement, in each case as such may be amended in accordance herewith; (f) the word "or" shall not be interpreted to be exclusive (i.e., "or" shall mean "and/or"); (g) the term "dollars" and the symbol "$" mean United States Dollars; (h) the Schedules and the recitals form part of this Agreement; (i) references to any statute, regulation or other statutory provision in this Agreement includes reference to such statute, regulation or provision as modified, consolidated or re-enacted from time to time; (j) Section headings are for ease of reference only, and do not govern the meaning or interpretation of any provision of this Agreement; and (k) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends and such phrase shall not mean simply "if."

19.合同结构。为本协议的目的，除非另有明确指定本:(a)"hereof," "herein," "hereunder" 以及具有类似含义的文字将作为一个整体指代本协议，而不指代本协议的任何特定章节或段落，且提及本协议的特定章节时将包括其中的所有段落;(b)在本协议中使用"include," "includes" or "including"一词时，均应视为其后接有"但不限于"的词语;(c)定义将同样适用于所定义术语的单数和复数形式;(d)提及男性、女性或中性时，应包括彼此的性别;(e)在本协议中凡提及任何章节、段落或附录，均应被视为提及本协议的章节、段落或附录，在任何情况下均可按照本协议进行修订;(f)词语"或"不应解释为排他性的(即，"或"应指和/或);(g)术语"美元"和符号"$"是指美元;(h)附录和摘要构成本协议的一部分;(i)提及本协议中的任何法规、法规或其他法定条款时，包括提及不时修改、合并或重新制定的该等法规、法规或条款;(j)章节标题仅供参考，并不支配本协议任何条款的含义或解释;(k)短语中的"程度"一词应指在一定程度上，该短语不应仅指"如果"。

27

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

**20.Mandatory Arbitration; Consent to Jurisdiction; Governing Law; Waiver of Jury Trial.**

(a) Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Lexington, Kentucky or Louisville, Kentucky before one arbitrator. If Licensor and Licensee are unable or fail to agree upon the arbitrator within 30 days after the commencement of arbitration, the arbitrator shall be appointed by JAMS in accordance with its rules. All arbitrators shall serve as neutral, independent and impartial arbitrators. Unless otherwise agreed by the Licensor and Licensee, the arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures.   In any arbitration arising out of or related to this Agreement, the arbitrator shall award to the prevailing party, if any, the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration. If the arbitrator determines a party to be the prevailing party under circumstances where the prevailing party won on some but not all of the claims and counterclaims, the arbitrator may award the prevailing party an appropriate percentage of the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration.  Judgment on the arbitration award may be entered in any court of competent jurisdiction. The Parties shall maintain the confidential nature of the arbitration proceeding and any award or decision, except as may be necessary to prepare for or conduct the arbitration hearing on the merits, or except as may be necessary in connection with a court application for a provisional remedy, enforcement of any arbitration award or decision in a court, a judicial challenge to the arbitration award or its enforcement, or unless otherwise required by law, regulatory requirements or judicial decision.  Before making any such disclosure, a party shall give written notice to all other parties and shall afford them a reasonable opportunity to protect their interests, except to the extent such disclosure is necessary to comply with applicable law, regulatory requirements or judicial decision. This Section 20 shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

20.强制仲裁;同意管辖权;适用法律;放弃陪审团审判。

(a) 因本协议的违约、终止、执行、解释或有效性而产生的或与之相关的任何争议、索赔，包括确定本协议的仲裁范围或适用范围，均应在肯塔基州列克星敦或肯塔基州路易斯维尔由一名仲裁员进行仲裁决定。如果许可方和被许可方在仲裁开始后 30 天内无法或未能就仲裁员达成一致，则仲裁员应由 JAMS 按照其规则指定。所有仲裁员均为中立、独立和公正的仲裁员。除非许可方和被许可方另有约定，仲裁应由 JAMS 根据其简化的仲裁规则和程序进行管理。在因本协议引起的或与本协议有关的任何仲裁中，仲裁员应将胜诉方(如有)因仲裁而合理产生的费用和律师费判给胜诉方。如果在胜诉方赢得部分但不是全部索赔和反索赔的情况下，仲裁员判定一方为胜诉方，仲

28

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

裁员可以将胜诉方因仲裁而合理支付的费用和律师费的适当比例判给胜诉方。仲裁裁决可由任何有管辖权的法院作出判决。双方应保持仲裁程序和任何裁决或决定的机密性，但为准备或根据案情进行仲裁听证会可能需要的情况除外，或与法院申请临时救济有关的情况除外。在披露任何该等信息之前，一方应向所有其他方发出书面通知，并应向他们提供合理的机会保护其利益，但为遵守适用法律、监管要求或司法决定而必须披露的情况除外。本第 20 条不排除双方向具有适当管辖权的法院寻求帮助仲裁的临时救济。

(b)     Licensor and Licensee each submits for itself and its property in any proceeding relating to this Agreement, or for recognition and enforcement of any award or judgment in respect thereof, to the nonexclusive general jurisdiction of any Kentucky State court or federal court of the United States of America sitting in Louisville, Kentucky or Lexington, Kentucky, and any appellate court from any thereof.
(b)许可方和被许可方各自提交的关于其自身或其财产的，与本协议有关的任何程序，或任何关于本协议的裁决或执行任何裁决或判决的诉讼，应提交到在路易斯维尔、肯塔基州或列克星敦、肯塔基州和任何上诉法院，肯塔基州州法院或美国联邦法院具有非排他性的一般管辖权。

(c)     This Agreement shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation, and performance of this Agreement shall be governed by, the laws of the State of Kentucky, without giving effect to provisions thereof regarding conflict of laws.  The Parties hereto knowingly, intentionally and voluntarily waive all right to trial by jury in any proceeding to enforce or defend any rights or remedies arising under or in connection with this Agreement.
（c）有关本协议的解释、有效性和履行的所有问题均应受肯塔基州法律管辖，且不受有关冲突法的规定的影响。在本协议项下或与本协议有关的任何诉讼中，本协议双方有意并自愿放弃所有由陪审团审判的权利。

**21.Waiver.**  The failure or delay of any Party to enforce any of its rights under this Agreement shall not constitute a waiver of such rights, any other rights, or any future rights arising under this Agreement.  A waiver of rights under this Agreement shall only be effective if set forth in a writing and executed by the Party waiving such rights.
21.豁免。任一方未能或延迟执行其在本协议项下的任何权利不构成对该等权利、任何其他权利或本协议项下产生的任何未来权利的放弃。对本协议项下权利的放弃仅在书面提出并由放弃该等权利的一方签署的情况下方为有效。



29

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

**22.Severability.**  If any term or provision of this Agreement shall be held invalid or unenforceable, the remainder of this Agreement shall not be affected thereby, and each term and provision hereof shall be valid and enforceable to the fullest extent permitted by law.

22.可分割性。如果本协议的任何条款或规定被认为无效或不可执行，本协议的其余部分不受影响，本协议的每一条款和规定应在法律允许的最大范围内有效和可执行。

**23.Notices.**  通知

(a)     Any notices or other documents to be given or served under this Agreement may be delivered by hand or sent by prepaid post, facsimile transmission or e-mail to the Party at its address, fax number or e-mail address set out below, which may be updated from time to time.  The Parties intend to treat all electronic transmissions as original.  The Parties understand and agree to assume the inherent risks in communications made by way of electronic transmissions.

(a)在本协议项下发出或送达的任何通知或其他文件，均可通过专人递送或通过预付费邮寄、传真或电子邮件发送至本协议项下下述地址、传真号码或电子邮件地址，该地址可能不时更新。双方同意将所有电子传输文件视为原件。双方理解并同意承担通过电子传输方式进行的通信的固有风险。

If to Licensor:   通知发给许可方：

| | |
|---|---|
| Address:地址 | 1004 Gateway Industrials Park, Jenkins, KY 41537, USA |
| Fax number:传真号 | N/A |
| Email address:电邮地址 | bsmith@rollerdie.com |
| Attention: 收件人 | Brandon Smith |

If to Licensee:   通知发给被许可方

| | |
|---|---|
| Address:地址 | 6/F & Unit 702–3, 7/F, 100 Queen's Road Central, Central, Hong Kong |
| Fax number:传真号 | N/A |
| Email address:电邮地址 | wangyangping@hb.co.kr |
| Attention:收件人 | Wang Yangping |

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

(b)   Any notice provided pursuant to paragraph (a) shall be deemed to have been served (i) if delivered by hand, at the time of delivery; (ii) if sent by ordinary pre-paid post, at the expiration of three (3) business days after the postage pre-paid envelope containing the same shall have been put into the post if mailed domestically; (iii) if sent by facsimile transmission, when dispatched with a transmission report showing that the entire fax was sent to the relevant fax number; or (iv) if sent by email, at the time of transmission, provided that such e-mail is sent to the email address designated above (as may be updated from time to time) and no failure message has been received.

(b)根据(a)款提供的任何通知应被视为已送达(i)如果是专人递送,则在交付时被视为已送达;(ii)用普通预付邮资邮寄的,在国内邮寄的,应当在信件发出之日起 3 个工作日内邮寄;(iii)如果通过传真发送,则在发送时附带发送报告,显示整个传真已发送至相关传真号码;或(iv)如果通过电子邮件发送,则在发送时,前提是该电子邮件被发送到上述指定的电子邮件地址(可能会不时更新),且未收到失败信息。

(c)   In proving such service, it shall be sufficient to prove that delivery was made or that the envelope containing such notice or document was properly addressed and posted or that the facsimile transmission or e-mail was properly addressed and dispatched as the case may be.

(c)在证明送达时,应足以证明送达已完成,或载有该等通知或文件的信封已按情况适当地写上地址并邮寄,或传真或电子邮件已按情况适当地写上地址并分发。

(d)   A Party shall immediately inform the other Party by notice in writing of any changes to any of its details (including the address, fax number or e-mail) set out above in this Section 23.

(d)若本第 23 条中所述的任何细节(包括地址、传真号码或电子邮件)发生任何变更,一方应立即以书面通知另一方。

**24.Representations and Warranties**.  声明和保证

**(a) Licensor**. Licensor makes the following representations and warranties for the benefit of the Licensee:

(a)许可方。许可方为被许可方的利益作出以下声明和保证

(i)                    Licensor is a limited liability company that has been duly organized and is validly existing and in good standing under the laws of the State of Kentucky and is authorized to do business and to own real property in the state in which the Premises is located;

31

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

(i)许可方是一家依据肯塔基州法律合法成立并有效存续，处于经营良好状态的有限责任公司,在矿场所在地区取得合法授权开展业务并拥有不动产;

(ii)　　　　Licensor has full power and right to enter into and perform its obligations under this Agreement and this Agreement is binding on Licensor in accordance with its terms;

(ii)许可方有充分的权力和权利订立并履行其在本协议项下的义务，且本协议按照其条款对许可方具有约束力;

(iii)　　The execution and delivery of this Agreement and the consummation of the transactions contemplated thereby (1) have been duly authorized by all necessary action on the part of Licensor, (2) do not require any governmental or other consent (including judicial consent) other than consents that have been obtained as of the Effective Date and remain in effect throughout the entire Term of this Agreement and (3) will not result in the breach of any agreement, indenture or other instrument to which Licensor is a party or is otherwise bound;

(iii)本协议的签署和履行以及交易的圆满完成（1）许可方已经获得通过适当程序进行的正式授权，和(2)除了在本协议生效日期前已经获得的并在整个合同有效期内保持有效的同意外，无需获得任何政府的或其他部门的同意(包括司法同意),(3)不会违反许可方作为一方当事人或者受其约束的任何协议、契约或其他文书

(iv)　　There is no pending or, to the best of Licensor's knowledge, threatened litigation, proceeding or investigation (by any person, governmental or quasi-governmental agency or authority or otherwise) which might materially adversely affect the ownership, use, occupancy, value, operation or title of the Premises;

(iv)就许可方所知，不存在可能对该矿场的所有权、使用、占用、价值、经营或其他权利产生重大不利影响的未决或即将发生的诉讼、程序或调查(由任何个人、政府或准政府机构或当局或其他方面发起的);

(v)　　　　Licensor has a valid fee simple absolute estate in the Premises free and clear of all liens, conditions, covenants, restrictions, rights of way, or regulations that would adversely affect or prohibit the use of the Premises for the Bitcoin Mining activities contemplated hereunder, and Licensor shall not enter into any leases and no additional encumbrances shall be recorded against the Premises absent the consent of Licensee;

32

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

(v)许可方在该矿场内拥有有效的绝对所有权，不存在任何会对使用矿场进行本协议项下预期的比特币挖矿活动产生不利影响或禁止的留置权、条件、契约、限制、通行权或其他法律规定。未经被许可方同意，许可方不得就该矿场签订任何租约，且不得在该矿场上附加任何额外负担

(vi)        Licensor has no knowledge of (i) enacted, pending or proposed condemnation proceedings or other governmental action, (ii) pending or threatened litigation, (iii) current or proposed plans to alter access to the Premises, or (iv) enacted, pending, or proposed law, regulation, rule, ordinance, order or restriction of any kind that might prohibit the Bitcoin Mining activities contemplated herein, or that might otherwise materially impact this Agreement;

(vi)据许可方所知不存在以下情况:(i)已颁布的、未决的或拟议中的征用程序或其他政府行动，(ii)未决的或即将提起的诉讼，(iii)目前或拟议中的改变对矿场使用权的计划，或(iv)已颁布的、未决的或拟议中的法律、法规、规则、条例，可能禁止本协议中预期的比特币挖矿活动或可能对本协议产生重大影响的任何种类的命令或限制;

(vii)        The Premises (including any parking areas or facilities) has been and is presently used and operated in compliance in all material respects with, and in no material way violates any, applicable statute, law, regulation, rule, ordinance, order or permit of any kind whatsoever affecting the Premises or any part thereof or any matters of record

(vii)在矿场内(包括任何停车场或设施),目前的使用和运转没有在任何实质方面违反任何、适用的规约、法律、法规、条例、条例、命令或任何影响矿场或其任何其他部分或任何记录事项的许可

(viii)    To Licensor's knowledge, there are no hazardous materials present on the Premises (in soil, groundwater, or soil vapor) in quantities or under conditions that would require investigation, removal, remediation, or other treatment under any applicable environmental laws;

(viii)据许可方所知，该矿场中不存在任何危险物质(以土壤、地下水或土壤蒸汽的形式存在)需要根据任何适用的环境法律进行调查、移除、修复或做其他处理的，无论在数量上或根据一定的条件需要处理的

(ix)        There are no environmental easements or deed restrictions on the Premises that restrict the current or future uses of the Premises due to the presence of hazardous materials on the Premises.

(ix)该矿场上不存在任何可能对该矿场目前或将来使用造成影响的环境地役权或契约限制。

33

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

(x)                    The Premises are neither listed nor, to Licensor's knowledge, after due inquiry, proposed to be listed, by the United States Environmental Protection Agency or by any state or local government on any similar list of known or suspected contaminated sites.

(x)该矿场未被美国环境保护局或任何州或地方政府列入任何类似的已知或疑似污染场地清单；据许可方所知也不存在，经适当调查后，建议将该矿场列入此清单的情况

(xi)     There are no underground storage tanks on the Premises;

(xi)该矿场内没有地下存储容器

(xii)                   Licensor is not in default on any of its material obligations under any of the agreements (written or oral and whether or not of record) presently solely affecting the Premises to which the Licensor is a party and knows of no material default on the part of the other parties thereto and such other parties possess no unsatisfied claim against Licensor;

(xii) 许可方在任何协议(书面或口头，无论是否有记录)项下均不存在会对矿场产生不利影响违约行为。在这些协议中对方不存在违约行为，且对方没有对许可方提出索赔的主张

(xiii)    All of the material certificates, licenses and permits from governmental authorities required for the current ownership, use, occupancy, operation and maintenance of the Premises have been obtained by Licensor and are in full force and effect; and

(xiii)许可方已获得并充分有效的，为该矿场当前所有权、使用、占有、运营和维护所需的所有政府当局的主要资质、证书和许可;和

(xiv)    All of the equipment and other personal property attached or appurtenant to, located on or used in connection with the ownership, use, operation or maintenance of the Premises as of the Effective Date is included in the definition of "Licensor Property," except any such equipment or personal property to be incorporated into the Premises that is included within the definition of "Licensee Property," as specified in Section 1 above and further defined in Schedule A attached hereto, which shall be further supplemented when such specifications are finalized.

(xiv)除了本协议第一条中规定的、并在本协议附件A中进一步定义的"被许可方财产"中包含的将并入矿场的任何设备或个人财产外，自本协议生效日起，与该矿场的所有权、使用、操作或维护相关的所有设备和其他个人财产均包含在"许可方财产"的定义中，（该等细节确定后将进一步补充）。

34

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

**(b) Licensee**. Licensee makes the following representations and warranties for the benefit of the Licensor:
(b)被许可方。被许可方对许可方的利益作出以下声明和保证:

(i) Licensee is duly incorporated or organized, as applicable, validly existing, in good standing in the jurisdiction of its incorporation or organization, as applicable, and has all requisite power and authority to own and lease property and conduct business in the state where the Premises are located, and that each individual executing this Agreement on behalf of Licensee is duly authorized to execute and deliver this Agreement on behalf of Licensee;
（i）被许可方是依法成立的，合法存续，在对其具有司法管辖权的辖区内处于经营良好的状态（如适用），并具有所有必要的权力和合法授权,在矿场所在地区拥有或租赁资产，开展业务。代表被许可人签署和执行本协议的任何个人据有合法和适当的授权;

(ii) Licensee has full power and right to enter into and perform its obligations under this Agreement and this Agreement is binding on Licensee in accordance with its terms;
（ii）被许可方有充分的权力和权利订立并履行其在本协议项下的义务，且本协议按照其条款对被许可方具有约束力;

(iii) The execution and delivery of this Agreement and the consummation of the transaction(s) contemplated hereby (1) have been duly authorized by all necessary action on the part of Licensee, and (2) will not result in the breach of any agreement, indenture or other instrument to which Licensee is a party or is otherwise bound; and
(iii) 本协议的执行和交付以及本协议项下交易的圆满完成已经获得(1)被许可方通过适当程序进行的正式授权,和(2)不会导致违反被许可方作为一方当事人或受其约束的任何协议、契约或其他法律文件的相关规定

(iv) There is no action, suit or proceeding pending or, to the best of Licensee's knowledge, threatened against Licensee in any court or by or before any other governmental agency or instrumentality which would materially and adversely affect the ability of Licensee to carry out its obligations under this Agreement.

35

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

（iv）没有任何行动,诉讼或未决诉讼,或据被许可方所知的，在任何法院或其他政府机构存在可能对被许可方履行本协议项下义务产生实质性负面影响的威胁。

**25.Quiet Enjoyment**. Licensor covenants and agrees with Licensee that, upon Licensee performing all of the covenants and provisions on Licensee's part to be observed and performed under this Agreement, Licensee shall and may peaceably and quietly have, hold and enjoy the Premises, in accordance and subject to the terms and conditions of this Agreement, as against all persons claiming by, through or under Licensor.

25.平静受益。许可方承诺并同意，在被许可方履行本协议项下所有关于被许可方的条款和规定的情况下,被许可方有权按照本协议的条款和条件平静地拥有和使用该矿场,并可以对抗与许可方或许可方的所有人的干扰。

**26.Amendment.**  Except as otherwise provided herein, no provision of this Agreement may be amended, modified, or waived, unless by an instrument in writing executed by a duly authorized officer of the Party against whom enforcement of such amendment, modification, or waiver is sought.

26.修订。除本协议另有规定外,不得对本协议任何条款进行修改、修订或弃权,除非由寻求对该等修改、修订或弃权的一方正式授权的官员签署的书面文书。

**27.Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

27. 副本。本协议可签署一式两份,每一份均视为正本,所有副本与正本具有同等法律效力。

28. **Translation**. This Agreement has been translated from English into Chinese, in the event of any discrepancies between the English and Chinese version, the English version shall prevail.

28. **翻译**。本协议由英文翻译成中文,如中英文版本有任何差异,以英文版本为准。

*[Signature Page Follows]* 以下为各方签署页

36

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement on the date first above written.

兹证明，双方已于上述日期签署本协议。

**MOHAWK ENERGY, LLC**

For and on behalf of

**Mohawk Energy, LLC**

Name: Brandon Smith

Title: President

Date: 5/31/2022

**HBTPower LIMITED**

For and on behalf of

**HBTPower Limited**

Name: Zhuo Wang

Title: Director

Date: 5/31/2022

Signature:

Name: YangPing Wang

Title: General Manager

Date: 5/31/2022

Company Seal:

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

**SCHEDULE A  附件 A**

**Licensee Property  被许可方财产**


Transformers, substation transformers, 69kV Substation and 15kV Distribution, Pdu plus splitter cables, Racks and Shelves; Silver board or replacement material; Cat5 Cable premade; Network Switches and components; Ventilation Louvers for intake; Misc Construction material & tools; 2/0 wire; Electrical cable raceways and other necessary hardware for the mining site.

变压器，配电变压器，69kV 变电站和 15kV 配电，Pdu 加分路电缆，机架和货架;银板或更换材料;Cat5 电缆半成品;网络交换机及组件;进气口的通风百叶;杂项建筑材料;工具;2/0 线;矿用电缆道及其他必要的硬件。

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

**SCHEDULE B** 附件 B

**Licensor Property** 许可方财产

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

**SCHEDULE C　附件C**

**Design and Specifications　设计和规格**

DocuSign Envelope ID: 8FAC3601-9F7E-4B97-88AB-D2FA1FF8C254

**SCHEDULE D  附件 D**

**Power Supply Contract**
电力供应合同

# EXHIBIT 2



1004 Gateway Industrials Park, Jenkins, KY 41537          No. 06182022-101

# Receipt

To: HBTPower Limited/ Huobi Technology Holdings Limited

Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG1110, British Virgin Islands

| Date | Discription | Amount USD |
|------|-------------|-----------|
| 7-Jun-22 | Energy Security Deposit | 2,849,970.00 |
| 7-Jun-22 | Energy Security Deposit | 292,970.00 |
| 17-Jun-22 | Rent Security, first month Rent, First Month Stuffing Fee, 10% deposit of the equipment purchasing | 989,970.00 |
| **Total:** | | **4,132,910.00** |

Sigature     *Brandon Smith*

# EXHIBIT 3

| **From:** | Shane D Allen <sdallen2@aep.com> |
| **Sent:** | Friday, June 10, 2022 1:43 PM |
| **To:** | Brandon Smith |
| **Subject:** | Receipt of Payment |

Brandon,

Kentucky Power received the $2,800,000 Wired Deposit on 6/8/2022 from Mohawk Energy, LLC. The Deposit has been added to Mohawk Energy, Kentucky Power Account # 034-012-350-0-1.

Thanks,



**SHANE D ALLEN** | **CUSTOMER ACCOUNT MGR**
SDALLEN2@AEP.COM | A:8.610.1205
1400 E. MAIN STREET, HAZARD, KY 41701

**AEP CONFIDENTIAL**

# EXHIBIT 4

From: Shane D Allen sdallen2@aep.com
Subject: Updated Address
Date: Dec 15, 2022 at 11:04:01 AM
To: Brandon Smith brandon@mohawkenergy.net

Brandon,

I have corrected the Address on all documents. I will also make sure it is changed on the account as well from 1400 Gateway Industrial Park to 1004 Gateway Industrial Park.

Thanks,



SHANE D ALLEN | KEY ACCOUNT MGR
SDALLEN2@AEP.COM | A 8 610 1205
1400 E. MAIN STREET, HAZARD, KY 41701

**AEP CONFIDENTIAL**

ADDENDUM TO CONTRACT FOR ELECTRICAL SERVICE - Build-up clause

This Addendum is a part of the Agreement entered into this **14th** day of July **2022**, by and between Kentucky Power Company (the Company) and **Mohawk Energy, LLC** (the Customer) for electric service to the **Customer cryptocurrency facility located at 1004 Gateway Industrial Park Unit B, Hatfield, Letcher County, KY**.

It is mutually agreed that the reservation of capacity contracted for by the Customer under this Agreement is 30,000 kW. However, the Company recognizes that the Customer is completing the project on a schedule that will require some period of time for the operation to transform to its full operating capacity. Therefore, the Company agrees that the contract capacity as it relates to determination of minimum monthly charges shall be in accordance with the following schedule:

1.    Effective with the service commencement date of this Agreement to the end of the 3rd billing period, the contract capacity shall be the greater of 15,000 kW or the highest 15-minute integrated demand, adjusted to the nearest 100 kW, actually recorded since the service commencement date. Billing will be under the provisions of the Company's 359 **INDUSTRIAL GENERAL SERVICE SUBTRANSMISSION** tariff.

2.    Effective with the 4th billing period, the reservation of capacity shall be **30,000 kW**. Billing will be under the provisions of the Company's 359 **INDUSTRIAL GENERAL SERVICE SUBTRANSMISSION** tariff.

**Kentucky Power Company**

By: _Kenneth Borders_

Printed Name: Kenneth Borders

Title: Mgr., Customer and Dist. Svcs

Date: December 19, 2022

Account Number: 0340123500

**Mohawk Energy, LLC**

By: _Brandon D Smith_

Printed Name: Brandon D. Smith

Title:

Date: 12/16/2022

## ADDENDUM TO CONTRACT FOR ELECTRICAL SERVICE - Flicker/Harmonics

### Made a Part of Contract for Electric Service Dated 7/14/2022
### Between Kentucky Power Company and Mohawk Energy, LLC

This Addendum is entered into this 14th Day of July, by and between Kentucky Power Company, hereafter called the Company, and Mohawk Energy, LLC, or his or its heirs, successors or assigns, hereafter called the Customer.

WHEREAS, the Company's terms and conditions of service contained in the applicable tariffs indicate that the Customer shall not use the electrical service provided for under the terms of the Contract for Electric Service in a manner detrimental to other customers or in such a way as to impose unacceptable voltage fluctuations or harmonic distortions, and

WHEREAS, the Customer anticipates utilizing certain equipment at the service location covered by the Contract that could impose an unacceptable level of voltage flicker or harmonic distortion,

NOW THEREFORE, the parties hereby agree as follows:

I. POINT OF COMPLIANCE – The point where compliance with the voltage flicker and harmonic distortion requirements are evaluated. The Point of Compliance for Mohawk Energy, LLC as per this agreement will be defined as: Company Structure K409-1 .

II. VOLTAGE FLICKER CRITERIA – The Company's standards require that the voltage flicker occurring at the Point of Compliance defined herein shall remain below the Border Line of Visibility curve on the Flicker Limits Curve of IEEE Standard 141 and in compliance with the voltage flicker criteria contained in IEEE Standard 1453.

III. HARMONIC DISTORTION CRITERIA – The Company's standards require that the harmonic distortions occurring at the Point of Compliance defined herein shall remain below the harmonic distortion criteria contained in IEEE Standard 519.

IV. COMPLIANCE AND MONITORING – The Company reserves the right to monitor the Customer for the electric distortions referenced in this Addendum, or any other electrical distortions that would be relevant or complementary, at the determined Point of Compliance. Compliance with these criteria shall be determined solely by the Company.

The Company may agree to permit the Customer to operate above some of the Criteria stated herein, until the Company receives complaints from other customers or other operating problems arise for the Company. By so agreeing, the Company does not waive any rights it may have to strictly enforce its established criteria as measured/calculated in the future.

The Customer agrees that if the operation of its facility and equipment results in voltage flicker or harmonic distortions in excess of the Company's Criteria, it will be the Customer's responsibility to take action, at the Customer's expense, to comply with such Criteria. Corrective measures could include, but are not limited to, modifying production methods/materials or installing mitigation equipment necessary to bring the Customer's operations into compliance.

If the Customer fails to take corrective action within a reasonable time, not to exceed 90 days, after notice by the Company, the Company shall have such rights as currently provided for under its tariffs, which may include discontinuing service, until such time as the problem is corrected.

Kentucky Power Company                           Mohawk Energy, LLC

By: _Kenneth Borders_                            By: _Brandon D. Smith_

Kenneth Borders                                  Printed Name: Brandon D. Smith

Title: Customer & Dist Svcs Mgr                  Title: President Mohawk Energy

Date: December 19, 2022                          Date: 12/16/2022

Account Number: 0340123500

ADDENDUM TO CONTRACT FOR ELECTRICAL SERVICE – EDR Statement

This Addendum is a part of the Agreement entered into this 14th day of July 2022, by and between Kentucky Power Company (the Company) and **Mohawk Energy, LLC** (the Customer) for electric service to the **Customer cryptocurrency facility located at 1004 Gateway Industrial Park Unit B, Hatfield, Letcher County, KY**.

If the 10-year contract between Kentucky Power Company and Mohawk Energy, LLC for the Economic Development Rider and Demand Response Service is not approved by the Kentucky Public Service Commission, then the contract for new service on Kentucky Power's Tariff Industrial General Service (I.G.S.) Subtransmission will be null and void.

**Kentucky Power Company**

By: *Kenneth Borders*

Printed Name:  Kenneth Borders

Title:  Mgr., Customer and Dist. Svces

Date:  December 19, 2022

Account Number: 0340123500

**Mohawk Energy, LLC**

By: Brandon D. Smith

Printed Name:

Title:

Date: 12/16/2022

**This Contract**, entered into this day of July 14, 2022 by and between Kentucky Power Company, hereafter called the Company, and Mohawk Energy, LLC, 1004 GATEWAY INDUSTRIAL PARK UNIT B, JENKINS, KY, 41537 or his or its heirs, successors or assigns, hereafter called the Customer.

**Witnesseth:**

For and in consideration of the mutual covenants and agreements hereinafter contained, the parties hereto agree with each other as follows:

The Company agrees to furnish to the Customer, during the term of this Contract, and the Customer agrees to take from the Company, subject to Company's standard Terms and Conditions of Service as regularly filed with the **Kentucky Public Service Commission**, all the electric energy of the character specified herein that shall be purchased by the Customer in the premises located at 1004 Gateway Industrial Park, Jenkins, KY.

The Company is to furnish and the Customer is to take electric energy under the terms of this Contract for an initial period of 24 month(s) from the time such service is commenced, and continuing thereafter until terminated upon 12 month(s) written notice given by either party of its intention to terminate the Contract. The date that service shall be deemed to have commenced under this Contract shall be the date service is energized.

The electric energy delivered hereunder shall be alternating current at approximately 69000 volts, 4-wire, 3-phase, and it shall be delivered to the **Customer** owned structure from the Kentucky Power structure K409-1, which shall constitute the point of delivery under this Contract. The said electric energy shall be delivered at reasonably close maintenance to constant potential and frequency, and it shall be measured by a meter or meters owned and installed by the Company and located on Customer owned pole on the secondary voltage side of Mohawk Energy, LLC Substation.

The Customer acknowledges that the Customer may be eligible to receive service under more than one of the Company's schedules and that such options have been explained to the Customer. The Customer and Company agree that the Customer has chosen to receive service under the provisions of the Company's Schedule INDUSTRIAL GJ L SVC SUBTRAJ SMISSIOJ. The Customer agrees to pay the Company monthly for electric energy delivered hereunder at the rates and under the provisions of the Company's Schedule as regularly filed with the Kentucky Public Service Commission, as long as that schedule is in effect. In the event that the Schedule chosen by the Customer is replaced by a new or revised Schedule incorporating different rates or provisions, or both, the Company and Customer understand and agree that the Company will continue to provide service, and the Customer will continue to take service, under this Contract, subject to such changed provisions, and that the Customer will pay for such service at the new rates on and after the date such rates become effective.

The Customer's contract capacity under the Schedule named herein is hereby fixed at 30,000 kW. If a time-of-day demand is available under the Schedule and is selected by the Customer, the reservation of capacity aforementioned shall be the peak period reservation of capacity and shall determine the minimum monthly billing demand of the Schedule. The minimum billing demand for this agreement shall be 18,000 kW. The amount of capacity requested during the off-peak period is 30,000 kW.

There are no unwritten understandings or agreements relating to the service hereinabove provided. This Contract cancels and supersedes all previous agreements, relating to the purchase by Customer and sale by Company of electric energy at Customer's premises as referred to above, on the date that service under this Contract commences. This Contract shall be in full force and effect when signed by the authorized representatives of the parties hereto.

KENTUCKY POWER COMPANY                              Mohawk Energy, LLC

By: _Kenneth Borders_                               By: _Brandon D. Smit_
    Kenneth Borders

Title: Customer & Dist Svcs Mgr                     Title: President  Mohawk ENERGY

Date: December 19, 2022                             Date: 12/16/2022

Account Number: 0148123500

**EXHIBIT 5**

**ANNA STEWART WHITES**
*Attorney at Law*
327 Logan Street
P.O. Box 4023
Frankfort KY 40601
(502) 352-2373/FAX 352-6860
AnnaWhites@aol.com

October 12, 2023

Hon. Lesley Owen
Hon. JT Skinner
KKHBS, LLP

Via Email Only

RE:  Mohawk Energy, LLC/Huobi

Folks:

We are in receipt of your letter of 10/11/23.  As I have consistently reminded you, Mohawk and Huobi had frequently, often weekly, zoom meetings for the past year during which many of the initial contract terms and provisions were modified or discarded – primarily because of Huobi delays in payment or refusal to agree to specific necessary items which resulted in supply chain issues or lack of availability, and some due to weather conditions or other matters on the Mohawk side.  Additionally, the parties refined the relationship as they moved through the fit-up and hosting process and learned that how the process worked in actuality did not always fit the model they had imagined before the process began.

Huobi's onsite supervisor, Mr. Wang, has been integrally involved in each step of this process and approved each modification or amendment. Your lack of understanding of the revised agreements appears wilfull at this point as you have had ample opportunity to discuss this with your clients and Mohawk and to review the notes and videos of those meetings.

Huobi should already have a bill of sale for its own mining equipment.  Mohawk did not buy that equipment and so cannot provide a bill of sale for the miners.

As Mohawk has reminded you, the equipment used in fit-up for Huobi's purposes does not belong to Huobi but was ordered and installed, at great cost in time, labor and monies to Mohawk.  Huobi paid some portion of the purchase costs for those materials as well but cannot have a "bill of sale" for those as it does not own those.  No bill of sale is owed to Huobi by Mohawk.

p. 2

Similarly, your client was well aware that Mohawk is purchasing the property, is the owner of the facility and is current on its purchase payments but that the seller, a Mohawk shareholder, will not provide a deed to the property until the full purchase price is paid. Because Huobi wanted this particular site, it agreed that the Mohawk purchase arrangement was permissible.  Your client's onsite representative participated in these discussions live and Huobi executives and counsel participated in these discussions and agreements via zoom.  You have been advised of this but continue to claim otherwise.  Your behavior is a serious impediment to any progress being made between our clients.

As Mohawk reminded Huobi over a period of several months, labor and rent costs are past due.  As Huobi declined to make those payments, Huobi employees cannot remain on the premises.  Further, as the premises are a commercial space, housing is not permitted there.

Mohawk looks forward to Huobi working with Bitmain or Mohawk or other partners to move forward with the mining.  Mohawk affirms that it continues to act in good faith with regard to any exit or transition by Huobi or any proposed agreement for a successor in interest to Huobi's tenancy.

As you are aware, the plant has been ready to operate for a month but Huobi has declined to begin mining.  This may be due in part to your erroneous advice to them that Mohawk can somehow "reduce" the utility rate. You even assert at p. 2 of your letter that this reduction in rate is one of the conditions of Huobi continuing to work with Mohawk on the project. As Kentucky Power's attorney explained to Lesley and I months ago, this is not something that is possible. The rate is set by the utility company and approved by the PSC. Individual businesses cannot change that. This knowledge was part of the initial agreement and has been the subject of zoom meetings between the parties.  Huobi is and has been well aware that Mohawk cannot unilaterally lower a utility rate.  The applicable Kentucky statutes and administrative regulations and PSC guidelines also address this.

Please be assured that Huobi's mining machines are protected.  Mohawk even continues to insure those despite the fact that Huobi breached its agreement to insure these machines and pay the utility bills required for the facility in which they are housed.  Security measures including but not limited to presence of personnel, cameras, alarms and fences remain in place. Huobi's agents or employees are free to ask Mohawk staff to supervise them as they tour the premises at any time to satisfy themselves of this.

Once Huobi pays the past due rent and labor, it may provide proof of ownership of any machines it would like to remove from the facility.  My experience with these tech company ownership changes has shown that often various former agents or employees show up demanding that they be permitted to remove the equipment from the premises although they have no legal right to the equipment.  For this reason, Mohawk would ask for (a) proof of ownership;

(b) the complete inventory list with serial numbers; and (c) a receipt for the original purchase of the equipment.

We look forward to your client's cooperation as they either transition their lease and equipment to a third party agreeable to Mohawk, or buy out Mohawk's multi-million dollar investment in the site, fit up, and contracting.

Sincerely,

Anna Whites

**EXHIBIT 6**



**DLA Piper LLP (US)**
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131-5341
www.dlapiper.com

Harout Jack Samra
Harout.Samra@us.dlapiper.com
T   305.423.8534
F   305.468.6348

November 24, 2023
*Via Email*

Mohawk Energy LLC
c/o Anna Stewart Whites
Anna Whites Law Office
327 Logan Street
P.O. Box 4023
Frankfort, KY 40601
E: annawhites@aol.com

Re:     Cease and Desist - HBTPower Limited adv. Mohawk Energy LLC

Dear Ms. Whites**,**

We represent HBTPower Limited ("**Huobi**"). Your client, Mohawk Energy LLC ("**Mohawk**"), entered into the Operating Rights License Agreement with Huobi on May 31, 2022 (the "**License Agreement**") to carry out Bitcoin mining activities at 1004 Gateway Industrials Park, Jenkins, KY 41537 (the "**Premises**"). We understand that you are counsel for Mohawk and, as a consequence, have directed this correspondence to you. Please advise us immediately if you are no longer counsel for Mohawk.

As you know, a dispute has arisen between the parties as a consequence of various breaches of the License Agreement by Mohawk, including, without limitation, its failure to have a fee simple absolute interest in the Premises and, its failure to have the contractually required electricity supply. Since these disputes arose, Mohawk has ousted Huobi from the Premises on the pretext of non-payment of rent for use of "space lease," even though the obligation under the License Agreement to pay for rent and labor charges had not yet started.

After ousting Huobi from the Premises, Mohawk unlawfully retained the 4,335 mining machines that were delivered to the Premises by Huobi (the "**Equipment**"). Huobi has received evidence that Mohawk is now engaging in negotiations intended to lead to the unauthorized sale or disposition of some or all of the Equipment to third parties. Mohawk has not sought, nor has Huobi granted, consent for Mohawk to use, sell, dispose, or encumber the Equipment in any way. Any use, sale, disposition or encumbrance of the Equipment by Mohawk would constitute conversion, misappropriation, and will result in further breaches of the License Agreement leading to irreparable harm to Huobi.

Accordingly, we demand that Mohawk, including its employees, agents, principals, immediately cease and desist from any activities involving the unauthorized sale, disposition, or



*Mohawk Energy LLC*
*November 24, 2023*
*Page Two*

encumbrance of all or some part of the Equipment. Should Mohawk fail to do so, we have been instructed to commence immediate legal proceedings to enforce Huobi's legal rights.

Nothing herein shall constitute a waiver, release, or otherwise by Huobi in connection with any claims or potential claims against Mohawk, those acting for it, and any other potentially liable third party, including claims that maybe discovered in Huobi's ongoing investigation into Mohawk's wrongful conduct, misrepresentations, and deceptive actions. Huobi expressly reserves its right to pursue any and all legal and equitable remedies available to it in connection with the above referenced actions, not limited to breaches and violations of the License Agreement.

If you would like to discuss any of the above or are willing to cooperate, please contact the undersigned at your earliest convenience.

Sincerely,

Harout J. Samra

CC:
Palmer G. Vance II (gene.vance@skofirm.com)
Lindsey Howard Meares (lindsey.meares@skofirm.com)

**EXHIBIT 7**

**ANNA STEWART WHITES**
*Anna Whites Law Office*
327 Logan Street
P.O. Box 4023
Frankfort KY 40601
(502) 352-2373/(502) 229-1063 (cell)
AnnaWhites@aol.com

November 27, 2023

Hon. Harout Samra
DLA Piper LLP (US)
200 South Biscayne Boulevard
Suite 2500
Miami, FL  33131-5341
Via email:  Harout.Samra@us.dlapiper.com
Cc:  Gene.Vance@skofirm.com, Lindsey.Meares@skofirm.com

   Re:  Mohawk Energy, LLC v. HBTPower Limited a/k/a "Huobi"

Dear Mr. Samra:

Thank you for your letter of 11/24/23.  I appreciate you reaching out regarding the ongoing failure of Huobi to begin the agreed upon mining activities at the Mohawk site.  As you can see from the attached emails and communications with Huobi's prior counsel, this delay has cost Mohawk significant funds and harmed the entity financially.  We look forward to an amicable resolution of the outstanding debts and issues so that the parties can terminate their agreement.

Mohawk owns certain commercial space that is eligible for use as a host facility for bitcoin mining.  Once mining hosting is operational, the site is simultaneously used by Mohawk for a training and certification program to educate displaced flood victims and unemployed coal miners in the region in learning new skills.  Mohawk's economic development will entitle it and any hosting partner to certain tax incentives and benefits.  The utility company has also offered Mohawk a lower economic development rate for electrical power if any of its host customers agree to a ten (10) year period of operations and pay the bond required by the utility company.

The parties entered an initial agreement more than a year ago.  Almost immediately, Huobi notified Mohawk that it would be unable to fulfill certain terms and conditions.  Mohawk was similarly transparent with Huobi on various issues, including the fact that it had purchased the site and was making purchase price payments on the real estate. The seller provided Huobi with written assurances that the site is more than 50% paid for and the payments are current at this time.

During the weekly zoom meetings between key leadership on both sides, various verbal modifications of the agreement were made and certain deadlines and requirements were eliminated or altered.  Financial delays on the part of Huobi required that Mohawk expend its own funds and time to modify the property in accordance with Huobi's changing requirements and/or failure to timely pay equipment vendors.  Mohawk also spent its own funds on various equipment and materials that were fabricated or purchased to meet Huobi's changing standards and demands.

Huobi still owes Mohawk the sum of $300,000 on an unpaid balance for the fit-up.  Mohawk paid those expenses out of its own pocket as they were due, based on the assurance that Huobi would reimburse for those.  Mohawk has placed a lien on Huobi's equipment in that past due sum.

During active fit-up, prior to the site being ready to host Huobi operations, various Chinese workers stayed on the site to help with certain specific construction. The Huobi workers stayed temporarily in RVs owned by Mohawk initially.  The workers then stayed temporarily on the site in RV housing provided by a third party.

Once the physical plant was ready for use there was a Grand Opening ceremony and Mohawk's Human Resources, management, training and certification program offices were operational and in use.  Huobi's hosted space was also ready for use and therefore was no longer accessible to unsupervised visitors or personnel not directly involved in operations.  No residential use of the property was permitted after that time under state and local zoning and industrial use regulations. Further, the insurer of the commercial space and operations specifically prohibited residential use of the factory. Huobi was given months of notice regarding those zoning requirements and the need to house its workers elsewhere. Mohawk even offered to aid Huobi in finding alternative housing for its workers.  Huobi declined all such offers of assistance.

During and following fit-up, the parties had a space rental and labor agreement requiring a monthly payment by Huobi of $90,000.  Huobi has failed and refused to pay that sum for more than five (5) months.  Mohawk has placed liens on Huobi's equipment to secure payment of that past due debt.

Because of Huobi's unpaid debt and expenses, Mohawk notified Huobi that it could access the property at any time, but that such access had to be under Mohawk supervision.  Huobi has declined to request access since that date.  Mohawk stands ready to allow Huobi agents or staff access to visit the property at any time, but no equipment may be removed from the property until the past due debts are paid.

Mohawk has notified  Huobi repeatedly that the site is ready to operate and that Mohawk is losing significant funds daily because Huobi is not commencing mining.  This financial loss creates an ongoing harm to Mohawk and is a material breach of the amended agreement between the parties.  Huobi's intentional and ongoing refusal to mine at the site has also harmed

Mohawk's training and certification programs, since its potential students cannot begin training until some entity uses the host space and there are operating machines in situ for those students to learn to maintain and repair.  The damage to Mohawk's finances and reputation by Huobi is significant.  Huobi's breach of the eight (8) year contract and refusal to commence mining is a multi-million dollar damage to Mohawk.

As an alternative to using a portion of the facility for mining and to offset the losses it is incurring, Mohawk has offered to let Huobi out of the contract, so it can use the host space for other mining  entities.  Mohawk has also offered to let Huobi subcontract with a third party approved by Mohawk for use of the hosting space.  Mohawk has suggested that the parties could amend the contract to give Mohawk a set host fee and allow Huobi to mine onsite at a lower usage rate.  To date, Huobi has declined all those offers.

In a related concern, Huobi and its agents appear to have claimed in various visa applications that a third party entity employs its staff who were working at the Mohawk facility.  While Mohawk signed the application to verify such employment at the time it was filed last summer, Huobi is not currently providing any employees on the Mohawk site and has refused to engage in the mining activities for which the host site was prepared.  Mohawk will therefore have to notify INS of this change in status and lack of work for those Huobi employees who are currently in the United States on a falsified status.

Let's schedule a time to talk via zoom or live about resolution of these concerns.  Please reach out to me with some possible dates and times.  Recognizing the difficulties of international communication for you and your client, I am happy to engage in calls outside 8-5 with advance notice.

Sincerely,

Anna Whites