# Exhibit 3

**IN ARBITRATION BEFORE JAMS**

HBTPOWER LIMITED,

       Claimant,

   v.

MOHAWK ENERGY, LLC

       Respondent.

**DEMAND FOR ARBITRATION**

**INTRODUCTION**

1.       This arbitration arises under an Operation Right License Agreement, dated May 31, 2022 (with an effective date of June 1, 2022) (the "License Agreement"), between HBTPower Limited as "Licensee" ("HBTPower" or "Claimant") and Mohawk Energy, LLC as "Licensor" ("Mohawk" or "Respondent") (collectively, the "Parties"), pursuant to which HBTPower would run and operate Bitcoin mining activities at 1004 Gateway Industrials Park, Jenkins, KY 41357 (the "Premises").[1]

2.       In the License Agreement, Mohawk represented that it had a valid fee simple absolute estate in the Premises, encompassing the entire plot of land, free and clear of all liens, conditions, covenants, restrictions, rights of way, or regulations that would adversely affect or prohibit the use of the Premises for the Bitcoin mining activities contemplated. It also represented that it had already entered into a power supply contract with Kentucky Power Company ("KPC"), with which it would continue to negotiate to bring the power consumption rates to an average of $0.047/kWh within 5 years.

---

[1] *See* License Agreement - Claimant's Exhibit A.

1

3.      Pursuant to the License Agreement, Mohawk provided that within three (3) months it would conduct upgrades on the Premises, including providing the necessary energy supply, so that HBTPower could use the Premises as a Bitcoin mining facility. Completion of these upgrades to HBTPower's satisfaction constituted a condition precedent to HBTPower's performance under the License Agreement, including any monthly payments. Though not obligated to, HBTPower has made payments towards rent and labor staffing charges to Mohawk through July 2023.

4.      Consistent with the terms of the License Agreement, HBTPower also delivered 4,335 Bitcoin mining machines ("Mining Machines") to the Premises. The Mining Machines delivered to the Premises were among the best available on the market at that time. Very few entities in the world own mining machine inventory of this quality and size.

5.      Almost one year after executing the License Agreement, Mohawk still had not completed the upgrades to the Premises. Specifically, Mohawk had not executed the power supply contract with KPC and could not secure the energy supply in terms of the License Agreement. Mohawk did not even have any title to the Premises and was in dispute over the ownership of the Premises with its original owner.

6.      On October 11, 2023, after having secured over $12,000,000 from HBTPower towards energy security deposits, rent deposit, rent, construction material and equipment, and fundamentally breaching several conditions of the License Agreement, Mohawk improperly ousted HBTPower's staff from the Premises that HBTPower was exclusively licensed to use. Immediately after, Mohawk, through counsel, incorrectly claimed that the contract terms and provisions of the License Agreement between the Parties were modified. Ironically, Mohawk assured HBTPower that its Mining Machines were protected while at the same time it was plotting to sell the Mining Machines. Six weeks later, HBTPower learned that Mohawk is attempting to

wrongfully sell the Mining Machines and even the electricity equipment bought with HBTPower's fund to third parties, including a party with strong ties to Mohawk's President. Upon learning this, HBTPower sent a cease and desist letter.[2]

7.        In response to HBTPower's cease and desist letter, Mohawk made erroneous allegations, but included no assurances that it would not sell the Mining Machines or that it had not already attempted to do so.[3] The Mining Machines are virtually impossible to procure or replace on the same scale in the current market. HBTPower has already filed a Verified Complaint for Temporary Restraining Order and Permanent Injunctive Relief ("Verified Complaint")[4], and a Motion for Temporary Restraining Order ("TRO Motion") against Mohawk in the US District Court for the Western District of Kentucky.[5] In Respondent's Answer and Counterclaim to the Verified Complaint filed by Mohawk on December 4, 2023 ("Federal Court Answer"), Mohawk admitted that it has sold a significant number of Mining Machines.[6]

8.        Now, HBTPower is bringing this arbitration to enforce its rights under the License Agreement.

## ARBITRATION AGREEMENT BETWEEN THE PARTIES

9.        Pursuant to Section 20(a) of the License Agreement:

Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Lexington, Kentucky or Louisville, Kentucky before one arbitrator. If Licensor and Licensee are unable or fail to agree upon the arbitrator within 30 days after the commencement of arbitration, the arbitrator shall be appointed by JAMS in accordance with its rules. All arbitrators shall serve as neutral, independent and impartial arbitrators. Unless otherwise agreed by the Licensor and Licensee, the arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures. In

---

[2] *See* Claimant's Cease and Desist Letter – Claimant's Exhibit B.
[3] *See* Respondents' Response to Claimant's Cease and Desist Letter – Claimant's Exhibit C.
[4] *See* Verified Complaint - Claimant's Exhibit D.
[5] *See* TRO Motion - Claimant's Exhibit E.
[6] *See* Respondents' Answer and Counterclaim at ¶ 42 – Claimant's Exhibit F.

any arbitration arising out of or related to this Agreement, the arbitrator shall award to the prevailing party, if any, the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration. If the arbitrator determines a party to be the prevailing party under circumstances where the prevailing party won on some but not all of the claims and counterclaims, the arbitrator may award the prevailing party an appropriate percentage of the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration. Judgment on the arbitration award may be entered in any court of competent jurisdiction. The Parties shall maintain the confidential nature of the arbitration proceeding and any award or decision, except as may be necessary to prepare for or conduct the arbitration hearing on the merits, or except as may be necessary in connection with a court application for a provisional remedy, enforcement of any arbitration award or decision in a court, a judicial challenge to the arbitration award or its enforcement, or unless otherwise required by law, regulatory requirements or judicial decision, Before making any such disclosure, a party shall give written notice to all other parties and shall afford them a reasonable opportunity to protect their interests, except to the extent such disclosure is necessary to comply with applicable law, regulatory requirements or judicial decision. This Section 20 shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

10.     Section 20(b) of the License Agreement further provides that the Parties submit themselves "for recognition and enforcement of any award or judgment in respect thereof, to the nonexclusive general jurisdiction of any Kentucky State court or federal court of the United States of America sitting in Louisville, Kentucky or Lexington, Kentucky, and any appellate court from any thereof."

11.     Per Section 20(c) of the License Agreement, "all questions concerning the construction, validity, interpretation, and performance of [the License Agreement] shall be governed by, the laws of the State of Kentucky."

12.     As explained above, HBTPower has commenced proceedings for provisional relief before a federal court in Kentucky.

## THE PARTIES

13.     HBTPower Limited is an indirect non-wholly owned British Virgin Islands-based subsidiary of Sinohope Technology Holdings Limited (formerly known as New Huo Technology

4

Holdings Limited or Huobi Technology Holdings Limited), a technology solution service provider, offering a variety of services in virtual asset ecosystem, such as asset management, trust and custodian businesses, and cryptocurrency trading.

14.     Mohawk Energy, LLC, is a Kentucky limited liability company, with its principal places of business in Jenkins, Kentucky. Mohawk represented that it is an energy and technology company that specializes in Blockchain application, crypto mining/hosting, and Blockchain security.

## FACTUAL BACKGROUND

### A.     The Parties' Negotiations of the License Agreement

15.     In or around March 2022, HBTPower was seeking opportunities to develop a Bitcoin mining facility in a place that could provide efficient power supply rates and a favorable return on investment policy. HBTPower also wanted to utilize the thousands of mining machines HBTPower had acquired.

16.     Around this time, HBTPower was introduced to Brandon D. Smith, the President of Mohawk, who indicated that Mohawk had the property and the ability to help HBTPower carry out its Bitcoin mining activities.

17.     On April 14, 2022, a Letter of Intent was sent by Wang Yangping, then Director of Overseas Operation of Huobi Technology Holdings Limited to Mr. Smith, outlining the Parties' mutual desire for HBTPower to "purchase the operation right of the mining field owned by Mohawk [i.e., the Premises] on [the] condition that the mining field's software and hardware facilities meet HBTPower's requirements."[7]

---

[7] *See* Letter of Intent - Claimant's Exhibit G.

5

18.     The Letter of Intent outlined some of the terms and conditions that the Parties would later incorporate into the License Agreement, such as that "Mohawk [was] responsible for providing no less than 41,000 square feet of mining plant and no less than 30MW power capacity." Mr. Smith acknowledged receipt of the letter and agreed to its content.[8]

19.     On April 15, 2022, Mohawk provided HBTPower with specifications and plans to upgrade and renovate the Premises to a Bitcoin mining facility.[9]

**B.      Relevant Provisions of the License Agreement**

20.     On May 31, 2022, the Parties entered into the License Agreement, which had an effective date of June 1, 2022 (the "Effective Date").

21.     Mohawk represented in the License Agreement that it had a valid fee simple absolute estate in the Premises free and clear of all liens, conditions, covenants, restrictions, rights of way, or regulations that would adversely affect or prohibit the use of the Premises for the Bitcoin mining activities contemplated.[10]

22.     Under the terms of the License Agreement, Mohawk granted HBTPower an exclusive, irrevocable license to run, operate, and manage Bitcoin mining activities on the Premises for the duration of the License Agreement, with the right to utilize the electricity facilities and racks of mining machines that Mohawk would install for HBTPower on the Premises.[11]

23.     A central aspect of the License Agreement was Mohawk's obligation to upgrade the Premises within three (3) months of the Effective Date.[12]

---

[8] *Id.*
[9] *See* Premises Specifications (April 15, 2022) – Claimant's Exhibit H.
[10] *See* License Agreement, Sec. 24(v) - Claimant's Exhibit A.
[11] *Id.* at Sec. 2.
[12] *Id.* at Sec. 3(b)(iii).

24.     Mohawk was contractually required to purchase various equipment on behalf of HBTPower, including, but not limited to, transformers, substation transformers, racks and shelves, internet infrastructure, and construction materials, and to install them on the Premises.[13]

25.     The overall cost of the equipment and construction material purchased by Mohawk on behalf of HBTPower was not to exceed $8,000,000. Mohawk was required to provide proforma invoices to HBTPower for the equipment that Mohawk purchased on HBTPower's behalf.[14]

26.     HBTPower's performance obligations were expressly conditioned upon HBTPower's satisfaction with Mohawk's obligation to upgrade the Premises.[15]

27.     The License Agreement characterizes this as a condition precedent that must be completely satisfied to HBTPower's satisfaction to thereby give rise to HBTPower's performance.[16]

28.     Sections 3(a) and (b) of the License Agreement outlines other conditions precedent to HBTPower's performance of and obligations to Mohawk, including that:

    i.    the representations and warranties set forth in Section 24 of the License Agreement were true and correct;

    ii.   Mohawk has secured "[a]ll necessary governmental, and regulatory authorizations, together with all third party approvals and consents," which included an "Economic Development Rider" ("EDR") from KPC (such EDR was necessary for HBTPower to profitable carry out Bitcoin mining activities);

---

[13] *Id.* at Sec. 4(c).
[14] *Id.* at Sec. 4(a).
[15] *Id.* at Sec. 3(a).
[16] *Id.*

7

iii. the Premises was capable of sustained Bitcoin mining activities consistent with the HBTPower's intended use of the Premises, and the conditions, electrical service, and facilities at the Premises were suitable for Bitcoin mining activities;

iv. the Premises contained a 41,000 square feet plant which would be "appropriately modified [as approved by [HBTPower]" to host HBTPower's Bitcoin mining operations and fit HBTPower's Bitcoin mining operations;

v. Mohawk had already entered into a contract for power supply with Kentucky Power Company ("KPC"), with which Mohawk would continue to negotiate to bring the power consumption rates to an average of $0.047/kWh within 5 years; and

vi. the appropriate power supply infrastructure would be installed on the Premises to host HBTPower's Bitcoin rig equipment.

29. Per Section 24 (a)(iii), Mohawk made additional representations and warranties in the License Agreement, including, but not limited to:

i. that the execution of the License Agreement and the consummation of the transactions contemplated by it did not require any governmental or other consent (including judicial consent) other than consents that were obtained as of the Effective Date and remained in effect throughout the entire term of the License Agreement; and

ii. that there is no pending or threatened litigation, proceeding or investigation (by any person, governmental or quasi-governmental agency or authority or otherwise) which might materially adversely affect the ownership, use, occupancy, value, operation or title of the Premises.

30.     Per Section 6(a)(ii), Mohawk was also going to provide eleven employees, consisting of "six maintenance technicians, one electrical engineer, three security guarders and one cleaning person. […] The cost of hiring and employing such pre-determined workers to conduct Bitcoin Mining at the Premise shall be US $40,000.00 per month."

**C.     HBTPower Satisfied the Payment Obligations Triggered by the Effective Date**

31.     The Parties agreed that, after the Effective Date, HBTPower would pay a rent security deposit in the amount of $100,000 and an additional $50,000 for the first month of rent; energy security deposits in the amount of $2,850,000 and $293,000; and an $800,000 deposit for the construction and equipment.[17]

32.      Between June 7 and June 17, 2022, HBTPower paid, and Mohawk confirmed receipt of $4,132,910 from HBTPower for the rent security deposit and first month of rent; energy security deposit; staffing fee; and deposit for construction and equipment.

33.     On June 8, 2022, Mohawk transferred $2,800,000 to KPC for the energy security deposit paid by HBTPower. On June 10, 2022, KPC confirmed receipt of $2,800,000 from Mohawk.

**D.     HBTPower's Additional Payment Obligations Triggered by the Delivery Date Have Not Occurred Yet**

34.     Per Section 5 of the License Agreement, the "Delivery Date" is the later of "the date on which [HBTPower] confirms [Mohawk's] [w]ork has been completed in a manner satisfactory to [HBTPower]" or "all of the conditions set forth in Section 3(b) have been satisfied or waived."

---

[17] *Id.* at Sec. 6.

9

35.     To date, Mohawk's work on the Premises has not been completed, much less in a manner satisfactory to HBTPower, and many of the conditions set forth in Section 3(b) have neither been satisfied nor waived. Thus, the "Delivery Date" has not yet occurred.

36.     Section 7 provides that the 8-year "Initial Term" under the License Agreement "shall commence on the Delivery Date." The "Delivery Date" is also the "Commencement Date" for the "Initial Term" of 8 years, when HBTPower's monthly obligation to pay rent, labor, and 10% of the revenue generated by its Bitcoin mining operation were scheduled to begin.

37.     As a gesture of good faith, to ensure that Mohawk reached the Delivery Date, and to facilitate the commencement of mining activities at the Premises, HBTPower began paying rent and labor costs in June 2022 and continued to pay these until July 2023, even though it was not obligated to do so.

38.     To date, HBTPower has paid more than $12,000,000 in rent, labor, deposits for electricity charges and staffing fees, and advances for construction and equipment.

**E.     HBTPower Was Contractually Required to Secure the Mining Machines**

39.     The License Agreement required HBTPower to secure the Mining Machines it would use on the Premises.

40.     On June 20, 2022, HBTPower delivered 1,000 Bitcoin mining machine units to the Premises, all of which were M30 series and M31 series models. On July 12, 2022, HBTPower delivered an additional 1,059 mining machine units to the Premises, which were also M30 series and M31 series models. The Bitcoin mining machines delivered to the Premises were among the best available on the market at that time. Very few entities in the world own mining machine inventory of this quality and size.

41.     On March 7, 2023, HBTPower delivered another shipment of 2,276 Bitcoin mining machines to the Premises, all of which were Bitmain Antminer S19j Pro and Bitmain Antminer S19 Pro models.

42.     In total, HBTPower has delivered 4,335 Mining Machines to the Premises.

**F.      Mohawk's Misrepresentations and Breaches of the License Agreement**

43.     While HBTPower has been diligent in its obligations under the License Agreement, Mohawk has not only carried out fundamental and material breaches of the License Agreement, but also made misrepresentations.

> **i.      Mohawk did not have a contract with, or the proper authorizations from, Kentucky Power Company.**

44.     As outlined above, Mohawk expressly represented in the License Agreement that its contract with KPC was already in place as of June 1, 2022. In reality, however, Mohawk did not enter into power supply contracts with KPC until December 19, 2022 (the "KPC Power Contracts"). This was a misrepresentation and a fundamental breach of a condition precedent on Mohawk's part.

45.     Moreover, Mohawk warranted and represented in the License Agreement that Mohawk had secured all necessary governmental, and regulatory authorizations, together with all third-party approvals and consents for mining activities. However, in mid-2023, both KPC and Mohawk informed HBTPower that KPC cannot provide an EDR to Mohawk for HBTPower's mining activities.  This, again, was a breach of the License Agreement.

> **ii.     Mohawk has breached its obligation to provide the appropriate electricity connection.**

46.     Although HBTPower paid $3,143,000 in energy security deposits to Mohawk in June 2022, Mohawk still had not equipped the Premises with the power connection necessary for Bitcoin mining more than 18 months after the License Agreement was executed.

47.     When Mohawk was presented with opportunities by KPC to provide requisite bonds for the energization of the Premises for Bitcoin mining activities, Mohawk failed to post the bond. As such, Mohawk committed a default under the License Agreement.

### iii. Mohawk does not own the Premises, despite contractually representing that it did.

48.     In late August 2023, HBTPower learned that Mohawk does not even own the Premises, despite Mohawk's representation in the License Agreement that it had a fee simple absolute estate in the Premises as of June 1, 2022.

49.     Further, in June 2022, Mohawk suddenly claimed that the Premises does not encompass the entire plot of land, but only encompasses the physical structures.

50.     HBTPower has learned that Mohawk is now in a dispute with the actual owner of the Premises.

51.     HBTPower's decision to enter into the License Agreement for a term of eight (8) years depended heavily on the material condition that the Premises was unencumbered and, thus, the circumstances would not foreseeably result in HBTPower's displacement.

### iv. Mohawk has failed to provide proforma invoices for the equipment purchased on behalf of HBTPower.

52.     HBTPower has paid $7,710,000 in advance payments for equipment, which, according to Mohawk, has been spent by Mohawk on equipment and construction materials for the Premises. However, Mohawk has failed to provide HBTPower with proforma invoices detailing how those funds have been applied, despite that the License Agreement requires it to do so.

53.      On October 12, 2023, Mohawk, through counsel, stated that Mohawk would not provide proforma invoices for equipment acquired by Mohawk for HBTPower's use at the Premises since, according to Mohawk, HBTPower does not own the equipment.

54.      Without providing an account of the funds spent, Mohawk has attempted—and to an extent succeeded—to extract funds from HBTPower that have not been due.

> **v.   Mohawk has failed to complete upgrades to the Premises necessary to HBTPower's Bitcoin mining activities.**

55.      Starting in 2022 and continuing through 2023, Mohawk moved several transformers, substations, and other equipment necessary for carrying out mining activities to the Premises, but never completed the installation of the appropriate power supply infrastructure to host Bitcoin mining activities, thereby violating the License Agreement.

56.      As of the date of HBTPower's ouster from the Premises, the infrastructure necessary for HBTPower to perform its mining activities on the Premises was not made available by Mohawk under the terms outlined in the License Agreement. Despite that, Mohawk was required to provide the infrastructure within three (3) months of the Effective Date.

> **vi.   Mohawk has failed to hire the required number of employees.**

57.      Per the License Agreement, Mohawk had to hire eleven employees, for which HBTPower had to pay a monthly labor cost of $40,000. However, in July 2023, HBTPower learned that Mohawk had only hired eight employees, even though the labor charges paid by HBTPower accounted for eleven employees.

**G.      Mohawk Improper Ouster of HBTPower from the Premises**

58.      On October 11, 2023, Mohawk improperly removed HBTPower's staff from the Premises on the pretext of non-payment of rent and labor charges, but did not allow HBTPower to remove its Mining Machines.

59.     As explained above, HBTPower was not obligated under the License Agreement to make any payments towards rent or labor charges until the Delivery Date.

60.     In a letter to HBTPower on October 12, 2023, Mohawk, through its counsel, incorrectly claimed that "many of the initial contract terms and provisions were modified or discarded" over Zoom meetings. Mohawk also "assured that [HBTPower's] mining machines are protected."

**H.     Mohawk Attempts to Sell and Dispose HBTPower's Mining Equipment**

61.     On November 23, 2023, HBTPower received information from market sources that Mohawk is attempting to sell some or all of HBTPower's Mining Machines to third parties.

62.     Upon information and belief, one of the third parties to whom Mohawk has attempted to sell Mining Machines is an entity in which Brandon D. Smith, Mohawk's President, has a founding interest and other financially-beneficial connections.

63.     On November 24, 2023, HBTPower sent a cease and desist letter to Mohawk demanding that Mohawk, including its employees, agents, principals, immediately cease and desist from any activities involving the unauthorized sale, disposition, or encumbrance of all or some of the Mining Machines.

64.     On November 27, 2023, Mohawk responded with another letter lodging additional erroneous allegations and offering HBTPower the opportunity to inspect the Premises. However, the November 27, 2023 letter did not include assurances by Mohawk that it would not sell the Mining Machines or that it had not already attempted to do so.

65.     HBTPower has strong reasons to believe that despite the filing of the Verified Complaint, Mohawk is proceeding with selling the Mining Machines to unknown third-parties. Indeed, certain individual recently visited the Premises at the location where the Mining Machines are stored.

66.     Moreover, in the Federal Court Answer, Mohawk admitted that it has already sold a significant number of Mining Machines.[18]

67.     Mohawk has no legal interest whatsoever in the Mining Machines. Likewise, Mohawk has not sought—nor has it been granted—HBTPower's consent to use, sell, dispose, or encumber the Mining Machines.

68.     Mohawk's unauthorized distribution and sale of HBTPower's highly specialized and valuable Mining Machines not only constitutes a breach of contractual obligations, but also inflicts irreparable harm upon HBTPower. HBTPower cannot simply go out and replace the Mining Machines. Bitcoin mining hardware is designed for specific cryptocurrencies or algorithms. As a result, obtaining machines specialized for Bitcoin's algorithm, with the necessary hashing power, is more challenging than acquiring general-purpose hardware. The Mining Machines are virtually impossible to procure or replace on the same scale in the current market.

69.     The value of HBTPower's Mining Machines is not solely monetary; it extends to the strategic advantage the Machines provide in a highly competitive market. The Mining Machines give HBTPower a distinct competitive advantage in the cryptocurrency mining industry, which advantage is compromised by Mohawk's unlawful actions. The unauthorized sale of HBTPower's Mining Machines will result in direct financial losses to HBTPower and will also undermine its market position and reputation.

70.     The unauthorized distribution of the Mining Machines will continue to disrupt HBTPower's operational efficiency, leading to tangible and intangible losses. The unauthorized use or distribution of the Mining Machines may result in a breach of warranty obligations, leaving HBTPower without the necessary support and maintenance required for optimal performance. This

---

[18] *See* Respondents' Answer and Counterclaim (14 at ¶ 42) – Claimant's Exhibit F.

not only compromises the reliability of HBTPower's mining operations, but also poses a risk to the integrity of the Mining Machines.

71.     Mohawk's breaches and improper removal of HBTPower from the Premises has thus far resulted in the deprivation of more than 17 months of mining Bitcoin from which HBTPower should have enjoyed the benefits.

## COUNT I: FRAUDULENT MISREPRESENTATION

72.     HBTPower re-alleges and incorporates by reference, as if set forth fully herein, each and every allegation set forth above.

73.     By virtue of the License Agreement and its pecuniary interest therein, Mohawk owed a duty to HBTPower to exercise reasonable care in its communication of information in connection therewith.

74.     Mohawk knowingly supplied false information for the guidance of HBTPower in connection with the Parties' relationship, which false information is outlined below.

**First Misrepresentation: Mohawk's Purported Ownership of the Premises**

75.     Mohawk expressly warranted in Section 24(v) of the License Agreement that it had a fee simple absolute estate in the Premises.

76.     In late August 2023, HBTPower learned that Mohawk did not own the Premises, and was in dispute with the Premises' original owner.  Further, Mohawk suddenly claimed that the Premises did not encompass the entire plot of land, but only encompassed the physical structures.

77.     The provision requiring fee simple absolute estate of the entire Premises is a material term of the License Agreement in light of the cost of setting up the mining business and related need for reliable access to energy.

78.     Mohawk made this misrepresentation with the knowledge that HBTPower would rely on it.

79.     HBTPower did, in fact, rely on Mohawk's misrepresentation that the Premises was unencumbered and completely owned by Mohawk when it entered into the License Agreement, and HBTPower's reliance was reasonable.

80.     As a direct and proximate result of Mohawk's misrepresentation and HBTPower's reliance thereon, HBTPower has suffered and continues to suffer substantial damages, and Mohawk has gained a monetary advantage at HBTPower's expense.

**Second Misrepresentation: Mohawk's Purported Supply Agreement with KPC**

81.     Per the License Agreement, the Parties agreed and understood that key to turning the Premises into, and operating it, as a Bitcoin mining facility was to provide energy supply, at a rate and cost, that could support HBTPower's mining activities and generate profit.

82.     In the License Agreement, Mohawk represented that, as of June 1, 2022, it had entered into a contract for power supply with KPC with which it would negotiate to bring the power consumption rates to an average of $0.047/kWh within 5 years.

83.     Mohawk did not have an executed power supply agreement with KPC until December 19, 2022.

84.     In July 2023, HBTPower learned for the first time that HBTPower needed to contract directly with KPC because Mohawk could not pass through electricity to HBTPower. At the same time, HBTPower learned that power consumption rates could not be brought to an average of $0.047/kWh, or even remotely close, within five years as Mohawk could not secure an EDR.

85.     Mohawk never made any of these disclosures to HBTPower during the negotiations of the License Agreement, let alone as part of the License Agreement.

86.     Mohawk made these misrepresentations with the knowledge that HBTPower would rely on them.

87.     HBTPower did, in fact, rely on Mohawk's misrepresentations, and HBTPower's reliance was reasonable.

88.     As a direct and proximate result of Mohawk's material misrepresentations and HBTPower's reliance thereon, HBTPower has suffered and continues to suffer substantial damages, and Mohawk has gained a monetary advantage at HBTPower's expense.

## COUNT II: BREACH OF CONTRACT

89.     HBTPower re-alleges and incorporates by reference, as if set forth fully herein, each and every allegation set forth above.

90.     On May 31, 2022, HBTPower entered into the License Agreement with Mohawk, under which Mohawk made a number of representations, and agreed to perform a number of obligations, as delineated in the License Agreement and explained herein. The License Agreement is a valid and enforceable contract under Kentucky law.

91.     At all times, HBTPower has complied fully with all of the applicable and necessary terms and conditions of the License Agreement, including, but not limited to, timely making all payments triggered by the "Effective Date," purchasing the Mining Machines, delivering the Mining Machines to the Premises, and transferring more than $12,000,000 to Mohawk for rent, labor, deposits for electricity charges and staffing fees, and advances for construction and equipment.

92.     Nevertheless, as of the date of HBTPower's ouster from the Premises, Mohawk still had not completed the contractually agreed-upon upgrades to the Premises, or honored its other contractual obligations, as promised under the License Agreement. For the avoidance of doubt,

Mohawk's specific material breaches of the License Agreement, as laid out by HBTPower in the "Factual Allegations" section of this Complaint, are hereby expressly and completely incorporated into this Count.

93.     As a direct and proximate result of Mohawk's breaches and violations, HBTPower has suffered and continues to suffer substantial damages. Such damages include amounts paid to Mohawk, damages suffered as consequence of not commencing the Bitcoin mining activities, and the value of Mining Machines.

## COUNT III: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

94.     HBTPower re-alleges and incorporates by reference, as if set forth fully herein, each and every allegation set forth above.

95.     Implied in the License Agreement is an obligation that Mohawk act in good faith and deal fairly with HBTPower, and that Mohawk do everything necessary to carry out its contractual obligations to HBTPower. "Every contract or duty under this code shall impose an obligation of good faith in its performance or enforcement. 'Good faith' shall mean honesty in fact in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing." Ky. Rev. Stat. § 45A.015.

96.     By taking the actions described herein above, Mohawk breached not only its explicit contractual obligations to HBTPower under the License Agreement, but also breached its implied duty of "good faith and fair dealing" and duty to do everything necessary to perform the License Agreement, including by, inter alia:

     i.     misrepresenting that it owns a valid fee simple absolute estate in the Premises;

     ii.    misrepresenting that it had entered into a power supply agreement by KPC as on June 1, 2022;

    iii.    failing to perform acts necessary to secure a power connection for Bitcoin mining activities;

    iv.    failing to provide proforma invoices to HBTPower for equipment acquired on behalf of HBTPower;

    v.    failing to hire eleven employees;

    vi.    selling or attempting to sell HBTPower's Mining Machines.

97.    Mohawk's acts are inconsistent with the reasonable commercial standards of fair dealing.

98.    Mohawk's breaches of its implied duty of "good faith and fair dealing" and its failure to do everything necessary to carry out its obligations to HBTPower under the License Agreement have injured HBTPower and caused HBTPower to suffer damages for which it should be compensated.

## COUNT IV: CONVERSION

99.    HBTPower re-alleges and incorporates by reference, as if set forth fully herein, each and every allegation set forth above.

100.    At all material times herein, HBTPower has possessed exclusive legal title to the Mining Machines, a total of 4,335 Bitcoin mining machines.

101.    Mohawk has sold, or attempted to sell, some or all of HBTPower's Mining Machines.

102.    Mohawk has failed to return HBTPower's Mining Machines.

103.    Mohawk's sale and wrongful withholding of HBTPower's Mining Machines purposefully and intentionally deprived HBTPower of its rights to the Mining Machines.

104.    As a direct and proximate result of Mohawk's violation, HBTPower has suffered and continues to suffer substantial damages, the sale proceeds thereof, and the loss of value and use of the irreplaceable Mining Machines.

## PRAYER FOR RELIEF

**WHEREFORE**, Claimant, HBTPower, demands an award against Respondent Mohawk as follows:

1.    An award in in its favor against Respondent, Mohawk, for all claims asserted herein;

2.    Compensatory and consequential damages against Mohawk in an amount to be proven at the arbitration hearing;

3.    An award of punitive damages, where available;

4.    Pre-award and post-award interest at the maximum legal rate;

5.    Costs and reasonable attorneys' fees;

6.    Such other and further reliefs as the arbitrator deems fair and equitable.

December 5, 2023                        Respectfully submitted,

                                       /s/ Harout J. Samra

                                       Harout J. Samra
                                       Noorvik Minasian
                                       Ishaan Madaan
                                       **DLA PIPER LLP (US)**
                                       200 South Biscayne Boulevard, Suite 2500
                                       Miami, Florida 33131
                                       Telephone: (305) 423-8500
                                       Facsimile: (305) 437-8131
                                       harout.samra@us.dlapiper.com
                                       noorvik.minasian@dlapiper.com
                                       ishaan.madaan@dlapiper.com

                                       Palmer G. Vance II
                                       Lindsey Howard Meares
                                       **STOLL KEENON OGDEN PLLC**
                                       500 West Jefferson Street, Suite 2000
                                       Louisville, KY 40202
                                       Phone: (502) 333-6000
                                       gene.vance@skofirm.com
                                       lindsey.meares@skofirm.com

                                       *Attorneys for Claimant,*
                                       *HBTPower Limited*