**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT LOUISVILLE**

| | | |
|---|---|---|
| **HBTPOWER LIMITED,** | ) | CASE NO.: 3:23-cv-628-CHB |
| | ) | |
| Plaintiff, | ) | JUDGE: Claria Horn Boom |
| | ) | |
| vs. | ) | **MEMORANDUM IN SUPPORT OF** |
| | ) | **PLAINTIFF, HBTPOWER LIMITED'S,** |
| **MOHAWK ENERGY, LLC,** | ) | **MOTION TO DISMISS** |
| | ) | **COUNTERCLAIM** |
| Defendant. | ) | |
| | ) | |
| | ) | |

\* \* \* \* \* \* \*

Comes the Plaintiff, HBTPower Limited ("HBTPower"), by counsel and pursuant to Federal Rules of Civil Procedure ("Rule") 12(b)(6), respectfully submits this memorandum of law in support of motion to dismiss the claims asserted by Defendant, Mohawk Energy, LLC ("Mohawk"), in the Answer and Counterclaim (DN 14) to HBTPower's Verified Complaint for Temporary Restraining Order and Permanent Injunctive Relief (DN 1) ("Complaint").

## INTRODUCTION

The relationship between HBTPower and Mohawk (together, the "Parties") is governed exclusively by the Operation Right License Agreement.[1] Thereunder, the Parties agree to arbitrate any dispute arising out of the License Agreement, including issues related to its application or scope. Going on, the License Agreement explains that the Parties are still permitted to seek provisional relief in court. In accordance therewith, HBTPower brought this action solely to

---

[1] See License Agreement attached as **Exhibit 1**. When "'a document is referred to in the complaint and is central to the plaintiff's claim' . . . 'the defendant may submit an authentic copy to the court to be considered on a motion to dismiss, and the court's consideration of the document does not require conversion of the motion to one for summary judgment.'" Greenberg v. Life Ins. Co., 177 F.3d 507, 514 (6th Cir. 1999) (quoting 11 James W.M. Moore, et al., Moore's Federal Practice § 56.30[4] (3d ed. 1998)).

1

request injunctive relief from the Court, while simultaneously arbitrating the merits of its substantive claims against Mohawk.

Mohawk has now filed a Counterclaim against HBTPower asking this Court to resolve the Parties' underlying merits disputes, patently violating the express agreement to arbitrate contained in the License Agreement. Worse, Mohawk has asserted in the arbitration the very same issues raised in the Counterclaim. All of the claims asserted in the Counterclaim are arbitrable under the Federal Arbitration Act ("FAA"). To get around this, Mohawk has argued that HBTPower waived arbitration by commencing this action, but the License Agreement is clear that this Court lacks power to decide arbitrability issues. The Court should, therefore, dismiss the Counterclaim at this time.

Even if this Court does not dismiss the Counterclaim on FAA grounds, dismissal is nevertheless warranted where the Counterclaim fails to satisfy the minimum pleading requirements in Rule 8(a), let alone the higher standard of plausibility required to survive dismissal under Rule 12(b)(6). Employing the guesswork necessary to interpret the Counterclaim, HBTPower is forced to assume Mohawk intends to assert various contract, fraud and tort claims. However, as illustrated below, the Counterclaim fails to state a claim for relief under every conceivable legal theory.

## RELEVANT BACKGROUND

**A.      Mohawk's Allegations in the Counterclaim[2]**

Mohawk and HBTPower entered into the License Agreement on June 1, 2023, whereby Mohawk agreed to complete the physical improvements and install the appropriate equipment and

---

[2] The allegations in the Counterclaim are taken as true for the purposes of this Motion only, but conclusory allegations of law are not. In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 902 (6th Cir. 2009). Mohawk combined its "ANSWER" (DN 14 at PageID #s 104-117) ("Answer"); "COUNTERCLAIM" against HBTPower (Id. at PageID #s 117-122), and "RESPONSE TO MOTION FOR INJUNCTIVE RELIEF" (Id. at PageIDs 122-125) into one single submission (DN 14). This Motion only concerns the allegations contained in the "COUNTERCLAIM" section of that submission (i.e., DN at PageID #s 117-122) (the "Counterclaim").

2

power supply necessary to allow HBTPower to conduct Bitcoin mining operations in Mohawk's warehouse, located at 1004 Gateway Industrials Park, Jenkins, Kentucky (the "Premises"). (Ex. 1 at Recitals; see also Counterclaim (DN 14) ¶ 2.) That the License Agreement governs the relationship between the Parties, including the process for resolving disputes, is not contested.

### 1. Mohawk's physical improvements on the Premises were delayed

Mohawk's performance of the overall physical improvements necessary for HBTPower to begin Bitcoin mining was significantly delayed. (Counterclaim (DN 14) ¶¶ 4, 6.) In the Counterclaim, Mohawk attributes its delay, in part, to HBTPower's failure to provide funds upfront, but does not identify a provision in the License Agreement requiring HBTPower to pay the costs upfront. (Id. at ¶¶ 3, 4.) Nevertheless, Mohawk received $7,700,000 from HBTPower for the physical improvements and equipment on the Premises. (Id. at ¶ 2, 16.)[3] The License Agreement capped the amount Mohawk could spend on construction, equipment and materials at $8,000,000. (Id. ¶ 2.) Although the Counterclaim does not acknowledge it, the License Agreement only required HBTPower to pay $800,000 as a deposit before Mohawk's work began.[4]

Mohawk also attributes its substantial delay in completing the Premises' physical improvements on HBTPower's alleged refusal to approve vendor contracts and "delay in agreeing to" specific equipment Mohawk sought to purchase on HBTPower's behalf. (Id. at ¶¶ 4, 6.) As before, Mohawk again does not point to provisions in the License Agreement imposing those obligations on HBTPower. In reality, the License Agreement obligates HBTPower to agree to specific equipment or approve vendors only after Mohawk "submit[s] all the proforma invoices

---

[3] Specifically, Mohawk alleges first in the Counterclaim that it "would be paid $8,000,000 to fit up its facility," then subsequently complains that it "has not been paid the final $300,000." (Id.)

[4] Section 4(b) of the License Agreement is clear that HBTPower is only obligated to pay as an upfront deposit 10% of the "Maximum Work Cost," or $800,000. (Ex. 1 at § 4(b).) The License Agreement defines "Maximum Work Cost" as the "overall cost of the equipment . . . and construction materials," which "shall not exceed" $8,000,000. (Id. at § 4(a).)

for the equipment" to HBTPower. (Ex. 1 at § 4(c).) The Counterclaim does not mention a single instance when Mohawk satisfied this condition precedent to HBTPower's approval. This is because there is no such instance.

Finally, Mohawk points to HBTPower's "frequent changes to the overall plan" as a cause for Mohawk's delay in rendering the Premises suitable for Bitcoin mining operations. (Counterclaim (DN 14) ¶¶ 4, 9.) Again, Mohawk fails to identify a provision in the License Agreement prohibiting HBTPower from modifying the so-called "overall plan." This is because no such provision exists. Instead, the License Agreement expressly requires HBTPower's approval of the modifications Mohawk was to make on the Premises. (See Ex. 1 at § 3(a)(v)-(vi).)

### 2. Mohawk's alleged issues with HBTPower's on-site supervisor

The Counterclaim contains two allegations related to HBTPower's on-site supervisor, Wang Yangping,[5] with only the second bearing any semblance of relevance to the Parties' dispute. First, Mohawk claims that Mr. Wang created a Kentucky company to serve as his "employer" and asked Mohawk to affirm to the United States Citizenship and Immigration Services ("USCIS")[6] that he was working on the Premises. (Counterclaim (DN 14) ¶ 21.) However, once construction on the Premises allegedly ended, Mr. Wang supposedly "declined to return to the [Premises]," which has compelled Mohawk to contact USCIS to report "that the work status relied upon for [Mr. Wang's] green card is fraudulent."[7] (Id.) Second, Mohawk alleges that Mr. Wang attempted

---

[5] In Chinese culture, the order of names is typically reversed compared to Western conventions, with the surname (Wang) coming first, followed by the given name (Yangping). As such, Wang Yangping is referenced herein as "Mr. Wang."

[6] In the Counterclaim, Mohawk mistakenly refers to the USCIS as the "United States INS" and the "INS." (Id. at ¶¶ 21, 26.) However, the United States Immigration and Naturalization Services (INS) no longer exists and its functions were transferred to various agencies under the Department of Homeland Security in 2003. Now, the USCIS handles immigration benefits and services, including the processing of green cards.

[7] As Mohawk itself tells it, Mr. Wang did, in fact, work on the Premises when he allegedly asked Mohawk to affirm to the USCIS that he was working on the Premises. It was only after construction ended and he supposedly "declined to return" to the Premises that his work status allegedly changed.

to "channel purchase contracts for expensive parts" to entities in which he had financial interests. (Id. at ¶ 22.) However, Mohawk's "vigilant COO" caught on to Mr. Wang's alleged scheme, through an investigation that somehow cost Mohawk both "time and funds," and refused to engage those entities. (Id. at ¶¶ 22, 24.)

### 3. Mohawk allegedly finishes the physical improvements on the Premises

Under the License Agreement, after the Premises was fully equipped for mining operations "in a manner satisfactory to [HBTPower]," Mohawk was contractually entitled to recover payments from HBTPower if its Bitcoin mining operations fell below a certain minimum threshold level. (Id. at ¶ 18; see also Ex. 1 at §§ 3(c)(v), 5(b).) According to Mohawk, the Premises was ready for HBTPower to begin its mining operations in August 2023, but HBTPower allegedly refused to begin mining, resulting in the "loss of six months labor and rent costs… in a sum in excess of $400,000." (Counterclaim (DN 14) ¶¶ 13, 17-18.) [8]

As a whole, the Counterclaim is devoid of labels and does not identify the claims it purports to assert against HBTPower. The Counterclaim generally alleges that HBTPower is "proximately liable for all financial loss to Mohawk;" "liable for all costs associated with the[] remedial measures" that Mohawk is purportedly taking to inform USCIS that Mr. Wang's "green card is fraudulent;" "liable for all financial and economic loss incurred by Mohawk;" and "liable for Mohawk's loss of business standing and reputation due to its defamation of Mohawk, [and] making false claims[9] about Mohawk and its Manager, Brandon Smith[.]"(Id. at ¶¶ 19, 21, 26, 28-29.)

---

[8] Mohawk notably does not plead in the Counterclaim that (1) it complied with its contractual obligation to issue notice to HBTPower to inspect the Premises to determine if Mohawk completed the work in a satisfactory manner (it did not), (2) whether such condition was waived by an instrument in writing (it was not), or (3) that Mohawk was entitled to any monthly labor or rent costs (it was not). (See Ex. 1 at §§ 5(b), 5(c), 6(a), 7(a) and 26.)

[9] Importantly, this is the Counterclaim's only use of the word "defamation," which is supported only by the blanket allegation that HBTPower made "false claims about Mohawk and its Manager, Brandon Smith[.]" (Id. at ¶ 29.) The Counterclaim is otherwise devoid of allegations that would explain the contents of the "false claims," who made the claims, to whom the claims were made, or when they were made.

B.  **The Arbitration Agreement**

The License Agreement between the Parties provides for mandatory binding arbitration of disputes with Judicial Arbitration and Mediation Services, Inc. ("JAMS"):

> (a) Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Lexington, Kentucky or Louisville, Kentucky before one arbitrator. . . . Unless otherwise agreed by the [Parties], the arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures. . . [.]
>
> This Section 20 shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

(Ex. 1 at § 20(a).) However, the License Agreement explicitly authorizes the Parties to seek provisional remedies, *i.e.*, injunctive relief, from a court with jurisdiction: "This Section 20 shall not preclude Parties [sic] from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction." (Id.)

C.  **Relevant Procedural History**

On October 11, 2023, Mohawk ousted HBTPower from the Premises and refused to return HBTPower's mining hardware. (Complaint (DN 1) ¶ 35.) Following HBTPower's ouster, on November 23, 2023, HBTPower received information from market sources that Mohawk was attempting to sell a portion of HBTPower's mining hardware. (Id. at ¶ 37.) On November 29, 2023, HBTPower instituted these proceedings against Mohawk by filing the Complaint, which specifically requested injunctive relief against Mohawk "without waiving arbitration" and reserved HBTPower's "right to seek damages and other relief before an arbitral tribunal consistent with the arbitration provision in the License Agreement." (Id. at ¶¶ 4, 59.)

On December 4, 2023, Mohawk filed its Answer (DN 14 at PageID #s 104-117) to HBTPower's allegations in the Complaint and Counterclaim (Id. at PageID #s 117-122) against

HBTPower. Mohawk admitted in its Answer that it had already sold some of HBTPower's mining hardware in exchange for $360,000. (Id. at ¶ 42.) On December 5, 2023, HBTPower moved this Court for a temporary restraining order enjoining Mohawk from selling any more of HBTPower's mining hardware or the equipment purchased by Mohawk using the $7,700,000 in funds provided by HBTPower, and directing Mohawk to account for the funds received from the unauthorized sales Mohawk had already completed. (DN 16.) Not long after, the Parties entered into an agreement to maintain the status quo until the Court could decide whether HBTPower was entitled to a preliminary injunction. (DN 21-1.) Per the terms of the status quo agreement, Mohawk promised not to sell or use any of HBTPower's mining hardware or equipment that remains on the Premises. (Id. at ¶¶ 1-2.)

Also on December 5, 2023, HBTPower instituted arbitration proceedings with JAMS, Ref. No. 5440001154 (the "JAMS Arbitration"), under the JAMS Streamlined Arbitration Rules and Procedures ("JAMS Streamlined Rules") to arbitrate the merits of its underlying dispute with Mohawk. In it, HBTPower asserts claims against Mohawk for breach of contract, fraudulent misrepresentation, conversion and breach of the implied duty of good faith and fair dealing. Mohawk submitted its answer and counterclaim in the JAMS Arbitration on December 12, 2023, the paragraphs of which are identical to the Counterclaim submitted in this action. (See DN 25-1.)

Finally, on December 19, 2023, HBTPower moved this Court for a preliminary injunction against Mohawk to restrain it from selling or using HBTPower's mining hardware and to direct it to account for, and escrow, the funds received from previous sales of HBTPower's mining hardware. (DN 23.) The Court scheduled a preliminary injunction hearing on January 25, 2024. (DN 24.)

# ARGUMENT

Fed. R. Civ. P. 12(b)(6) permits dismissal of a lawsuit for "failure to state a claim upon which relief can be granted." A pleading is dismissed pursuant to Rule 12(b)(6) when "there is no law to support the claims made, or if the facts alleged are insufficient to state a claim, or if on the face of the complaint there is an insurmountable bar to relief." See Rauch v. Day & Night Mfg. Corp., 576 F.2d 697, 702 (6th Cir. 1978). As detailed below, all three of these bases call for dismissal of Mohawk's Counterclaim.

**A.     The Court should dismiss Mohawk's claims against HBTPower pursuant to the arbitration provision in the License Agreement.**

HBTPower and Mohawk agreed to arbitrate any dispute arising out of the License Agreement with JAMS. (Ex. 1 at § 20(a).) Mohawk has brought claims against HBTPower in this Court instead, patently violating the Parties' express agreement to arbitrate contained in the License Agreement. (See Counterclaim (DN 14).) Moreover, Mohawk has asserted in the JAMS Arbitration the very same issues raised in the Counterclaim. (See DN 25-1.) The Court should, therefore, dismiss Mohawk's claims against HBTPower.

Under the Federal Arbitration Act, 9 U.S.C. § 1, et seq. ("FAA"), a written agreement to arbitrate disputes arising out of a contract involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  The FAA expresses a strong statutory preference for arbitration. AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 345 (2011) ("[o]ur cases place it beyond dispute that the FAA was designed to promote arbitration."). The "primary purpose" of the FAA is to ensure "that private agreements to arbitrate are enforced according to their terms." Volt Info. Sciences, Inc. v. Bd. of Tr. of Leland Stanford, Jr. Univ., 489 U.S. 468, 479 (1989). "The proper vehicle for dismissing a case in favor of arbitration is pursuant to Fed. R. Civ. P. 12(b)(6)."

8

Pinnacle Design/Build Grp., Inc. v. Kelchner, Inc., 490 F.Supp.3d 1257, 1262 (S.D. Ohio 2020). "A party's 'failure to pursue arbitration' in spite of a compulsory arbitration provision means that the party 'has failed to state a claim [upon which relief can be granted.]'" Teamsters Local Union 480 v. United Parcel Serv., Inc., 748 F.3d 281, 286 (6th Cir. 2014).

Mohawk does not deny that the License Agreement contains the arbitration provision. (See Answer (DN 14) ¶ 4; see also Complaint (DN 1) ¶ 4.) The record in this case demonstrates that the issues placed before this Court in the Counterclaim arise out of the License Agreement. Mohawk, however, contends that HBTPower somehow waived arbitration when it initiated this action and that this Court should therefore entertain Mohawk's Counterclaim. (See Mohawk's Response to HBTPower's Motion to Compel Arbitration (DN 19) at 2-7.) This contention is wrong for two reasons.

First, the License Agreement explicitly authorizes the Parties to "seek[] provisional remedies in aid of arbitration from a court of appropriate jurisdiction." (See Ex. 1 at § 20(a).) HBTPower's Complaint is limited to a request for injunctive relief, *i.e.*, a "provisional remed[y] in aid of arbitration." (See id.; see generally Complaint (DN 1).) Thus, HBTPower was within the authority granted it by the License Agreement when it initiated this Action. HBTPower has continued to seek only provisional relief from this Court. (See generally DN 19 and DN 23.)

Second, the License Agreement expressly dictates that "the determination of the scope or **applicability** of this agreement to arbitrate[] **shall** be determined by arbitration[.]" (Id. (emphasis added).) In other words, Mohawk agreed by contract to expressly confer to the arbitrator the power to decide questions of arbitrability. "The [FAA] allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes." Henry Schein, Inc. v. Archer & White Sales, Inc., 202 L.Ed.2d 480, 485 (2019).

9

Thus, this Court lacks power to decide the arbitrability issue that Mohawk has created: whether, by initiating this action for provisional relief, HBTPower has waived its ability to pursue arbitration. See id. In any event, even if the License Agreement did not expressly resolve the issue (it does), "[t]he Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or ***an allegation of waiver***, delay, or a like defense to arbitrability." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). Even Rule 8(b) of the JAMS Streamlined Rules expressly empowers the arbitrator to decide, as a preliminary matter, issues of jurisdiction and arbitrability.

Mohawk is obligated to proceed to arbitration. Its Counterclaim seeking resolution of the underlying merits disputes between the Parties therefore fails to state a claim upon which relief can be granted. Teamsters, 748 F.3d at 286.

**B.      In the Alternative, the Court Should Dismiss Mohawk's Counterclaim for Failure to Satisfy Pleading Requirements and Failure to State a Claim.**

Even if this Court does not dismiss the Counterclaim on FAA grounds, dismissal is nevertheless warranted where the Counterclaim fails to satisfy the pleading requirements in Rules 8(a) and 9(b), and otherwise fails to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (citation omitted).

**1.      The Counterclaim, taken as a whole, fails to satisfy the basic pleading requirements in Rule 8(a).**

To begin, the Counterclaim does not identify the claims it purports to assert against HBTPower and is otherwise so lacking in form as to warrant dismissal under Rule 8(a). "[R]ule 12(b)(6) must be read in conjunction with Rule 8(a) of the Federal Rules of Civil Procedure, which requires a 'short and plain statement of the claim showing that the pleader is entitled to relief[.]"

New Albany Tractor, Inc. v. Louisville Tractor, Inc., 650 F.3d 1046, 1050 (6th Cir. 2011). A pleading must provide the answering party with "fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). The key to Rule 8(a)'s requirements is whether adequate notice is given. Id. Here, it is not.

Indeed, as illustrated below, it is nearly impossible for HBTPower to analyze whether Mohawk's claims satisfy the 12(b)(6) standard because HBTPower cannot readily identify the claims Mohawk intends to assert in the Counterclaim. The Counterclaim does not include any cause of action phrases or legal elements sufficient to distinctly identify a claim or legal theory.[10] "[A]lleging facts is not enough – the plaintiff must articulate a cause of action, as a district court is not required to conjure up causes of action[.]" Lowe v. Boone Co. Sheriff's Dep't, 2014 U.S. Dist. LEXIS 100719, *21 (E.D. Ky. July 23, 2014). The Counterclaim therefore "results in an undue burden being placed on [HBTPower] responding to the [pleading] and on the Court." Sevier v. Google, 2015 U.S. Dist. LEXIS 31903, at *5 (M.D. Tenn. Feb. 20, 2015). Accordingly, the Counterclaim does not meet the minimum standards set forth in Rule 8(a), let alone the higher standard of plausibility required to survive dismissal under Rule 12(b)(6).

> **2. All of Mohawk's potential claims against HBTPower both fail to meet the pleading standards under Rule 8(a) and Rule 9(b) and fail to state a claim under Rule 12(b)(6).**

Even assuming that the Counterclaim satisfies the basic pleading standards in Rule 8(a) (and it does not), it nevertheless fails to state a single claim for relief under Rule 12(b)(6). To survive dismissal under Rule 12(b)(6), a claim must contain sufficient factual matter to "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial

---

[10] The Counterclaim mentions the words "contract," "breach," "fraudulent," and "good faith and fair dealing." (Counterclaim (DN 14) ¶¶ 7, 13, 18, 21, 24, 26, 29, 40, 42, 52). However, the mere use of these words is not enough to conclude that the Counterclaim satisfies the minimum pleading standards. In any event, and to be sure, the claims associated with those words are specifically addressed in further detail below.

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663. Although in this context all of the factual allegations in the pleading are taken as true, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555. Moreover, while a pleading need not contain "detailed factual allegations," its "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." Id.

      **a.**    **If Mohawk intends to assert a contract claim, the Counterclaim both fails to meet the basic pleading standard and fails to state a claim.**

Employing the guesswork necessary to interpret Mohawk's Counterclaim, HBTPower will assume, for purposes of this Motion, that Mohawk intends to include a breach of contract claim against HBTPower where it alleges that "Mohawk has not been paid the final $300,000 under the contract[,]" and that HBTPower's "refusal to begin mining has cost Mohawk five (5) months of profit so far, due to [HBTPower's] breach of the parties' agreement." (Counterclaim (DN 14) ¶ 16.) As an initial matter, Mohawk's hypothetical contract claim fails where the Counterclaim is devoid of contract language whereby HBTPower assumed a legally-enforceable obligation to Mohawk and thereafter failed to perform. Indeed, Mohawk fails to attach a copy of the License Agreement to the Counterclaim, much less cite to, or quote, its relevant provisions. This failure is fatal to Mohawk's claim where "[i]t is a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached." Northampton Rest. Group, Inc. v. FirstMerit Bank, N.A., 492 Fed. Appx. 518, 522 (6th Cir. 2012) (quoting Harris v. Am. Postal Workers Union, 1999 U.S. App. LEXIS 26601, at *14 (6th Cir. 1999)). "A plaintiff's failure to identify any contract language that would support the existence of his claimed contractual rights against a defendant is a failure to show that

the plaintiff is 'entitled to relief.'" GKP, LLC v. Wells Fargo & Co., 2013 U.S. Dist. LEXIS 136433, at *9 (N.D. Ohio Sept. 24, 2013) (citing Iqbal, 556 U.S. at 663)).

Moreover, the Counterclaim fails to identify, or otherwise establish, any of the elements necessary to succeed on a breach of contract claim. "Under Kentucky law, in order to recover in any action based on breach of contract, a plaintiff must show the existence and the breach of a contractually imposed duty." Lenning v. Com. Union Ins., 260 F.3d 574, 582 (6th Cir. 2002) (citing Strong v. Louisville & Nashville R.R. Co., 43 S.W.2d 11, 13 (Ky. 1931)). Applied here, the Counterclaim fails to include any factual allegations that would show, for example, whether HBTPower had a contractually imposed duty to pay Mohawk an additional $300,000 or to start Bitcoin mining five months ago, what conditions Mohawk was required to satisfy before HBTPower incurred an obligation to disburse those funds or begin its mining operations, or whether Mohawk satisfied all of the conditions precedent in the License Agreement, thereby triggering HBTPower's payment and performance obligations. Under these circumstances, the Counterclaim has not stated a claim for breach of contract that is plausible on its face. See Twombly, 550 U.S. at 555.

Mohawk conceivably attempts to assert a claim against HBTPower for breach of the implied duty of good faith and fair dealing where it alleges "[HBTPower] did not enter into or engage in the contact with Mohawk in good faith or act fairly and in accordance with law during that portion of contract [sic] requiring fit up, modifications, and changes to the contract." (Counterclaim (DN 14) ¶ 25.) Although it is not an independent cause of action, breach of the covenant of good faith and fair dealing can "potentially serve as a valid basis for a breach of contract claim." James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., 941 F.Supp.2d 807, 817 (E.D. Ky. Apr. 19, 2013). However, Mohawk's apparent claim for breach of implied duty

of good faith and fair dealing fails for the same reason as its breach of contract claim: the Counterclaim neither identifies nor presents the actual terms of the contract allegedly breached. See Stevens v. Allstate Corp., 2013 U.S. Dist. LEXIS 8209, at *8 (E.D. Ky. Jan. 21, 2013) (dismissing the plaintiffs' breach of contract and implied duty claims where plaintiffs did not attach contract to complaint or set forth language of provisions breached because, "[w]ithout a properly pleaded contract, the Court cannot assume that a duty of good faith and fair dealing ever arose.").

        **b.    If Mohawk intends to assert a fraud claim, the Counterclaim both fails to meet Rule 9(b)'s heightened pleading standard and fails to state a claim.**

If HBTPower uses the conjecture needed to unravel the Counterclaim, HBTPower can assume Mohawk intends to assert a fraud claim therein where it mentions the word "fraudulent" in two circumstances:

> 24. The actions of [HBTPower] were fraudulent and taken with the intent to take advantage of Mohawk's hard work and funds expended so that [HBTPower] could profit unfairly from the parties' agreement.
> …
>
> 26. [HBTPower] made fraudulent statements to United States INS, and misled Mohawk into affirming such fraudulent statements. Mohawk is taking steps to correct those innocent misstatements, at great cost to Mohawk. [HBTPower] is liable for all costs associated with these remedial measures.

(Counterclaim (DN 14) ¶¶ 24, 26.) A party seeking to prevail on a fraud claim under Kentucky law must establish:

> (1) that the declarant made a material representation to the plaintiff, (2) that this representation was false, (3) that the declarant knew the representation was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relief upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff.

Flegles, Inc. v. TruServ Corp., 289 S.W.3d 544, 549 (Ky. 2009) (citation omitted).

14

To support the first circumstance, Mohawk alleges "upon information and belief" that HBTPower's former employee, Mr. Wang Yangping, allegedly "attempt[ed] to channel purchase contracts for expensive parts to" entities "in which he had an ownership share or financial interest" and an allegation that HBTPower's "bad faith actions . . . intentionally or reckless [sic] harmed Mohawk and its owners and investors." (Counterclaim (DN 14) ¶¶ 22-23.) As an initial matter, the Counterclaim fails to satisfy the heightened pleading standard in Rule 9(b) for fraud claims. Flegles, Inc., 289 S.W.3d at 549 ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."). Although a party "may make allegations of fraud based upon information and belief," a pleading "'must set forth a factual basis for such belief.'" Sanderson v. HCA-The Healthcare Co., 447 F.3d 873, 877 (6th Cir. 2006) (quoting U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 903 (5th Cir. 1997)). "At a minimum, Rule 9(b) requires that the plaintiff specify the 'who, what, when, where, and how' of the alleged fraud." Id. Here, Mohawk identifies the "who" (*i.e.*, Mr. Wang), but fails to identify the "what," "when," "where," or "how."

In any event, the Counterclaim fails to address the elements for fraud. Although the Counterclaim arguably satisfies the third element necessary to establish a fraud claim – that HBTPower allegedly acted recklessly (see Counterclaim (DN 14) ¶ 23 ("The bad faith actions of [HBTPower] . . . reckless [sic] harmed Mohawk . . . [.]")) – it stops short of addressing any of the remaining five elements. (Id. at ¶ 23.) Mohawk fails to identify a material misrepresentation that HBTPower made to Mohawk with knowledge of its falsity under the first, second and third elements. Mohawk does not allege that HBTPower induced Mohawk to act upon any misrepresentation or that Mohawk relied upon a misrepresentation as required under the fourth

15

and fifth elements. Instead, by Mohawk's own admission, Mr. Wang did not induce Mohawk to act where Mohawk's supposed "vigilance" uncovered Mr. Wang's alleged scheme. (Id. at ¶ 22.)

As to the second circumstance, Mohawk alleges, again "upon information and belief," that Mr. Wang created a Kentucky company to serve as his "employer," which company Mohawk alleges it has never contracted with, "requested that Mohawk affirm that he and his company were working in Kentucky at the Mohawk site," but later "declined to return to the facility[.]" (Id. at ¶ 21.) Mohawk has since "reached out to INS" to report that Mr. Wang's green card is purportedly "fraudulent," "regrets unintentionally affirming those false assertions" and "is correcting that mistaken impression." (Id.) As with the first circumstance, Mohawk fails to identify a single representation that HBTPower made to Mohawk. Indeed, Mr. Wang's alleged request "that Mohawk affirm that he and his company were working…at the Mohawk site" did not affirmatively represent anything. Second, if Mr. Wang's request qualifies as a "representation" (it does not), Mohawk admits it was not false. Specifically, Mohawk repeatedly calls Mr. Wang "[HBTPower]'s onsite manager," thus, any affirmation that he was working at the facility was indeed true. Finally, Mohawk fails to allege damage resulting from the supposed misrepresentation. Mohawk has not pled a plausible fraud claim on the face of the Counterclaim.

      **c.    If Mohawk intends to assert claims for defamation, intentional interference with prospective business advantage or intentional impairment of the right to contract, the Counterclaim both fails to meet the basic pleading standard and fails to state a claim.**

Once more relying on speculation to decipher the Counterclaim, HBTPower has reason to believe that Mohawk intends to assert tort claims against HBTPower. This speculation is based on the language used in the introductory paragraph of Mohawk's JAMS Counterclaim:

> In accordance with JAMS Procedural Rule 9(a), Mohawk provides notice to the Petitioner and the arbitrator of the defenses and counterclaims found in its Answer and counterclaim before the Federal Court, appended hereto as Exhibit 1, and adds

> the counterclaims of defamation, intentional interference with prospective business advantage and intentional impairment of right to contract, as are outlined herein.

(JAMS Counterclaim (DN 25-1) at 18.) The paragraphs that follow the introduction in the JAMS Counterclaim are identical to the paragraphs contained in the Counterclaim in this action. Thus, HBTPower can only presume that the claims Mohawk intends to assert in the Counterclaim are for defamation, intentional interference with prospective business advantage and intentional impairment of right to contract. All of those claims fail to state a claim against HBTPower and are subject to dismissal under Rule 12(b)(6).

### 1. Mohawk's defamation claim fails as a matter of law.

Mohawk mentions the word "defamation" in a single instance:

> [HBTPower] is liable for Mohawk's loss of business standing and reputation due to its defamation of Mohawk, making false claims about Mohawk and its Manager, Brandon Smith, and its undermining Mohawk with Mohawk's own staff and members, all of which are a breach of the requirements of good faith and fair dealing imposed on all contracts by Kentucky law.

(Counterclaim (DN 14) ¶ 29.) "Under Kentucky law, to establish a *prima facie* case of defamation, a plaintiff must show proof of published, defamatory language about the plaintiff, which causes injury to his or her reputation." Lockner v. Merrick Bank, 2020 U.S. Dist. LEXIS 72586, at *10 (E.D. Ky. Apr. 24, 2020) (citing Columbia Sussex Corp., Inc. v. Hay, 627 S.W.2d 270, 273 (Ky. App. 1981)).

The Counterclaim does not identify the allegedly "false claims" HBTPower made "about Mohawk and its Manager, Brandon Smith." (Counterclaim (DN 14) ¶ 29.) This is especially important where "[n]ot all false statements are defamatory." Dorn v. Dominique, 2023 U.S. App. LEXIS 6043, at *19 (6th Cir. Mar. 14, 2023) (applying Kentucky law) (citations omitted). "By not providing the allegedly defamatory statements," Mohawk's "defamation claim simply fails to 'provide fair notice of what the claim is and the grounds upon which it rests.'" Adams v.

17

Lexington-Fayette County Urban Gov't, 2023 U.S. Dist. LEXIS 169189, at *26 (E.D. Ky. Sept. 21, 2023) (quoting Twombly, 550 U.S. at 555). This Court is neither bound to take Mohawk's word for it nor required "to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555. By failing to include the contents of HBTPower's alleged defamatory statements, the Counterclaim fails to state a defamation claim.

### 2. Mohawk's claims for intentional interference with prospective business advantage and intentional impairment of right to contract fail as a matter of law.

Similarly, if Mohawk intended to include a claim for intentional interference with a prospective business advantage in the Counterclaim, such a claim fails. The only allegation in the Counterclaim that could conceivably relate to such a claim reads:

> [A]dditionally, [HBTPower] rendered Mohawk's performance under its contracts with the power company and its training and certification program impossible by refusing to engage in the bitcoin mining agreed upon and by delaying performance under the contract in an attempt to financially harm Mohawk and its members. Mohawk has suffered significant harm as a direct result of [HBTPower's] intentional and ongoing misconduct.

(Counterclaim (DN 14) ¶ 27.) Because Mohawk does not allege the existence of a valid business relationship or the expectancy of a contractual relationship with which HBTPower interfered, the Counterclaim fails to state a claim for interference with a prospective business advantage. Ventas, Inc. v. Healthcare Prop. Investors, Inc., 635 F.Supp.2d 612, 621 (W.D. Ky. 2009) (identifying "the existence of a valid business relationship or its expectancy" as the first element necessary to recover for interference with prospective business advantage) (quoting CMI, Inc. v. Intoximeters, Inc., 918 F.Supp. 1068, 1080 (W.D. Ky. 1995)).

To the extent Mohawk meant to call its claim for "intentional impairment of right to

18

contract"[11] one for intentional interference with a contract, that claim also fails where Mohawk does not allege that HBTPower intended to cause Mohawk to breach its "contracts with the power company" when HBTPower "refus[ed] to engage in the bitcoin mining agreed upon and . . . delay[ed] performance under the contract . . . [.]" (Counterclaim (DN 14) ¶ 27). See Snow Pallet, Inc. v. Monticello Banking Co., 367 S.W.3d 1, 5-6 (Ky. App. 2012) (recognizing "intent by the defendant to cause a breach" as a necessary element to establish tortious interference with contract claim).

## CONCLUSION

For the reasons stated herein, HBTPower respectfully requests that the Court dismiss Mohawk's Counterclaim and all claims against HBTPower. HBTPower requests that the Court enter an order (1) finding that the agreement to arbitrate in the License Agreement is enforceable; (2) compelling arbitration of all of Mohawk's claims; (3) directing Mohawk to comply with the agreement to arbitrate in its entirety; (4) dismissing Mohawk's Counterclaim; and (5) ordering such further relief as the Court deems just and proper.

---

[11] Claims for "intentional impairment of right to contract" typically arise in the constitutional context and involve challenges to state laws based on the Contract Clause of the United States Constitution, which provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. CONST. art. 1, § 10, cl. 1. See, e.g., Puckett v. Lexington-Fayette Urban County Government, 833 F.3d 590, 599 (6th Cir. 2016).

Respectfully submitted,

STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, Kentucky 40507-1380
(859) 231-3000
(859) 253-1093 facsimile

By: /s/ Lindsey H. Meares
    Palmer G. Vance II
    Lindsey H. Meares

and

Harout J. Samra
DLA PIPER LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8500
Facsimile: (305) 437-8131
Florida Bar No. 70523
Harout.Samra@us.dlapiper.com
Admitted *pro hac vice*

COUNSEL FOR PLAINTIFF,
HBTPOWER LIMITED

## CERTIFICATE OF SERVICE

I herby certify that on December 26, 2023, I served the foregoing via the Court's CM/ECF system, which will send electronic notification to all parties of record.

  /s/ Lindsey H. Meares
*Counsel for HBTPower Limited*