UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | |
|---|---|
| **HBTPOWER LIMITED** )<br>)<br>*Plaintiff*, )<br>)<br>v. )<br>)<br>**MOHAWK ENERGY, LLC** )<br>)<br>*Defendant*. ) | Case No. 3:23-cv-00628-CHB |

### DEFENDANT MOHAWK ENERGY'S RESPONSE TO MOTION TO DISMISS COUNTERCLAIM

Comes the Defendant, Mohawk Energy, LLC ("Mohawk") by counsel, and in RESPONSE to the Motion to Dismiss the Counterclaim (R. 26) filed by HBTPower Limited ("HBT"), states as follows:

Initially it must be noted that there is some concern that the real party in interest, the original HBTPower Limited, owned by and referred to earlier in this proceeding as "Huobi" is not actually before this Court. For this reason, Mohawk will refer to the Plaintiff as "HBT" herein but has a concern that the Plaintiff is simply Wang Yangping, claiming the interests of another, as is detailed in the contemporaneously filed Motion to Dismiss for Failure to Name Real Party in Interest.

The Memorandum in Support of Motion to Dismiss Counterclaim (R. 26), confirms that the initial agreement between the parties, which was just an Operation Right License Agreement,

1

permitted either party to seek relief in the federal court. Memo in Support, p. 1. This Court will note that HBT included significant factual and legal issues in its request for TRO (R. 16) and request for injunctive relief (R. 23). Those allegations went far beyond the narrow issue allegedly before the Court and expanded into false claims against Mohawk and various demands that certain contractual provisions unrelated to any injunctive relief be enforced.

     See, e.g., Complaint, R. 1, para. 27, referencing the delivery of the old and outdated mining machines that were not suitable for use at the plant, with no notice to Mohawk, and requiring Mohawk to store and protect those, which was outside any license agreement; para. 34, in which HBT alleges that it cannot operate without an EDR (which is false, as an EDR is merely one of many different rate assistance agreements offered by the power company), but fails to note that the power company and Mohawk offered the EDR contract and HBT refused to sign it, damaging Mohawk – outside the scope of any license agreement; para. 35, objecting to Mohawk's refusal to let HBT employees live in the industrial building and make residential use of it, which is far outside any license agreement; para. 36, which discusses the parties' various amendments to the original agreement, all of which are outside the scope of the license agreement and/or the arbitration provision; para. 37, addressing sale of the outdated mining machines to pay the rent and labor costs HBT had refused to pay, again, issues outside the scope of the license agreement; para. 42, referencing monies outside the scope of the license agreement; paras. 48-49, discussing HBT's marketing, business advantages, strategic plans for the future – all of which are outside the scope of the licensing agreement; and para. 51 – addressing speculation about Mohawk's business practices, assets and employees, all matters outside the scope of the licensing agreement.

Clearly, HBT strayed far outside the license agreement and any applicability of an arbitration provision contained therein, in its demands for relief before this Court. Further filings by HBT served to include additional concerns, issues and topics even further afield. Not only has HBT waived any right to bring the original agreement to arbitration, but it has intentionally included matters which must be heard before this Court. For this reason, the matter must stay in this Court and the Counterclaim is properly heard herein as well.

When Mohawk filed its counterclaim showing fraud and misconduct on the part of HBT, and various tort and contractual breaches of not just the initial license agreement but the parties' ongoing modified agreements, HBT suddenly changed its tone and no longer wanted to be before the Court.

In its Memo, HBT falsely asserts that Mohawk does not contest that the initial license agreement governs the relationship and all rights between the parties. Id., p. 3. That claim is incorrect. Mohawk has explained to counsel for HBT and argued before this Court that the initial agreement was modified repeatedly by Huobi and HBT during the past eighteen months and that there are significant rights and issues not reflected in the original agreement. See, e.g., Answer and Counterclaim (R. 14), para. 3, stating "would show that the parties entered into a hosting facility agreement so that Mohawk could host Huobi's mining activities at its Jenkins facility, while using the facility for its training and certification program. Exhibit 1, appended to Plaintiff's Complaint, was almost immediately amended by the parties and various verbal amendments continued throughout the term of the parties' interactions." See also: Answer and Counterclaim, paras. 12, 17, 52. These contract modifications are documented by recorded Zoom meetings, which HBT has failed to produce, despite repeated demands by Mohawk.

HBT continues to be confused about the fact that Mohawk did not evict Huobi from the premises and persistently alleges such "ouster." Memo, p. 6. In fact, as has been repeatedly patiently explained to counsel for HBT, Mohawk told the Chinese workers that they could no longer live in the factory, once it was formally opened for operations. Simultaneously, Mohawk informed HBT and Huobi that due to months of unpaid rent and labor costs, they couldn't operate at the plant until those expenses were paid but that they were welcome to visit the plant at any time, day or night, with Mohawk supervision. Neither HBT nor Huobi has been evicted from the plant and both entities are welcome to come back at any time, and welcome to start operations should they reach an agreement with Mohawk to do so. Significantly, Mohawk's recent offers of compromise and settlement have gone wholly unanswered by HBT (as discussed in Mohawk's pending Motion to Dismiss for Failure to Name Real Party in Interest).

I. THE ARBITRATION OPTION IN THE LICENSE AGREEMENT DOES NOT PROHIBIT OTHER CLAIMS BEING CONSIDERED BY THIS COURT

In its Memo in Support of the Motion to Dismiss, HBT argues that because the limited operating rights initial agreement between the parties provided for arbitration, that is the only forum which can hear any matter, related or unrelated to the initial agreement between the parties. Memo in Support, p. 8. HBT then argues that the provision permitting arbitration of some limited issues if no waiver of that provision has occurred means that the entire counterclaim must be dismissed. That argument is specious and without merit.

As the Kentucky Supreme Court stated in *University of Kentucky v. Regard*, 679 SW3d 903, 919 (Ky. 2023*)* "simply because an arbitration provision is included in a contract to resolve disputes arising under that contract does not mean it shares mutuality of subject matter with other provisions." The court noted that many other provisions in the document as well as other

4

agreements between the parties were unrelated to the arbitration provision. Similarly, where the parties in this case had an initial license agreement but then amended not only that, but numerous other agreements and activities between them, the arbitration provision, even if valid, does not cover those other agreements.

The law requires that the party attempting to enforce arbitration must show that there was a valid arbitration agreement covering the matter that it wishes to arbitrate. See: P*ing v. Beverly Enters., Inc.*, 376 S.W.3d 581, 590 (Ky. 2012) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995). In the present case, HBT cannot prove that the arbitration provision in the original agreement, which has been modified or set aside by the parties more than a year ago, governs resolution of the entirety of the parties' disputes.

II.     STANDARD OF REVIEW

Dismissal of an action for "failure to state a claim upon which relief may be granted" (Fed. R. Civ. Pro. 12(b)(6)) requires proof by the moving party that there are no law or facts supporting the claims made by the non-movant. HBT alleges that the counterclaims are not ones on which relief may be granted. Kentucky courts note that "it is well settled in this jurisdiction when considering a motion to dismiss under CR 12, that the pleadings should be liberally construed in a light most favorable to the plaintiff and all allegations taken in the complaint to be true." *Mims v. Western-Southern Agency, Inc.*, 226 S.W.3d 833, 835 (Ky. App. 2007) (citing *Gall v. Scroggy*, 725 S.W.2d 867, 869 (Ky. App. 1987)).

The law provides that when a party makes a motion to dismiss for failure to state a claim upon which relief may be granted, that party is admitting as true the material facts of the complaint. *Fox v. Grayson,* 317 S.W.3d 1, 7 (Ky. 2010) (quoting *Upchurch v. Clinton County*, 330 S.W.2d 428, 429-30 (Ky. 1959)). The court cannot grant the motion to dismiss 'unless it

appears the pleading party would not be entitled to relief under any set of facts which could be proved[.]'" Id. (quoting *Pari-Mutuel Clerks' Union of Kentucky, Local 541, SEIU, AFL-CIO v. Kentucky Jockey Club,* 551 SW3d 803, 803 (Ky. 1977))).

The allegations in the pleadings, including the Answer and Counterclaim, clearly provide sufficient support for the allegations such that, if the Answer and Counterclaim is taken as true, a claim for relief has been stated. As HBT is admitting the facts outlined in the Answer and Counterclaim, it has admitted that the initial contract was modified, that the contract was breached by HBT, and that Mohawk was damaged by that breach. Admitting those facts shows that Mohawk is entitled to recovery of damages. For this reason, the Motion to Dismiss must be denied.

### III. BREACH OF CONTRACT WAS PROPERLY ASSERTED BY MOHAWK

Not only does Mohawk show this Court that the initial agreement was modified and new agreements between the parties made over the past eighteen months, but Mohawk reminds the Court that by raising issues outside any narrow claim for injunctive relief, HBT has waived the right to assert that all issues must be heard in arbitration.

The claim that the counterclaims do not state a basis for relief against HBT (Memo, p. 10), is without merit. HBT alleges that it has no notice of what claim is being made by Mohawk. Id, p. 11. Quite clearly the claim is that HBT breached its contract to pay for fit-up and its contract to use Mohawk's host facilities and pay 10% of all profits for eight years, (Answer and Counterclaim, paras 7; Counterclaim paras. 2, 5, 13, 27, 28 ), so that allegation by HBT is patently false. HBT argues that because Mohawk didn't attach another copy of the initial license agreement, which HBT drew up and which was attached to the Complaint filed with the Court by HBT, to which Mohawk was responding, it can't figure out what contract Mohawk is

referring to. Memo, pp. 12, 14. This assertion is specious on its face, and should be taken for naught.

### IV. FRAUD WAS PLEADED WITH SUFFICIENT PARTICULARITY

HBT cites the two paragraphs where fraud and material misrepresentation were specifically pleaded by Mohawk in the Counterclaim, paras. 24, 26. (Memo in Support, p. 14). HBT then asserts that the issue of self-dealing by Wang Yangping is not sufficiently particular to support a claim of fraud against HBT. Wang Yangping requested that Mohawk pay a company owned by him several hundred thousand dollars over market price for a transformer. Fortunately, Mohawk discovered in time that (a) White Rabbit company was owned by Mr. Wang himself, and that (b) the price was far above market value; and found a reputable source for fair market value transformers. As HBT was responsible for the actions of its agent (at the time, Wang Yangping was employed by Huobi to supervise fit-up on site at Mohawk), HBT is responsible for Wang Yangping trying to overcharge Mohawk by $200,000.00.

The second instance, where Wang Yangping, who admitted to this Court that he was terminated by Huobi/HBT in November, continued to represent to Mohawk and to INS that he was "working" at the Mohawk plant, that he was employed by a U.S. company, and that he was supervising Mohawk staff. In fact, Wang Yangping was not doing any of those things.

Wang Yangping has now come up with a one page document that he has filed with this Court alleging that HBT "retroactively" delegates him as HBT's agent for purposes of this litigation. That document not only lacks indicia of reliability and is violative of agency law, but also does not correct the earlier and ongoing fraud by Wang Yangping, acting as HBT's agent.

Because Mohawk was tricked by HBT and Wang into making what it has now learned were false representations to INS, Mohawk has been harmed and has incurred legal and reputational damages. Counterclaim, para. 26.

> In the Counterclaim, Mohawk specifically stated with regard to the actionable fraud;
>
> 21. Upon information and belief Yangping Wang, Huobi's onsite manager, created a "Kentucky company" HBTHub, Inc., in Richmond, Kentucky, that served as his "employer" so that he could "work for" for that company in Kentucky. Yangping Wang requested that Mohawk affirm that he and his company were working in Kentucky at the Mohawk site. Mohawk has not ever contracted with HBTHub, Inc., its agents or employees. At Yangping Wang's request during fit up, Mohawk affirmed that Wang was working at the Mohawk site. Once fit up ended, Yangping Wang, who has declined to return to the facility, was no longer working at the Mohawk site. Mohawk has reached out to INS to let them know that the work status relied upon for Yangping Wang's green card is fraudulent. Mohawk regrets unintentionally affirming those false assertions for the INS and is correcting that mistaken impression.
>
> 22. Upon information and belief, Yangping Wang engaged in various actions contrary to the best interests of Huobi and Mohawk, including but not limited to attempting to channel purchase contracts for expensive parts for fit up to "White Rabbit" and other out of state entities in which he had an ownership share or financial interest. Mohawk's vigilant COO was able to find out both that the materials purchase contract that Yangping Wang was pushing them to enter was more than $100,000 above market price, and also that Yang and others related to Huobi had an interest in that company and were hoping to profit from that side hustle at the expense of Mohawk.
>
> 23. The bad faith actions of Huobi intentionally or recklessly harmed Mohawk and its owners and investors.
>
> 24. The actions of Huobi were fraudulent and taken with the intent to take advantage of Mohawk's hard work and funds expended so that Huobi could profit unfairly from the parties' agreement. Mohawk suffered harm as a direct and proximate result of Huobi's misconduct, including having to expend additional time and funds investigating Yangping Wang's side hustle companies, and finding legitimate companies which could provide the materials at a fair market rate on short notice.

The six elements of fraud are set forth in *United Parcel Service v. Rickert*, Ky., 996 S.W.2d 464, 466 (1999) as follows: requiring that the complaint assert that the defendant a) made a material representation; b) which was false; c) which was known to be false or made recklessly; d) which

was made with inducement to be acted upon; e) which plaintiff acted in reliance upon; and f) which caused plaintiff injury.

The claims in the counterclaim detail actions and statements by Yangping Wang, as agent for HBT, that were false, material, made with the intention that Mohawk act upon them, and that when Mohawk did act (or, in the case of the side-hustle deal, began to act upon them and then discovered the scam just in the nick of time) Mohawk suffered harm. The requisite elements are present in the allegation and the motion to dismiss must be denied.

V.     DEFAMATION

HBT argues that its false statements about Mohawk and Sen. Smith do not support a claim for defamation. Memo in Support, p. 17. In paragraph 29 of the Counterclaim, Mohawk stated that:

> Huobi is liable for Mohawk's loss of business standing and reputation due to its defamation of Mohawk, making false claims about Mohawk and its Manager, Brandon Smith, and its undermining Mohawk with Mohawk's own staff and members, all of which are a breach of the requirements of good faith and fair dealing imposed on all contracts by Kentucky law.

Id.

"The requisite elements for a defamation claim are: '(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.'" *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 281-82 (Ky. 2014) (quoting the Restatement (Second) of Torts § 558 (1977)). The Counterclaim asserts that Yangping Wang, as agent for HBT, made false claims about Smith and Mohawk to Mohawk's staff and members and undermined Smith

9

and the company to its staff and members. That claim shows harmful speech, published to third parties, and resulting harm. The basic elements of a defamation claim have been met.

### VI.     INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE AND RIGHT TO CONTRACT WAS OUTLINED IN THE COUNTERCLAIM

HBT claims that the counterclaim does not sufficiently allege interference with contract or business. Memo, p. 18. This argument appears to be based on HBT's unsupported claim that Mohawk does not have a valid business or expectancy of business rather than being based on the applicable standard that all facts in the counterclaim must be admitted as true. Id. HBT also argues that it did not cause Mohawk to breach its contracts with the power company. Id, p. 19. While those arguments are assertions that could be more properly made in an answer to the counterclaim, the arguments are also blatant falsehoods. Mohawk outlined the breach of contract and related damages. See: Answer and Counterclaim, paras. 24, 31, Counterclaim paras. 12.

In the counterclaim, Mohawk argues that it had an agreement with the power company and that HBT caused it to breach that contract. Mohawk also asserts that it was forced to hold its entire facility fallow when HBT breached the contract and refused to begin mining. Both those contentions support a finding that an actionable claim has been made. In paragraph 14 of the Counterclaim, Mohawk stated that "Huobi has refused all Mohawk's offers of reducing the mining required, contracting with a third party, releasing Huobi from the contract, or negotiating some amicable resolution. Huobi's refusal necessitated Mohawk continuing to employ maintenance and security teams, and continuing to hold the space for Huobi rather than renting it

to any of the interested third parties who offered to assume Huobi's lease." Mohawk affirmed that this caused it financial harm. Id, paras. 15, 18, 19.

HBT's assertion that it didn't "intend" to force a breach of the power contract or its duty to commence mining (id.) is not a reason justifying dismissal the counterclaim. Again, that is simply a defense to be raised when HBT answers the charges in the counterclaim.

## CONCLUSION

For the foregoing reasons the Motion to Dismiss must be denied and this Court should find that the issues in the Complaint and Counterclaim are properly heard in this forum, which was selected and is utilized by Plaintiff herein.


Respectfully submitted,

_____
**Anna Stewart Whites**
ANNA WHITES LAW OFFICE PLLC
327 Logan Street
Frankfort KY 40601
(502) 352-2373 (office)
 Annawhites@aol.com
*Attorney for Defendant Mohawk Energy, LLC*

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing was this day served via the court's electronic filing system upon:

Palmer G. Vance
Lindsey H. Meares
STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, Kentucky 40507-1380

Harout J. Samra
DLA PIPER LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131

This the 30th day of December, 2023.

_____
Anna Stewart Whites