**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT LOUISVILLE**

| | | |
|---|---|---|
| **HBTPOWER LIMITED** | ) | |
| | ) | |
| *Plaintiff,* | ) | **Case No. 3:23-cv-00628-CHB** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MOHAWK ENERGY, LLC** | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

**DEFENDANT MOHAWK ENERGY'S RESPONSE TO MOTION FOR
INJUNCTIVE RELIEF**

Comes the Defendant, Mohawk Energy, LLC, by counsel, and in RESPONSE to the

Motion for injunctive relief (R. 23), states as follows:

In its Motion, HBT demands various relief from this Court, none of which is properly the

subject of extraordinary relief or an injunction.

First, HBT requests that Mohawk account for the sales price, buyer and location of the

funds from selling the older and outdated machines in order to reimburse Mohawk for the six

months of past due rent and labor at the site. That information was provided to HBT counsel

weeks ago, so the request is moot.

Second, HBT demands that it receive an "inventory" of the equipment sold to satisfy past

due rent and labor costs. HBT falsely alleges, at pp. 11-12 of its Memo that Mohawk has not

provided the inventory of equipment sold, the price paid, the information on the buyer, or the

current location of the funds from that sale. That claim is false. Mohawk provided that

information long ago. See: Exhibit 12. That demand is not a subject for injunctive relief.

1

Similarly, HBT's third claim for extraordinary relief, that Mohawk refuses to provide it access to the factory's security cameras, is without merit.  Mohawk has offered HBT access to the security cameras for weeks, merely requesting that the person using that access be a member or staff person of one of the law firms representing HBT, and not a foreign national or person not subject to this Court's immediate jurisdiction and control who might misuse that information. See:  Exhibit 9.  To date, HBT has not provided the name of any firm member or staffperson who would utilize the proffered security camera access.

Lastly, HBT demands that Mohawk be prohibited from using or selling or encumbering any of the other machines left at the Mohawk site when HBT breached its contract with Mohawk.  This Court will note that a small number of those machines already have a lien against them in the County Clerks' office for the remaining $300,000 due from HBT under the fit- up payment of $8,000,000.00.  The remainder provide security for the damages Mohawk is incurring due to the ongoing contractual breach by HBT.  The value of the mining machines and the value of the contractual breach are both purely monetary, and are not the appropriate subject of any injunctive action by this Court.

That said, this Court should note that HBT's allegation that the public would not be harmed by the requested relief (Motion, p. 2) is in error.  The public, particularly the Kentucky students targeted for Mohawk's employment, training and certification program, (those being displaced miners, flood victims and veterans in Eastern Kentucky), have already been seriously harmed by HBT's breach of contract and continue to be harmed with each day that the breach continues. While those damages are not purely monetary, Mohawk will address those during the trial of its counterclaim, rather than demanding an injunction on that matter.

DISCUSSION OF RELEVANT FACTS

Mohawk's purpose and mission is economic development.  In furtherance of that goal, Mohawk intentionally trained, certified and employed displaced flood victims, veterans, and coal miners who no longer had access to local employment.  Mohawk's goal in hosting HBT or other bitcoin miners was to provide local residents with employment and training in technology repair.  These training certificates would make those folks employable across the nation.  HBT's refusal to begin mining and refusal to permit Mohawk to use the facility to work with someone else who would mine or provide machines for repair continues to impede Mohawk's business and mission.

Letcher County, where Mohawk is located, is one of the counties hardest hit by the decrease in the coal industry, compounded by the tragic flooding that destroyed homes, jobs and businesses.  The plant was built there by its majority owner for the specific purpose of re-training and employing local residents in a local facility.  Both Mohawk and the citizens of the region continue to suffer due to HBT's non-performance of its contractual duties.

The claims made by HBT in this matter are supported primarily by specious assertions contained in affidavits of a former HBT employee.  No documentary or other evidence is provided, other than allegations by a valuation expert not experienced in bitcoin mining or the current market for mining machines, who claims the machines are rare and of exorbitant "value," but somehow utterly fails to place any specific dollar valuation on the machines at issue.  See: Memo at p. 20; Exhibit C to HBT's Memorandum in Support of Preliminary Injunction.  A simple internet search shows that these claims by HBT's expert are outdated and meritless. See: Internet site printout from December, 2023, Exhibit 10; Affidavit of Dustin Rogers, Exhibit 11, para. 5.   Quite clearly, similar machines are readily available and affordable.

### a.  *Claimed delays in communication with HBT by counsel for HBT are unusual and concerning*.

HBT's counsel has argued before this Court and in the JAMS proceeding that they have had delays in communication with HBT.  This is unusual.  Throughout the contractual period, until July, 2023, Mohawk engaged in not just the weekly zoom meetings but frequent text and in-person and email communication with multiple high level HBT management employees, including Ji Yun, Lily Zhang, and General Counsel Derrick Liu.  Responses were typically made within twenty four (24) hours of any communication.  There were few communication delays during the first year of the Agreement.  In June, 2023, Lily Zhang notified Mohawk that HBT was getting rid of the bitcoin mining division.  The only communication with "HBT" since then has been with the former employee Wang Yangping and various U.S. Attorneys he has hired, who have not been able to show any communication with HBT Management.  There has been no communication at all reflected in this case record from HBT management or Chinese counsel.

### b.  *HBT's Inability or refusal to produce key evidence, including zoom meeting records*.

The parties' relationship, modification of the initial license agreement, changes in timeline and duties, and other agreements created between the parties were all memorialized in the regular zoom meetings between Mohawk management and HBT's Chinese owners and managers abroad.  Affidavit of Dustin Rogers, para. 6.  Mohawk has requested copies of these recorded meetings since July, 2023, when Wang Yangping retained his initial Kentucky counsel (who fairly promptly withdrew from representation of Wang Yangping/"HBT"), presumably for the same types of concerns as are discussed in Mohawk's motions before this Court.  The meeting records have yet to be provided to counsel for Mohawk or this Court.

As detailed in the pleadings already before this Court, the parties had an initial operating rights agreement.  Due to various factors on HBT's side, that agreement was modified and

various other agreements were made during the parties' weekly recorded zoom meetings. Mohawk met with HBT leadership late on Monday or Friday evenings at 8 or 9 p.m. to enable management at Huobi and HBT in China to attend. Many meetings included HBT's General Counsel Derrick Lui. Translators were present in the meetings to ensure that the parties were able to communicate clearly.

Mohawk has repeatedly requested copies of those recordings from current counsel for HBT/Wang, reminding them that this factual evidence of the parties' actions and agreements is necessary in order for Mohawk to be able to show this Court the relevant facts related to the pending motion for injunctive relief. See: The most recent request of 1/5/24; See: Letters and communications appended to Motion to Dimiss for Lack of Standing, R. 34.. HBT has been unable to produce those, or, in fact, anything else reflecting direct communication with HBT or HBT. This is either an intentional attempt to keep relevant facts from the Court, or an inability by counsel to communicate with the real party in interest, either of which is deeply concerning.

### c. *Concerns regarding real party in interest*

Mohawk Manager and majority member Brandon Smith notes that in July, 2023, Lily Zhang, Huobi CFO and HBTPower Limited Manager notified Mohawk management that HBT was no longer interested in bitcoin mining and was trying to find a partner or third party to take over the mining operation. Affidavit of Dustin Rogers, para. 7. She requested that Mohawk agree to discuss having a third party take over as an option. Mohawk agreed to discuss modifying the agreement or even allowing HBT to assign the contract to a third party. Id.

No third party affiliated with HBT ever reached out to Mohawk after that conversation. Shortly thereafter, HBT ceased paying rent and labor charges and refused to begin mining at the site. Affidavit of Dustin Rogers, para. 8. Since that time, Wang Yangping is the only person

who has communicated with Mohawk.  Judging from the pleadings before this Court, Wang

Yangping, who admitted no longer being a HBT or HBT employee in his first affidavit before

this Court, has been the only person communicating with counsel for "HBT."  No HBT

management or other HBT employees have appeared in the case.  Despite emails requesting

confirmation, counsel for Plaintiff has been unable to assure counsel for Mohawk that such

witnesses will appear at any hearing on the matter.  See:  Email from counsel asking whether the

listed witnesses will be produced voluntarily or must be subpoenaed, Exhibit 13.

     A google search in September, 2023, revealed the same documents that the Plaintiff in

this action is claiming are corporate documents showing change of ownership of the entity that

contracted with Mohawk.  The documents provided by Plaintiff and attached as Exhibit B to the

Memo may have come from their alleged clients but are also the very same documents one can

find by simply googling and downloading from the internet.  For that reason, these documents do

not have indicia of reliability as communications from HBT to counsel or this Court unless the

cover letter or email from China showing where HBT sent that to counsel is also provided.

     The alleged new owners and shareholders of HBTPower Limited have never contacted

Mohawk, spoken with Mohawk, participated in any zoom meetings, executed any assignment of

the contractual rights, or otherwise communicated with Mohawk in any manner.  Derrick Lui,

General Counsel for HBT and HBTPower, and frequent attendee on zoom meetings, has not

communicated with Mohawk since July, 2023.  This cessation of communication seems odd, in

light of the parties' frequent earlier communications and more than a year of working closely

together.

     Since July, 2023, Wang Yangping has been the only person alleging that he represents

the interests of HBT or HBTPower Limited.  While he has claimed to be a hired "contractor" and

"representative" of HBT, there has been no confirmation by any individual known to Mohawk that he does fill that role or that he is not making false claims. Wang Yangping has provided an electronically signed one page document that purports to be from Wang Zhou, former Director at HBTPower Limited. This document asserts that Wang Yangping is a contractor "retroactively" named HBT's representative, going back six months. Not only is such allegation of retroactive agency ineffective, particularly where Wang Yangping contended that he was a Houbi employee for at least three of those months (see Wang Yangping First Affidavit/Declaration), but it is questionable evidence of any legal authority now asserted by Wang Yangping.

This is in line with decisions by Kentucky courts that notice of agency is required in order to be effective. The agent is a substitute or representative of his principal and derives his authority only from the principal. That principal must provide notice before the agency is effective. *Stewart v. Kentucky Paving Co., Inc.*, 557 S.W.2d 435, 437 (Ky. App. 1977) (citing *City of Covington v. Reynolds*, 240 Ky. 86, 41 S.W.2d 664 (1931)).See, e.g., *Sun Indemnity Company of New York v. Hulcer,* 251 Ky. 484, 65 S.W.2d 471, 472 holding that retroactive application of restrictions on action is ineffective.

The inability of Plaintiff to provide basic confirmatory evidence of his claimed legal status is concerning and suspicious. If the Plaintiff in this action is, in fact, the company that has been working with Mohawk for the past eighteen (18) months, it should have that documentation readily available. HBT is a large, multi-national entity and it seems unlikely that it would have "lost" or "mislaid" eighteen months worth of partnership zoom meeting recordings. It is concerning that the Plaintiff before this Court appears to have no knowledge of the parties' history, modifications of the agreement, or other information related to the months of work

together.  That, coupled with the fact that nobody who has worked with Mohawk before, other than Wang Yangping, who has a history of side hustles that he engaged in to the financial detriment of both Mohawk and HBT, has ever appeared in this case or provided information in this case, causes Mohawk grave concern.

For the past month, Mohawk has been requesting ownership documentation from HBT.  See:  Emails appended to Motion to Dismiss for Lack of Standing, R. 34.  If the Plaintiff before this Court actually owns the mining machines or other equipment at the Mohawk site, it should immediately be able to produce purchase documents, including but not limited to invoices, cancelled checks, wire transfers, shipping documents, bills of lading, tax receipts, customs documentation and other materials.  To date, HBT has been entirely unable to produce any such information other than the publicly available google download discussed earlier.

In other bitcoin hosting cases in the state and federal courts of Kentucky wherein the undersigned was counsel, various third parties claimed ownership of mining machines.  Those parties were only able to produce a one page "bill of sale" and a copy of the host facility's own machine inventory. Counsel for Mohawk has been involved in two such cases. See, e.g., *Touzi v. Biofuel Mining, Inc.*, Eastern District of Kentucky Case No. 3:22-cv-00008-GFVT, where Touzi, the alleged "owner" of the equipment stole it from the host facility and refused to pay the required settlement sum and replicated that misconduct across the nation;  and *Biofuel Mining v. VCV*, Martin County, Kentucky,  Civil Action No. 22-CI-00082; where, as in this case, the only ownership documents provided were a one page "bill of sale" created by the alleged "owner." with Biofuel's inventory of equipment appended thereto.

In each such case, none of the parties claiming ownership was found to actually own the mining machines.  In each case, the mining machines were owned by third parties and had been

appropriated, in some cases illegally, from various owners and other entities.  See, e.g., the ongoing SEC investigation  involving VCV and its actions in defrauding investors and actual mining machine owners.  For that reason, Mohawk demands valid proof of ownership from HBT before it will allow access to use, or release of the mining machines or information related thereto.  It is highly suspicious that the current Plaintiff before this Court was and continues to be unable to immediately provide documentation of ownership and even more suspicious that HBT now demands that Mohawk create an inventory of the HBT machines, as HBT should already have that inventory in hand.

As outlined in the Motion to Dismiss, R. 34,  HBT, the purported owner of the mining machines and Plaintiff before this Court has not been able to provide documentation of payment of state or federal taxes for the expensive property they held in Kentucky in 2022 or 2023. Again, this is deeply concerning.  A property owner should be able to immediately produce such proof.  Similarly, Mohawk has requested proof of insurance of its mining machines from HBT since July, 2023.  Counsel for the Plaintiff in this action has been  unable to provide any such proof of insurance.  Again, it seems obvious that the owner of expensive machinery would have covered such property with insurance.  A non-owner, on the other hand, would not have proof of such insurance coverage.

This is identical to a party claiming their car was stolen or is in the possession of someone else but being entirely unable to come up with any title, proof of insurance or registration or property  tax receipts.  In that case, one would doubt that the "plaintiff" actually owned the car.

Due to these serious concerns, Mohawk as the custodian of the mining machines will allow Wang Yangping's counsel a tour of the facility and a visual inspection of the equipment,

but not any right to use, handle or remove the equipment without firm proof of ownership.  As so much time has elapsed since that proof was requested, any documents provided now would be suspicious and require review and verification.

### d.   *HBT knew that there was no final power agreement in July, 2022 and spent months working with Mohawk and the power company to create specific contractual provisions that it wanted included in any proposed contract*

HBT argues that Mohawk had no contract with it because Mohawk failed to get an initial agreement with the power company.  In fact, it was HBT who kept cancelling and altering the initial power company agreement, even months after fit-up had begun.  See, e.g., email from Derrick Lui, HBT's General Counsel, dated 10/5/22. Exhibit 1, requesting that Brandon Smith and counsel for Mohawk work with the power company on drafting amendments to the initial power company agreement.  HBT did not agree to accept the proffered initial agreement Mohawk had created with the power company and demanded various changes to it.  This shows that HBT knew Mohawk had that initial agreement, but wanted a new and different agreement drafted as well as additional provisions in any proposed EDR (Economic Development Rate) agreement.

The following day (10/6), HBT's General Counsel Lui contacted Mohawk to confirm that the power company's communications with Mohawk and HBT during the zoom had cleared up most of the HBT concerns.  See:  Liu email, Exhibit 2.  HBT still did not authorize Mohawk signing any power agreement at that time, but stated that it would review the contract to see if Mohawk should sign.  The following day, after yet another meeting between Mohawk, HBT and the power company, HBT requested additional changes to the two year power contract as well as demanding a new ten year contract with various changes in it.  On 12/9/22 Mohawk communicated with HBT's General Counsel regarding the ongoing amendments to the power

company proposals and sought HBT's approval or feedback for those proposals, requesting that HBT cease modifying the agreements.  Email, Exhibit 3.

On 10/18/22 Mohawk confirmed to HBT's General Counsel and Wang Yangping that the EDR was ready to sign, that the rates on power contracts (IGR and EDR) are not locked in until the agreements are signed, and the HBT had not authorized the execution of the EDR contract yet.   See:  Exhibit 4.  To date, as of 12/29/23, HBT has yet to authorize execution of the EDR agreement.

On 12/7/22 Kentucky Power's counsel provided Mohawk and HBT clarification on why the initial proposed electrical rate had changed and affirmed that rate changes would be continuous throughout the contract based on PSC determinations annually or more frequently. See:  Exhibit 5.  On 7/21/23, HBT's prior Kentucky counsel was still working with Mohawk and the power company to make changes to the power agreement and to discuss whether the EDR should be signed.  See:  Exhibit 6.  On 8/10/23 Wang Yangping's email discussed working with Lily at HBT to try to make a decision on whether HBT wanted an EDR signed.  See:  Exhibit 7. Contrary to the Plaintiff's claims before this Court and JAMS, HBT not only knew there was no agreed upon power contract, but stated that Mohawk could not sign any proposed power contract until HBT reviewed it and agreed that various changes it had asked for were in the revised agreement.

### e. *HBT management was present at the site multiple times during fit up and was aware of status.*

HBT asserts before this Court in each pleading that it had "no idea" that in 2022 the plant was not ready for the specific use HBT desired to make of it. Documentary evidence reveals this assertion to be wholly untrue. Attached is a photograph from June, 2022 showing Wang

Yangping and others at the facility before any fit up began.  There is also a photograph from late November, 2022 that includes Lily Zhang CFO for HBT and HBT and another HBT management employee showing some initial fit-up completed during her visit to explain why HBT was having money difficulties and had delays in payment.  During that visit Mohawk explained that HBT's non-payment of the fit up payment of $8,000,000 adversely impacted Mohawk's ability to purchase the expensive and specific items HBT required for fit-up.  See: Exhibit 8; Affidavit of Dustin Rogers, para. 9.

### f.   Lack of veracity in Wang Yangping's Affidavits.

Wang Yangping was on site regulary at Mohawk's premises after June, 2022, allegedly supervising the Chinese speaking technicians who lived with him in Mohawk's RV and facility to help with fit-up.  Wang's statement at para. 9 of the Second Declaration that in late 2022, after shipment of the old and outdated mining equipment, that he suddenly realized the premises were not yet ready for mining is wholly without merit.  Wang was part of the day to day communication with HBT on fit up process and progress.  See: Dustin Rogers Affidavit, paras. 10, 11.

As HBT's own technicians designed and built the boxes for mining specifically not to use the M Series miners (which were old and outdated). Those miners are extremely inefficient and use three or more times the electrical power as newer models, with markedly less result for the cost, and are typically considered not fit for use in the US, due to power rates.  Affidavit of Dustin Rogers, para. 10. Wang's claim that HBT intended to use the old and outdated miners (Second Declaration, para. 12) is without merit.

Wang claims in the Second Declaration at para. 13 that HBT believed the premises would be ready to start mining in December, 2022.  The photograph appended hereto of HBT staff on

site in late November, 2022 to discuss delays caused by HBT nonpayment refutes that claim.
Clearly, at that time Wang and his Chinese technicians had not even begun to build the
specialized boxes for their mining machines.  The empty wall behind them is where the
technicians would eventually assemble the required structures.  The build was delayed by HBT's
inability to timely pay the fit up costs of $8 million. Rather than having Mohawk cancel the
agreement due to nonperformance by HBT, HBT's CFO Lily Zhang came to Kentucky to plead
HBT's case for continuation despite its delays.  See: Affidavit of Dustin Rogers, para. 9.

Wang alleges that Mohawk failed to provide HBT with "pro forma" invoices.  Second
Declaration, para. 16.  As Wang is aware, and as is reflected in the email communications
between the parties, for the equipment and transformers used in this fit-up, there was ongoing
communication and review of costs and purchases.  See, e.g., email from Dustin Rogers to Wang
Yangping, with a spreadsheet of all equipment, prices and shipment dates.  Exhibit 14.  Invoices
for charges or approvals for manufacturing were provided by HBT on an item by item basis,
with Wang often attending the off site meetings with manufacturers to personally approve such
purchases or manufacturing.  See:  Affidavit of Dustin Rogers, para. 10..  Wang and HBT
approved each purchase in advance.  This personal review and consent, and the approval for each
purchase and cost was provided by HBT in advance. Dustin Rogers Affidavit.

Paragraph 20 of the Second Declaration, which alleges that Wang "believed" that all
power contracting was complete in June, 2022, is shown to be patently false by the
contemporaneous communications with HBT's counsel Derrick Liu, who was integrally
involved both in negotiating with the power company and discussing what HBT wanted in the
power agreement, which was changed by HBT repeatedly over a period of many months. Wang,

13

who was present for the zoom meetings and for many meetings onsite with the power company's representative knows that this statement in the Declaration is not true.

In the first Declaration and in the Second Declaration at para. 23, Wang claims that there was an "agreed upon" power rate of 0.047kWh in the initial license agreement.  The terms of the Agreement, written by HBT, show that this statement is false.  See HBT's Memo for Preliminary Injunction at p. 5, **admitting** that HBT knew that power rate was not 0.047/kWh, and that HBT merely asked Mohawk to continue to negotiate for various concessions that might reduce the rate over the next five (5) years.  Mohawk has been actively engaged in such negotiations since June, 2022. While the parties agreed in writing in the License Agreement that Mohawk would work hard to obtain various tax incentives, special power discounts and other benefits to attempt to reduce the power rate to under 5 cents, the Agreement does not give a set rate.

At para. 24 of the Second Declaration, Wang asserts that Mohawk demanded a bond in "an excessive amount" for any Economic Development Rate (EDR) discount by Kentucky Power, suddenly, in the summer of 2023.  As HBT and Wang are aware, bonds for EDR discounts were mandated by the PSC and the power company, for the first time, in the spring of 2023.  No such bonds were in existence prior to that date but the fact that many bitcoin mining companies and other similar ventures were leaving the state years prior to the expiration of the ten year contract required by the power company for these multi-million dollar discounts on electrical rates, leaving taxpayers to bear the financial burden of these early departures, led the Attorney General's office, the PSC and the Power Company to mandate bonds for the first time. See, e.g., Kentucky Power Tariff Case, PSC Case No. 2022-0424.  This was explained not just to HBT but to the prior Kentucky counsel for HBT in an email dated 10/20/23.  Wang's assertion that this was somehow a Mohawk trick is wholly unrelated to reality.

At para. 27 of the Second Declaration, Wang claims that he "insisted" that Mohawk provide an exact power rate.  As the communications between the parties and Kentucky Power reflect, rate charts were repeatedly provided by the power company, the only entity that sets power rates (along with the Public Service Commission) to HBT and Wang.

Until HBT agreed to sign an IGR (Industrial rate agreement) or an EDR (Economic Development Rate agreement), the power rate would not be set, as detailed to HBT by the power company counsel and representative, Katie Glass and Shane Allen.  Power rates are set by the power company, not by the individual user, whether that be this Court at her home or Mohawk at its facility.

At paragraph 31 of the Second Declaration, Wang claims that Mohawk never provided any information on its property ownership.  The record shows that from the initial meeting between the parties, Mohawk informed HBT that it had purchased the property from a former Mohawk member, Rick Cole, and was making payments thereon.  A communication to HBT's counsel from Cole's attorney in early 2023 affirmed that the sale had been made and that Mohawk was current on property purchase payments. Mohawk completed making those payments in 2023 and now owns the property in fee simple.

Wang falsely alleges at para. 33 of the Second Declaration that Mohawk "ousted" HBT from the premises.  In fact, Mohawk has been asking HBT to begin mining promptly, due to Mohawk's losses caused by HBT's refusal to mine, since July, 2023.  See:  Affidavit, Exhibit 11. HBT was never "ousted" from the premises.  The Chinese workers were told in August, 2023 that they could no longer continue to live inside the business property as it was an operational factory.  Residential use of an industrial site is not permitted by zoning or covered by business insurance.  HBT staff were told that past due rent and labor must be paid before they could start

mining, which is a reasonable business request.  No ouster occurred and HBT staff were specifically informed that they could enter the plant at any time upon request and could begin mining once the back rent was paid up.  Id.

Mohawk has invested eighteen months of work and significant funds and labor expenditures to fit up the plant in accordance with HBT's frequently changing requirements. Mohawk has now suffered six (6) months of intentional non-performance by HBT, during which the site has lain fallow, at a loss of millions of dollars per year to Mohawk. See: Dustin Rogers Affdavit, Exhibit 11, para. 13.  Para. 39 of Wang's Second Declaration is false and unsupported by fact.

ARGUMENT

I.    THE STANDARD FOR INJUNCTIVE RELIEF HAS NOT BEEN MET AS THE MATTER IS A SIMPLE CONTRACTUAL DISPUTE IN WHICH MONETARY DAMAGES ARE SOUGHT BY EACH PARTY

This matter is a simple contractual dispute between two parties, involving fungible goods in terms of mining machines and questions of which party performed various contractual requirements timely or untimely, and who is stopping whom from performing the essence of the Agreement – that being the conducting of mining activity at the Mohawk site for the agreed upon host fee.  The matter does not require injunctive relief.  The parties are merely dickering over terms and money. HBT was current on rent and labor in December, 2023, after sale of the outdated machines to pay those back expenses, and could pay January's rent and labor, give consent to execution of the IGR or EGR and start work as per Mohawk's repeated requests that they do so.  The only thing stopping HBT from immediately commencing mining is HBT. Nothing else.  The claim that HBT somehow "cannot" start mining at the site (Memo, p. 9) is

false.  Mohawk has sent repeated communications asking that mining begin so as to reduce the
ongoing monthly harm to Mohawk. Those communications have been ignored by HBT.

The assertion by HBT that it is at risk of immediate and irreparable harm if the injunctive
relief is not granted  (Memo, pp. 17-18) is false.  HBT might, in a worst case scenario, have to
spend some time and money finding another 2000 machines to mine with at another site. A
simple internet search reveals that this might not be nearly as difficult as HBT's expert witness
apparently believes.  As many as 4000 machines, brand new and up to date, can be purchased
from China from multiple sites today.  See:  Exhibit 10.  But even if it were costly or difficult to
find other mining machines, that is only a monetary issue and not an irreparable harm to HBT.
HBT makes no colorable claim that monetary damages would be "seriously deficient as a
remedy," as is required by the very case cited by HBT, *Transamerica Ins. Fin. Corp. v. North
Am. Trucking Ass'n,* 937 F. Supp. 630 (W.D. Ky. 1996).

Rather than being in a precarious position, as HBT asserts at p. 19 of the Memo, Mohawk
is a company that has been in existence for more than a decade, has 20+ employees, owns a
multi-million dollar industrial site and 8 acres of prime realty in a burgeoning economic
development zone, and is steadily gaining both local and state support for its training and
employment programs. Mohawk is a valued institution in the region and is fully capable of
managing the outcome of this litigation.

Looked at dispassionately, HBT's main disagreement in this case is its dissatisfaction
with Kentucky Power Company's electricity rate.  That rate has nothing to do with Mohawk.
Mohawk has made efforts to connect HBT representatives with power company officials and to
aid HBT in negotiating for a lower power rate with the power company as is documented in the
record.  Mohawk has agreed to provide the jobs and training program that would enable the

partnership of Mohawk/HBT to be eligible to a multi-million dollar rate reduction under the EDR.  Mohawk has also worked over the past year to ensure that it will be eligible for local and state tax breaks and other offsets to rate costs and has assured HBT that it will share such savings with HBT.  Yet HBT has refused to move forward.

HBT is obviously seeking a monetary settlement. Common sense shows that it would not benefit HBT if Mohawk removed the parts used in fit-up and put them on a truck for HBT. Removing and taking apart wiring, electric structure, HVAC ducts and vents, metal shelving and supports for the machines and so on would greatly reduce the value of the site and the parts and serve no real purpose.  Obviously, all HBT wants is money.  HBT would like to refuse to comply with the terms of the agreement and receive some payment.  That demand is not one subject to injunctive relief. That is just a simple contractual claim for monetary damages.  In lieu of cash it might be agreeable to accept mining machines or large pieces of the equipment used in fit up. Again, that is simply a monetary issue to be resolved in its lawsuit and not a fit subject for injunctive relief.

What Mohawk would like in this action is similarly simple.  Either a buy-out of the contract by HBT or HBT's agreement to move forward with the mining and host fees and labor payments as agreed upon by the parties.  Similarly, that request is not one requiring an award of extraordinary relief by the Court.

While each party claims to be incurring financial loss because the contract is at a standstill, neither can show irreparable harm.  Mohawk loses money each day because the host facility is not operational and it cannot operate the training and certification program.  This is harmful, but compensable, although a great loss to the public in that economically distressed region of the state as they lose both a significant number of local jobs (currently Mohawk

employs 25 people, all retired veterans or displaced miners and flood victims) and the training school which could certify and train 30 people per semester.

HBT's claim is less clear. It claims that it is somehow suffering financial damages because Mohawk is not letting it mine but also says that if Mohawk let it mine the mining would not be profitable because the PSC and Kentucky Power's rates are too high and it would suffer financial damages from mining. Maybe it wants to go back in time three years to when utility rates were lower. Perhaps it is attempting to demand that the Court direct the PSC to give this Chinese company a lower utility rate than the PSC permits, a matter far outside the reach of the judiciary. Regardless, its demand, though speculative, is basically for monetary damages, which does not support an order granting injunctive relief. HBT has only suffered alleged monetary damages and would, if such "damages" were proven, only be entitled it to monetary damages. No extraordinary or injunctive relief is supported by HBT's pleadings.

Even if this Court were to permit the extraordinary relief of allowing HBT to remove its mining machines from the premises, HBT would be required to post a cash bond in U.S. dollars with this court so that the parties can be assured that the foreign entity, without even a single employee, office or title to any asset within the U.S., will be able to satisfy any judgment against it. That bond should be in the sum of the full and proven purchase price of the equipment and the damages suffered by Mohawk due to HBT's refusal to timely begin mining at the site.

The law on grants of injunctive relief require that a trial court only grant injunctive relief if each of the following is met: first, that the movant presents a "substantial question" in the case ("i.e. that there is a substantial possibility that the movant will ultimately prevail"); second, that the injury resulting absent injunctive relief would be immediate and irreparable; and third, that the temporary injunction "will not unduly harm other parties or disserve the public." *Price v.*

*Paintsville Tourism Com'n,* 261 SW3d 482, 484 (Ky. 2008).   Injunctive relief is addressed to the sound discretion of the trial court after consideration of the evidence provided by the parties. *Maupin v. Stansbury,* 575 SW2d 695, 697-98 (Ky. 1978), (citations omitted).

Kentucky cases consistently affirm that mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of such relief, are not enough to support a grant of injunctive relief.  See:  *Norsworthy v. Ky. Bd. Of Med. Licensure,* 330 SW3d 58, 62 (Ky. 2009), quoting *Sampson v. Murray,* 415 U.S. 61, 90,     94 S.Ct. 937 (1974). Generally, injunctive relief should not be issued to provide purely monetary relief, as monetary injury is generally not irreparable. *Norsworthy, supra*, 330 SW3d at 62.  This is because the courts find that "it is well established that economic and reputational injuries are generally not irreparable." Id. Courts deny a request for injunctive relief when the benefit to the movant is merely financial.  *Bartman v. Shobe,* 353 SW2d 550, 554 (Ky. 1962).

An injunction is an equitable remedy, not an independent cause of action. See Black's Law Dictionary REMEDY (10th ed. 2014) ("The means of enforcing a right or preventing or redressing a wrong; legal or equitable relief."). It serves the purpose to redress an injury not adequately recompensed by the law or by an award of monetary damages. *Cyprus Mountain Coal Corp. v. Brewer,* 828 SW2d 642, 645 (Ky. 1992).  "Injunctions, generally, will not be granted, minus some positive provision of the law to the contrary, where there is a choice between ordinary processes of law and the extraordinary remedy by injunction, when the remedy at law is sufficient to furnish the injury party fill relief to which he is entitled in the circumstances."  Id.

A showing of irreparable injury "is a mandatory perquisite to the issuance of any injunction."  *Maupin, supra.,* 575 SW2d at 699.   irreparable injury is one for which "there

20

exists no certain pecuniary standard for the measurement of damages." *Cyprus Mountain, supra.,* quoting *United Carbon Co. v. Ramsey,* 350 SW2d 454 (Ky. 1961).  No such irreparable injury has been or can be proven in this case.  HBT is a giant Chinese owned, multi-national, publicly traded corporate entity.   HBT's wants or needs can be fully satisfied by monetary relief if it is found entitled to same at the resolution of the contractual action it has filed.

## II.      HBT HAS SHOWN NO SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

While HBT makes the bold assertion that it has a "substantial likelihood of success on the merits" (Memo, pp. 3. 13), the record does not support that claim.  HBT's self-serving narrative and fraudulent and incorrect affidavits of Wang Yangping are not, in fact, "evidence" that it will decisively be entitled to unqualified success in this matter.  There is a real dispute in this case, multiple contract and agreements, an eighteen month course of dealing, and significant legal and contractual issues between the parties.  Litigation will be required to fully adjudicate the claims and defenses.

## III.     INJUNCTIVE RELIEF REQUIRES POSTING OF A BOND

Kentucky law requires that a party seeking injunctive relief must post a bond sufficient to protect the party against whom relief is sought.  See: Kentucky Rule of Civil Procedure 65.01; Fed. R. Civ. Pro. 65.  Mohawk values its loss per year from HBT's breach of contract at more than $5,000,000.  At a minimum, should injunctive relief be granted, it would have to post a bond in that total sum in U.S. dollars with this Court.  Foreign assets should not be used to support such a bond, particularly as HBT has no links to America, no employees in America and no real property or offices in America.  The risk of it absconding with the machines (the only easily saleable asset it has in the U.S.) and evading the jurisdiction of this Court is relatively high

21

and Mohawk must be protected from that risk.  See, e.g., *Teamsters local #783 v. National Linen Service,* 472 SW2d 671 (Ky. 1971).  The whole concept of an injunction bond, particularly in the case of an ex parte restraining order, is that the order is issued on peril of a subsequent determination that injunctive relief is not properly grantable. The party who obtains the order takes the chance of the validity of a grant of injunctive relief.  Id, 472 SW2d at 674; *Pharo Distributing Co. v. Stahl,* 782 SW2d 634, 637 (Ky. 1990).  The purpose of a bond is to ensure that the party seeking the extraordinary relief can protect the non-movant against any monetary damages it suffers if the grant of relief is found improper.

While HBT's expert, Adam Bakula, who provided a "Declaration" attached as Exhibit C to HBT's Motion for Preliminary Injunction (R. 23) seems to claim in his multi-page document that it could be hard to immediately locate 4000 mining machines to buy all at once, the expert was unable to come up with any cost or valuation whatsoever for the machines or any documentary proof of such "difficulty" in finding the machines.  In 10 minutes online, Mohawk's staff found 4,000 available immediately for approximately $6,000,000.  HBT itself has not been able to come up with a bill of sale showing the original purchase cost of the equipment several years ago, or even a current price for the equipment today.  The bond required, if the relief requested by HBT is granted, should be sufficient to address the years of non-performance of the eight year contract by HBT **and** the value of the machines, in excess of $6,000,000 for a minimum of $29,000,000 Million.

CONCLUSION

HBT has shown no right to the extraordinary relief it demands. The claims and issues between the parties can be remedied by monetary damages at the conclusion of any litigation in this matter. Further, Mohawk has shown that it is incurring significant financial damages each

month due to HBT's nonperformance of the agreements between the parties. HBT must not be

permitted to abscond with the only movable asset and disappear abroad, with no consequences.

This Court must DENY the motion for preliminary injunction.

Respectfully submitted,

Anna Stewart Whites
ANNA WHITES LAW OFFICE PLLC
327 Logan Street
Frankfort KY 40601
(502) 352-2373 (office)
 Annawhites@aol.com
*Attorney for Defendant Mohawk Energy, LLC*

<u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of
the foregoing was this day served via the
court's electronic filing system upon:

Palmer G. Vance
Lindsey H. Meares
STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, Kentucky 40507-1380

Harout J. Samra
DLA PIPER LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131

This the 8th day of January, 2024.

Anna Stewart Whites