## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## AT LOUISVILLE

| | |
|---|---|
| **HBTPOWER LIMITED,** | CASE NO.: 3:23-cv-628-CHB |
| Plaintiff, | JUDGE: Claria Horn Boom |
| vs. | |
| **MOHAWK ENERGY, LLC,** | |
| Defendant. | |

## HBTPOWER LIMITED'S REPLY
## IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Comes the Plaintiff, HBTPower Limited ("HBTPower"), by counsel, submits this reply in support of its Motion for Preliminary Injunction against Mohawk Energy, LLC ("Mohawk") (DN 23) (the "Motion"), which seeks to (1) enjoin Mohawk from improperly selling, disposing of, encumbering, assigning or using all or some of HBTPower's 2,276 Bitmain Antminer S19j Pro and S19 Pro mining machines (the "S19 Series Miners"); (2) direct Mohawk to account for its sale of HBTPower's 2,059 m30 Series and m31 Series mining machines (the "M Series Miners") (together with the S19 Series Miners, the "Mining Machines") that has already taken place, including to provide proof of payments received and where such funds were utilized; and (3) escrow all funds and consideration received by Mohawk from such sale until these issues are resolved in arbitration (together, the "Parties").

## I. Background and Key Developments

The Motion was filed subsequent to an agreement between the Parties proposed in the Parties' Joint Status Report[1] (DN 21) as accepted by the Court and which rendered HBTPower's Motion for Temporary Restraining Order (DN 16) moot. (See Order dated December 11, 2023, DN-22.) In the Joint Status Report, Mohawk agreed, *inter alia*, to "not sell, dispose, encumber, assign, use or in any manner compromise the mining machines that were delivered at the Premises by HBTPower and are stored thereon." Mohawk also agreed to "allow HBTPower access to the security cameras at the Premises[.]" However, to date, Mohawk has refused to provide access to security cameras to HBTPower on extraneous and manufactured grounds. (See DN 34 at 2.) Mohawk also agreed to allow HBTPower to enter the Premises and "inspect the mining machines and the equipment." Mohawk has now proposed to carry out the inspection only after January 21, 2024, and possibly on January 25, 2024.[2]

The Joint Status Report was filed, in part, pursuant to Mohawk's representation to the Court that "additional older model mining machines were provided by HBTPower" and it "will conduct an inventory promptly to confirm." (See Answer and Counterclaim, DN 14 at ¶29.) **It is not in dispute that HBTPower delivered the Mining Machines to Mohawk, in terms of the License Agreement.** Id. But, despite repeated requests, Mohawk still has not provided the inventory it represented it would conduct. In fact, Mohawk's response to the Motion challenges the ask claiming that "HBT[Power] should already have that inventory in hand." (See DN 34 at 9.) Of course, HBTPower has the inventory of what it delivered, but Mohawk refuses to provide any

---

[1] Capitalized terms have the same meanings as in the Motion, unless separately defined herein.
[2] Mohawk's counsel email dated January 9, 2024 is attached hereto as **Exhibit 1.**

insight into what it actually possesses at the Premises. Thus, the Court cannot rely on Mohawk's representations and injunctive relief is necessary.

In its response to the Motion (the "Response") (DN 34), Mohawk continues to make extra-contractual statements that are contrary to the License Agreement, and provides no evidentiary support for its tangential statements. The Response appears to reflect that this is the third time where a foreign organization entered into an arrangement for bitcoin mining with an entity founded or run by Brandon D. Smith, and the mining machines delivered to Kentucky went missing.[3] As in those cases, here, the M Series Miners, delivered in terms of the License Agreement, have also gone missing from a company owned by Brandon D. Smith. Mohawk states that the M Series Miners were sold on the pretext of "[recouping] $360,000 of past due sums." (See Answer and Counterclaim, DN 14, at ¶ 42.) No sums were contractually due. Indeed, the M Series Miners were sold after HBTPower issued a cease-and-desist letter, and filed the Verified Complaint,[4] and despite response by Mohawk's counsel that attached a letter which stated that "[p]lease be assured that [HBTPower's] mining machines are protected."[5]

Despite its representations, Mohawk is refusing to provide any information on the status of the remaining Mining Machines. HBTPower is now at a greater risk of losing all Mining

---

[3] Upon information and belief, Biofuel Mining, Inc. was co-founded by Brandon D. Smith, who left Biofuel Mining, Inc. after the parties to the dispute in Touzi v.Biofuel Mining, Inc., Eastern District of Kentucky Case No. 3:22-cv-00008-GFVT. News articles reporting Brandon D. Smith's co-founding of Biofuel Mining, Inc. are collectively attached herewith as **Exhibit 2**. The machines in issue there were of the same category as the Mining Machines here.

The other case mentioned by Mohawk, "Biofuel Mining v. VCV, Martin County, Kentucky, Civil Action No. 22-CI-00082," does not exist. Mohawk's attorney claims to be the counsel for Biofuel Mining, Inc. in both. There is an active case (Case no. 22-CI-00091) filed by VCV Power Gamma, Inc. and others against Biofuel Mining, Inc. in the same county.

[4] A copy of email from Mohawk's counsel showing record of sale, and its attachments, are attached herewith as **Exhibit 3**.

[5] See October 12, 2023 Letter attached as Exhibit 5 to DN 23-2.

Machines. Mohawk's conduct before the Court raises grave suspicion. A standstill agreement is already in place before the Court. But, in the absence of an injunctive relief, and until Mohawk is held accountable to its representations and undertakings, Mohawk will likely expropriate the machines completely while refusing compliance on manufactured pretexts. HBTPower will be irreparably harmed by the loss of these machines which are extraordinarily difficult to replace as HBTPower has shown in its Motion..

HBTPower is entitled to the relief sought for the reasons stated in the Motion, and for the reasons set out below.

## II. ARGUMENT

### A. Mohawk will suffer irreparable harm if the injunctive relief is not granted.

HBTPower has shown that it will suffer irreparable harm if Mohawk improperly sells the S19 Series Miners, which were delivered at the Premises in terms of the License Agreement. Mohawk has utterly failed to rebut that showing. Mohawk fails to demonstrate that it would be in a position to meet any potential award against it. HBTPower's reputation and financial standing rests on its investments and the Mining Machines it delivered. HBTPower has explained this in the Motion, and has cited relevant authorities that support injunctive relief. HBTPower's evidence demonstrates that its injury is not fully compensable by monetary damages. This constitutes the requisite showing of irreparable harm.

Mohawk's Response fails to address the various federal law authorities that HBTPower has cited in support. All Mohawk has done in this regard is cite state law. None of the state law standards apply here.

It is settled law in the 6th Circuit that "[a] plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages. However, an injury

- 5 -

is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." Certified Restoration Dry Cleaning v. Tenke, 511 F.3d 535 (6th Cir. 2007) (internal citations omitted).

Indeed, as explained in the Motion, the nature of Mohawk's continuing actions and its impact on HBTPower are such that it will be extremely difficult to calculate damages. HBTPower has already expended more than $12,000,000 in rent, labor, deposits for electricity changes and staff fees, and paid advances for construction and equipment. Mohawk was required under the License Agreement to facilitate commencement of mining activities at the Premises by September 1, 2022. Mohawk failed to make the Premises ready for mining. Mohawk has not provided any support to show otherwise.

The price of Bitcoin has increased by 47% since the Parties entered into the License Agreement.[6] That fluctuation of price, and control over the Mining Machines would have allowed HBTPower to monitor its revenue stream, investments, maintain its reputation and operational efficiency, and to thrive on its resources. Mohawk fails to address any of these factors.

"Irreparable injury based on financial loss alone will only be found where the potential economic loss is so great as to threaten the existence of the movant's business or "financial ruin" will result." Seiu Health Care Mich. v. Snyder, 875 F. Supp. 2d 710, 723 (E.D. Mich. 2012) (citing Performance Unlimited, Inc. v. Questar Pub., Inc., 52 F.3d 1373, 1382–83 (6th Cir.1995). "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." Stenberg v. Cheker Oil Co., 573 F.2d 921, 925 (6th Cir. 1978).

---

[6] A copy of historical chart from https://yhoo.it/48tMNak along with an image of the percentage graph is attached hereto as **Exhibit 4**.

Mohawk simply states that "HBTPower might, in a worst case scenario, have to spend some time and money finding another 2000 machines to mine with at another site." It does nothing to address the concern on collectability on a favorable award against Mohawk, except to state without evidence that "Mohawk […] has been in existence for more than a decade has 20+ employees, owns a multi-million dollar industrial site and 8 acres of prime realty in a burgeoning economic development zone, and is steadily gaining both local and state support for its training and employment programs." Contrary to Mohawk's assertions, upon information and belief, Mohawk was only acquired by Brandon D. Smith in 2022. Mohawk has a reported a turnover of only $80,000, with mere 3 employees.[7] Any assets, if it has, have been acquired from the proceeds paid by HBTPower. Mr. Smith's pattern of owning companies from which mining machines disappear, and then disowning the companies (as he did with Biofuel Mining, Inc.), raises serious concerns. The refusal to comply with undertakings given to court demonstrates Mohawk's utter disregard for law, and makes it highly likely that Mohawk will not be able to deliver on any enforcement action against it.

On the other hand, HBTPower has exhausted a significant chunk of its resources on Mohawk and the License Agreement. The injunction in respect of the mining machines will to an extent protect those, failing which HBTPower will meet its "financial ruin" and "threaten the existence of [HBTPower's] business.

HBTPower notes that Mohawk's submission of a proforma invoice for S19k Pro mining machines is suspect. It does not show that the S19 Series Miners are available. Mohawk has failed to rebut HBTPower's evidence on the value and scarcity of these machines. Mohawk also fails to

---

[7] A publicly available summary of Mohawk's filings is attached hereto as **Exhibit 5**.

address factors such as the additional 25% tariff, shipping costs, custom duties, testing, viability with mining conditions, and power rates required for such mining. In short, there is no question that HBTPower will suffer irreparable harm without the issuance of an injunction and Mohawk has failed to show otherwise.

**B.     HBTPower has a substantial likelihood of success on the merits.**

HBTPower establishes, with particularity, Mohawk's material breaches of the License Agreement. In its Response, Mohawk fails to place anything on record to show that it did not breach the License Agreement, that it did not make fraudulent misrepresentations, or that it did not convert the M Series Miners for its gain and at HBTPower's expense. It simply calls Mr. Wang's declarations as "fraudulent and incorrect," and states that "[l]itigation will be required to fully adjudicate the claims and defenses." (See Response, DN 34 at 21.)

Mohawk conveniently dismisses that it was bound by its representations contained in the License Agreement. (See Motion, DN 23-1 at 13 and 14.) Mohawk has failed to produce any documents on record that it owns the Premises as it represented. This ownership was fundamental to the License Agreement. Mohawk continues to mislead the Court. For instance, Mohawk first states that "[t]he property owner is actually a Mohawk minority member of the corporate entity." (See Answer and Counterclaim, DN 14 at ¶ 30.) It now states that "[…] Mohawk informed HBT that it had purchased the property from a former Mohawk member[.]" (See Response, DN 34 at 15.)

In addition, it alleges extra contractual facts in its defense, such as that Mohawk engaged in training and certification program at the Premises, and that HBTPower harmed it. However, HBTPower was granted an "exclusive, irrevocable license to run, operate, and manage Bitcoin

mining activities on the Premises for the duration of the License Agreement." (See Motion, DN 23-2 at ¶ 10.)

HBTPower has demonstrated the merits of its claims in its Motion and in the Verified Complaint. Mohawk has failed to rebut this position and HBTPower has clearly shown its substantial likelihood of success on the merits.

**C.     The Court can issue a preliminary injunction without a bond.**

Mohawk alleges that HBTPower should have to post a bond "sufficient to address the years of non-performance of the eight year contract by HBT and the value of the machines, in excess of $6,000,000 for a minimum of $29,000,000 Million." (See Response, DN 34 at 21 and 22.) No support is provided for this portion and, again Mohawk improperly places reliance on state law.

It is settled law in this circuit that courts have discretionary power over whether to require posting of security for the purposes of issuing an injunction. "While we recognize that the language of Rule 65(c) appears to be mandatory, and that many circuits have so interpreted it, the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security." Moltan Co. v. Eagle-Picher Industries, Inc., 55 F.3d 1171, 1176 (6th Cir. 1995).

Again, it was Mohawk that materially breached the License Agreement, and failed to satisfy the condition precedents. None of HBTPower's obligations were triggered. It is only HBTPower which is entitled to damages towards non-performance of obligations under the License Agreement. No financial consequence will occur to Mohawk if the injunction issues.

Mohawk's material breaches, misleading statements, and refusal to comply with undertakings given to the Court do not merit any bond requirement, especially when all that Mohawk possesses is a result of payments made by HBTPower in terms of the License Agreement.

### III. CONCLUSION

HBTPower reiterates its request for the relief sought in the Motion for Preliminary Injunction, and requests this Court grant the Motion.

Respectfully submitted,

STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, Kentucky 40507-1380
(859) 231-3000
(859) 253-1093 facsimile

By: /s/Palmer G. Vance II
    Palmer G. Vance II
    Lindsey H. Meares

and

Harout J. Samra
DLA PIPER LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8500
Facsimile: (305) 437-8131
Florida Bar No. 70523
Harout.Samra@us.dlapiper.com

Admitted *pro hac vice*

COUNSEL FOR PLAINTIFF,
HBTPOWER LIMITED

## CERTIFICATE OF SERVICE

I certify that on January 16, 2024, I served the foregoing via CM/ECF, which will send all parties of record a notice of electronic filing, including the following:

Anna Stewart Whites
Anna Whites Law Office
327 Logan Street
P.O. Box 4023
Frankfort, KY 40601
E: annawhites@aol.com
COUNSEL FOR DEFENDANT,
MOHAWK ENERGY, LLC

/s/ Palmer G. Vance II
*Counsel for Plaintiff,*
*HBTPower Limited*